John E. Bloomquist
Calli J. Michaels
BLOOMQUIST LAW FIRM, P.C.
220 South Pacific Street
P.O. Box 1418
Dillon, MT 59725-1418
(406) 683-8795
cmichaels@helenalaw.com
        *Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| **2-BAR RANCH LIMITED PARTNERSHIP, a Montana limited partnership; BROKEN CIRCLE RANCH COMPANY, INC., a Montana profit corporation; R BAR N RANCH, LLC, a Montana limited liability corporation,**<br><br>     **Plaintiffs,**<br><br>     **v.**<br><br>**UNITED STATES FOREST SERVICE, an Agency of the United States Department of Agriculture; SONNY PERDUE, in his official capacity as Secretary of the United States Department of Agriculture; VICTORIA CHRISTIANSEN, in her official capacity as Interim Chief of the Forest Service; LEANNE MARTEN, in her official capacity as Regional Forester for the Northern Region; MELANY GLOSSA, in her official capacity as Forest Supervisor for the Beaverhead–Deerlodge National Forest, State of Montana; CAMERON RASOR, in his official capacity as District Ranger for the Pintler Ranger District in the Beaverhead–Deerlodge National Forest,**<br><br>     **Defendants.** | **Case No.: _____**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

Plaintiffs 2-Bar Ranch Limited Partnership ("Two Bar Ranch"), Broken Circle Ranch Company, Inc. ("Broken Circle Ranch"), and R Bar N Ranch, LLC ("R Bar N") (collectively "Plaintiffs"), by and through their undersigned counsel, allege and assert as follows:

## I.   INTRODUCTION

1.   This is a civil action for judicial review under the Administrative Procedure Act ("APA").  Plaintiffs challenge findings and conclusions contained in Defendants' final administrative decision, issued by Forest Supervisor Melany Glossa for *In re Appeal of Suspension of a Portion of Term Grazing Permit for Dry Cottonwood Allotment — File Code 2230* (also known as USFS Appeal Nos. BDNF-18-1, BDNF-18-2, and BDNF-18-3) on April 18, 2018, discretionary review denied May 1, 2018.  A true copy of the final administrative decision is attached as **Exhibit A** and incorporated by reference.

2.   Defendants violated the APA, the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1604–1614, and agency regulations and guidance by finding that the allowable use standards set forth in the *2009 Beaverhead–Deerlodge National Forest Land and Resource Management Plan* ("2009 Forest Plan") do not apply to Dry Cottonwood Allotment and by modifying Plaintiffs permits to include allowable use standards from an Environmental Assessment that was completed in 1996.  Plaintiffs are entitled to clear, well-defined, achievable

standards that comport with law.  Plaintiffs were deprived of clear, well-defined, achievable standards that comport with law by being required to meet outdated standards that are vague, poorly defined, difficult to measure, unrealistic, inappropriate for the type of rangeland on Dry Cottonwood Allotment, and inconsistent with the 2009 Forest Plan.  This Court can redress Plaintiffs' injury by (a) setting aside the portion of the final agency decision that finds the allowable use standards in the 2009 Forest Plan do not apply to Dry Cottonwood Allotment, (b) declaring the outdated standards unlawful, and (c) directing Defendants to apply the 2009 Forest Plan's standards on the Allotment.

3.      Defendants violated the APA, NFMA, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370d, and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–1787, by modifying Plaintiffs' term grazing permits to include an unsigned, undated, and otherwise invalid "allotment management plan" that is not consistent with the 2009 Forest Plan. Defendants are required to consult with permittees and consider their advice before implementing an allotment management plan.  Defendants failed to consult with Plaintiffs or consider their advice before modifying their permits to include an unsigned, undated document that Defendants claim is the valid allotment management plan.   Plaintiffs were denied their procedural right to review, comment on, and otherwise consider the allotment management plan that

Defendants now seek to implement.  The document Defendants seek to use as an allotment management plan contains outdated standards, fails to account for ecosystems with different objectives concerning wildlife and fisheries, and fails to consider different management goals and grazing practices.  As explained in the Final Environmental Impact Statement for the 2009 Forest Plan, the outdated standards afford significantly less protection to riparian areas because they are not designed to protect aquatic resources and improve watershed conditions.  In addition, the impact of livestock management on riparian resources under the outdated standards is greater than that under the 2009 Forest Plan.  Plaintiffs enjoy the Allotment for its aesthetic and recreational value, rely on healthy rangelands in the Allotment to provide forage and habitat for wildlife that Plaintiffs enjoy seeing and hunting, and for forage and habitat for their livestock.  Plaintiffs rely on the healthy riparian areas and aquatic resources to protect fisheries and to improve water quality on the Allotment and downstream for Plaintiffs' personal and ranch uses.  Plaintiffs also rely on healthy riparian areas and rangelands on the Allotment to avoid noxious weed infestations both on the Allotment and on their private property.  This Court can redress Plaintiffs' injury by (a) declaring the document that Defendants seek to implement invalid, (b) setting aside the portion of the final agency decision that modifies Plaintiffs' term grazing permits to include the document, and (c) directing Defendants to comply with the 2009 Forest Plan.

4.     Defendants violated the APA, regulations, and agency guidance by issuing a Notice of Noncompliance without first attempting to resolve the issues informally, failing to provide detailed notice of the alleged issues, and failing to provide an opportunity to comply.  Defendants are required to attempt to resolve perceived issues with permittees informally before taking further action.   If informal attempts to resolve fail, Defendants must provide clear notice of the alleged violation, identify how the permittee can cure the violation, specify a date by which the violation must be cured, and allow the permittee an opportunity to cure.  Only if the permittee fails to cure the violation by the specified date can Defendants commence adverse administrative actions.  Plaintiffs are entitled to the procedural rights described above.  Plaintiffs were denied their procedural rights when Defendants' failed to address the perceived issues informally, notify Plaintiffs of a specific violation, identify how the violation could be cured, specify when the corrective action should be completed, and allow Plaintiffs an opportunity to cure.  This Court can redress Plaintiffs' injury by setting aside the portion of the final agency decision that issues a procedurally deficient Notice of Noncompliance for the 2017 grazing season and declaring the prior procedurally deficient Notice of Noncompliance invalid.

5.     Defendants violated the APA, regulations, and agency guidance by arbitrarily and capriciously issuing a Notice of Noncompliance for the 2017

grazing season that fails to apply the allowable use standards required by law and which is not supported by fact or evidence of the alleged violations.  Defendants may not punish Plaintiffs for perceived violations that never in-fact occurred. Defendants acted arbitrarily and capriciously by issuing a Notice of Noncompliance without any evidence to support the purported violations. Plaintiffs are adversely affected and injured by the Notice of Noncompliance because the Notice of Noncompliance appears as a black mark on their grazing record that sets them up for adverse administrative action in the 2018 grazing season.  This Court can redress Plaintiffs' injury by setting aside the portion of the final agency decision that issues a Notice of Noncompliance for the 2017 grazing season that contains no facts to support the alleged violation and declaring invalid the prior Notices of Noncompliance, which also lacked evidence to support the alleged violations.

6.     Plaintiffs also seek a declaratory judgment, injunctive relief, the award of costs and expenses of suit, including attorney fees pursuant to the Equal Access to Justice Act (28 U.S.C. § 2412; 5 U.S.C. § 504), and such other relief as this Court deems just and proper.

## II.     JURISDICTION

7.     Plaintiffs reassert and reallege the allegations in ¶¶ 1 through 6 as if fully set forth herein.

8.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States, including: 5 U.S.C. §§ 551–559, 701–706 (Administrative Procedure Act); 16 U.S.C. §§ 1600–1614 (National Forest Management Act); 42 U.S.C. §§ 4321–4370d (National Environmental Policy Act); 43 U.S.C. §§ 1701–1787 (Federal Land Policy and Management Act); 28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act); 28 U.S.C. § 2412, 5 U.S.C. § 504 (Equal Access to Justice Act).

9.     Jurisdiction is also proper in this Court under 28 U.S.C. § 1346(a)(2) because this action is against the United States and founded upon federal statutes and regulations.

10.     An actual controversy exists between Plaintiffs and Defendants. Defendants have deprived Plaintiffs of their procedural rights, imposed illegal standards that are harmful to Plaintiffs, and arbitrarily and capriciously initiated adverse administrative action against Plaintiffs without evidence to support the alleged violations.

11.     Plaintiffs rely and depend upon seasonal livestock grazing on Dry Cottonwood Allotment to maintain their ranching operations.  Plaintiffs rely and depend on healthy and diverse rangelands and aquatic resources within Dry Cottonwood Allotment for cultural, recreational, aesthetic, and economic purposes, including healthy forage and habitat for fish, wildlife, birds, insects, and their own

livestock.  Plaintiffs' rely on Dry Cottonwood Allotment to ensure a healthy wildlife community for their own hunting and viewing purposes, ensure healthy aquatic resources for fish, wildlife, livestock, and their own personal and ranch use, and to minimize the danger of weeds encroaching on the native vegetation on the Allotment and spreading to their adjoining private properties.

12.    Plaintiffs' interests in a healthy and well-managed rangeland within Dry Cottonwood Allotment are and will be adversely affected by Defendants' findings that the allowable use standards set out in the 2009 Forest Plan do not apply to Dry Cottonwood Allotment because, as the USFS stated in the Final Environmental Impact Statement for the 2009 Forest Plan, the standards in the 2009 Forest Plan are "specifically designed to protect aquatic resources" and will improve the watersheds and riparian areas in a way that prior standards did not.

13.    Plaintiffs' interests in a healthy and well-managed rangeland within Dry Cottonwood Allotment are and will be adversely affected by Defendants' use of outdated allowable use standards on the Allotment because the outdated standards are vague, poorly defined, difficult to measure, difficult to follow, and not consistent with what the USFS has found to be the more appropriate and more beneficial standards for riparian and aquatic areas.

14.    Plaintiffs have suffered legal wrong and been adversely affected and aggrieved by erroneous legal and factual findings and conclusions contained in

Defendants' final administrative decision, and are entitled to review, pursuant to 5 U.S.C. § 702.

15.     The federal government has waived sovereign immunity in this action, pursuant to 5 U.S.C. § 702.

16.     Plaintiffs have exhausted their administrative remedies, pursuant to 7 U.S.C. § 6912(e); 36 C.F.R. § 214.20.

## III.   VENUE

17.     Plaintiffs reassert and reallege the allegations in ¶¶ 1 through 16 as if fully set forth herein.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because this action is against the United States, a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and the public lands at issue are located in this district.   D. Mont. L.R. 1.2(c)(2) (Deer Lodge County is within the Butte Division of the United States District Court, District of Montana, in Butte, Montana).

## IV.   PARTIES

19.     Plaintiffs reassert and reallege the allegations in ¶¶ 1 through 18 as if fully set forth herein.

20.     Plaintiff 2-BAR RANCH LIMITED PARTNERSHIP is a limited partnership organized under the laws of Montana and authorized to conduct

business within the State of Montana.  Two Bar Ranch is a family owned and operated cattle ranch in Powell County, Montana.  The ranch has been owned and operated by the same family since 1909 and has been a permittee on Dry Cottonwood Allotment for the same period of time.

21.   Plaintiff BROKEN CIRCLE RANCH COMPANY, INC. is a corporation organized under the laws of Montana and authorized to conduct business within the State of Montana.  Broken Circle Ranch is a family owned and operated cattle ranch in Powell County, Montana.  The ranch has been a permittee on Dry Cottonwood Allotment since 2004.

22.   Plaintiff R BAR N RANCH, LLC is a limited liability company organized under the laws of Montana and authorized to conduct business within the State of Montana.  R Bar N is a family owned and operated cattle ranch in Deer Lodge County, Montana.  The ranch has been a permittee on Dry Cottonwood Allotment since 2006.

23.   Each Plaintiff is currently authorized to graze livestock on National Forest System lands within Dry Cottonwood Allotment in the Pintler Ranger District of the Beaverhead–Deerlodge National Forest.

24.   Plaintiffs' ranches do not have publicly traded stock, nor are they part of any other corporate entities that have publicly traded stock.

25.     The economic viability, market value, and operational integrity of the Plaintiffs' ranches rely upon use of Dry Cottonwood Allotment.

26.     Livestock grazing is authorized on Dry Cottonwood Allotment to protect and improve the rangeland and riparian resources and to preserve the Allotment's value as land designated for "multiple use."

27.     Livestock grazing is a statutorily protected multiple use on federal lands managed by the USFS, including on Dry Cottonwood Allotment.

28.     Plaintiffs have met the statutory and regulatory requirements and qualifications to hold a term grazing permit for the Allotment.  At all times prior to and during this controversy, Plaintiffs have maintained their qualifications to hold their term grazing permits.

29.     Plaintiffs have been and will continue to be injured by Defendants' actions in this matter.

30.     Defendants administer the National Forest System lands within Dry Cottonwood Allotment pursuant to statutory and regulatory authority.  Dry Cottonwood Allotment is located in Deer Lodge County, Montana.

31.     Defendant UNITED STATES FOREST SERVICE is a federal governmental agency charged with managing National Forest System lands.  As an agency responsible for managing federal lands, the USFS is required to follow and

implement the United States Constitution, federal laws, and regulations governing the use of National Forest System lands.

32.    Defendant SONNY PERDUE is sued in his official capacity as Secretary of the United States Department of Agriculture.  Secretary Perdue is responsible for the direction and supervision of all operations and activities in the Department of Agriculture, including those actions taken by the USFS, an agency of the Department of Agriculture.  Secretary Perdue and his employees, officers, agents, and assigns are charged with following and implementing the U.S. Constitution and the federal laws and regulations governing the management and use of National Forest System lands.

33.    Defendant VICTORIA CHRISTIANSEN is sued in her official capacity as Chief of the USFS.  Chief Christiansen is responsible for the direction and supervision of all operations and activities within the USFS.   Chief Christiansen and her employees, officers, agents, and assigns are charged with following and implementing the U.S. Constitution and the federal laws and regulations governing the management and use of those National Forest System lands.

34.    Defendant LEANNE MARTEN is sued in her official capacity as Regional Forester, Northern Region, USFS.   Regional Forester Marten is responsible for the direction and supervision of all operations and activities on

National Forest System lands in the Northern Region, which includes the State of Montana.   Regional Forester Marten and her employees, officers, agents, and assigns are charged with following and implementing the U.S. Constitution and the federal laws and regulations governing the management and use of those National Forest System lands.

35.   Defendant MELANY GLOSSA is sued in her official capacity as Forest Supervisor for the Beaverhead–Deerlodge National Forest, located in the State of Montana.   Forest Supervisor Glossa is responsible for the direction and supervision of all operations and activities on the Beaverhead–Deerlodge National Forest and for implementing and following land and resource management plans for the forest.   Forest Supervisor Glossa and her employees, officers, agents, and assigns are charged with following and implementing the U.S. Constitution and the federal laws and regulations governing the management and use of those National Forest System lands.

36.   Defendant CAMERON RASOR is sued in his official capacity as District Ranger of the Pintler Ranger District in the Beaverhead–Deerlodge National Forest.   District Ranger Rasor is responsible for the direction and supervision of all operations and activities in the Pintler Ranger District, including those on Dry Cottonwood Allotment.   District Ranger Rasor and his employees, officers, agents, and assigns are charged with following and implementing the U.S.

Constitution and the federal laws and regulations governing the management and use of those National Forest System lands.

## V.     FACTUAL ALLEGATIONS

37.     Plaintiffs reassert and reallege the allegations in ¶¶ 1 through 36 as if fully set forth herein.

History of Management on Dry Cottonwood Allotment

38.     Dry Cottonwood Allotment is a USFS grazing allotment located within the East Deerlodge Management Area of the Clark Fork Flint Landscape in the Pintler Ranger District of the Beaverhead–Deerlodge National Forest.

39.     In 1995, the USFS completed an Environmental Assessment for Dry Cottonwood Allotment to determine whether—and on what conditions—it should re-issue ten-year term grazing permits.  The conditions for grazing were all taken from the Deerlodge Forest Plan, which had recently adopted the INFISH-1995 standards for monitoring riparian conditions.  The 1995 Environmental Assessment did not develop site-specific allowable use standards tailored to Dry Cottonwood Allotment, it merely applied those standards already adopted in the Deerlodge Forest Plan.  In other words, the 1995 Environmental Assessment did nothing more than apply the Deerlodge Forest Plan—with its INFISH-1995 standards--to Dry Cottonwood Allotment.

40.   In 1996, the USFS issued a Decision Notice and Finding of No Significant Impact authorizing ten-year term grazing permits for Dry Cottonwood Allotment and adopting the INFISH-1995 riparian mitigation measures, as set out in the Deerlodge Forest Plan.  The standards, shown below, require the USFS to determine the vegetative community, resiliency/resistance, and season of use for each location where monitoring is conducted:

| Vegetative Community | Parameter | Resiliency/Resistance | | |
| --- | --- | --- | --- | --- |
| | | Low | Medium | High |
| Conifers Shrubs Sedges | Stream Disturbance Stubble Height* Woody Utilization Forage Utilization | 20% 6-8-8 in 20% 35% | 25% 5-6-7 in 25% 40% | 35% 5-6-7 in 25% 40% |
| Deciduous Trees & Native Grasses | Stream Disturbance Stubble Height* Woody Utilization Forage Utilization | 30% 6-8-8 in 20% 35% | 45% 6-6-7 in 20% 40% | 45% 5-6-7 in 25% 40% |
| Introduced Grasses, ARTTRI, POTFRU & other herb | Stream Disturbance Stubble Height* Woody Utilization Forage Utilization | 50% 3-3-4 in 20% 50% | 65% 2-2-3 in 20% 50% | 65% 2-2-3 in 25% 50% |

*Allowable stubble height at water's edge varies with season of grazing.  Early season use (roughly June through mid-July) allows stubble heights to be reduced since regrowth is expected.  Mid-season is considered to be mid-July through mid-August and late season use is late August to the end of October.

Neither the Environmental Assessment from 1995 nor the Decision Notice from 1996 analyze which vegetative community and resiliency/resistance designation apply for the various riparian areas in Dry Cottonwood Allotment, making the standards both vague and useless.

41.    Although several USFS documents refer loosely to an allotment management plan issued in 1996, Defendants have not produced any such plan or supporting NEPA analysis.  Plaintiffs recall no consultation period leading up to a plan's implementation.   Defendants have produced two draft documents, each labeled "allotment management plan," neither of which are signed or dated. Defendants concluded that one of the draft documents *must* be a valid allotment management plan since no fully executed document has been found.   Neither document contains allowable use standards.   One document states that the "Riparian Mitigation Measures are attached," but nothing is attached to the document.    The same document identifies vegetative communities and resiliency/resistance standards for the four primary riparian areas on the Allotment, but Defendants have not produced the NEPA documents supporting the designations.

42.    In 1997, the USFS implemented the Beaverhead Riparian Amendment as part of a settlement agreement in a lawsuit.  The Amendment modified the Beaverhead Forest Plan's riparian mitigation measures.  Also in 1997, the USFS provided Riparian Mitigation Measures for the Deerlodge National Forest and attached them to Plaintiffs grazing permits with instructions that they be followed. The import and validity of the 1997 Riparian Mitigation Measures is unclear.

43.    In 2008, the USFS issued its Final Environmental Impact Statement for the 2009 Forest Plan.   The USFS explained that the 1996 administrative consolidation of the Beaverhead and Deerlodge National Forests had resulted in three separate sets of aquatic habitat direction on the Beaverhead–Deerlodge National Forest and that the USFS intended to merge the direction into a comprehensive strategy for the entire Forest.

44.    The 2008 Final Environmental Impact Statement considered six alternatives, one of which would have retained the Deerlodge Forest Plan (including the INFISH-1995 Amendment that the 1995 Environmental Assessment adopted for use on Dry Cottonwood Allotment) for management areas like Dry Cottonwood Allotment located west of the Continental Divide.   The USFS determined that the Deerlodge Forest Plan and INFISH-1995 Amendment did not adequately protect aquatic resources or mitigate impacts from livestock grazing. Accordingly, the USFS *rejected* the allowable use standards in the Deerlodge Forest Plan and its INFISH-1995 Amendment in favor of INFISH-2005 and additional forest-wide direction contained in the 2009 Forest Plan for management areas located west of the Continental Divide.   Page 111 of the 2009 Forest Plan clarifies that the only standards that apply within the East Deerlodge Management Area—which contains Dry Cottonwood Allotment—are the forest-wide standards identified within the plan itself.   Unlike the outdated standards, the standards

provided in the 2009 Forest Plan are tailored to the different ways in which allotments are used and do not require the USFS to determine vegetative communities and resiliency/resistance for each reach of stream where they are to be applied.   The standards that apply to Dry Cottonwood Allotment are set out below:

| Category | Deferred or Rest-Rotation | Area | Key Species *(others may be used for specific allotments)* |
|---|---|---|---|
| Upland range utilization | ≤ 55% of forage utilized on suitable range on 85% of the area.<br><br>≤ 65% utilization on remaining 15%. | Suitable range. | Idaho fescue Bluebunch-wheatgrass Rough fescue |
| Streambank Disturbance | ≤ 30% streambank disturbance measured by reach. | 85% of riparian habitat, by stream reach, within suitable range for each pasture.  5% of riparian habitat could exceed standards on a repeat basis (crossings). | n/a |
| Riparian Stubble Height | Green Line ≥ 4" measured by reach, flood plain ≥ 3" measured by reach. | 85% of riparian habitat, by stream reach, within suitable range for each pasture. | Sedges, rushes Bluejoint reedgrass Tufted hairgrass |

45.    Despite clear direction in the 2009 Forest Plan and its implementing Final Environmental Impact Statement, Defendants have refused to relinquish the outdated Deerlodge Forest Plan and its INFISH-1995 standards by claiming that their draft allotment management plan overrides the 2009 Forest Plan.

History of Use on Dry Cottonwood Allotment

46.    Dry Cottonwood Allotment is divided into four pastures:  Orofino Pasture, Basin Pasture, Hilltop Pasture, and Butte-Pacific Pasture.

47.    Plaintiffs graze cattle on the Allotment seasonally pursuant to ten-year term grazing permits issued by the USFS.

48.    Plaintiffs utilize a rest-rotation system, rotating cattle between three of the four pastures in the Allotment each year and allowing the fourth pasture to rest and recover.  The pasture that is rested changes each year.

49.    A rest-rotation grazing system promotes rangeland health by giving the vegetation in one pasture a full growing season to produce seed and restore energy without disruption.   Because each pasture receives a rest year, the vegetation can withstand more intensive grazing when the pasture is in use, as reflected in the allowable use standards provided in the 2009 Forest Plan.

50.    Plaintiffs have a long history of cooperating and collaborating with the USFS on Dry Cottonwood Allotment.  Plaintiffs have always worked and communicated effectively with the USFS about management on the Allotment.

51.    Two Bar Ranch has been a permittee on the Allotment for over one hundred years.    Until 2016, the ranch had never received a Notice of Noncompliance or other citation indicating that it was not performing its

obligations under the term grazing permit. Two Bar Ranch did not change management in 2016.

52.    Broken Circle Ranch has been a permittee on the Allotment since 2006. Until 2016, the ranch had never received a Notice of Noncompliance or other citation indicating that it was not performing its obligations under the term grazing permit. Broken Circle Ranch is unaware of its predecessors ever having received a negative citation. Broken Circle Ranch did not change management in 2016.

53.    R Bar N has been a permittee on the Allotment since 2008. Until 2016, the ranch had never received a Notice of Noncompliance or other citation indicating that it was not performing its obligations under the term grazing permit. R Bar N is unaware of its predecessors ever having received a negative citation. R Bar N did not change management in 2016.

54.    Plaintiffs have a vested interest in the long-term health and diversity of the rangeland on Dry Cottonwood Allotment to support their livestock grazing operations, abundant wildlife, fish, birds, and insects, and other aesthetic, cultural, recreational, and economic interests. On their own initiative, Plaintiffs have hired riders to distribute livestock, moved unauthorized cattle off the Allotment, developed new water sources, improved grazing practices, and proposed land management options to improve the rangeland, protect fences and water

developments, install new off-stream water developments, and erect exclosures around high use areas.

55.    Defendants have obstructed Plaintiffs' efforts to improve rangeland management practices by dismissing their ideas.  For reasons they do not explain, Defendants refuse to authorize exclosure fences around high use riparian areas. When neighboring landowners fail to maintain border fences and drive unauthorized cattle onto the Allotment and when public land users leave gates open so cattle can roam at will, Defendants look away and blame Plaintiffs for the damage that results.

56.    Dry Cottonwood Allotment is one of the largest allotments in the Beaverhead–Deerlodge National Forest.  Between its size and terrain, Plaintiffs cannot check every structural improvement in the Allotment on a daily or even a weekly basis.  Rather than notifying Plaintiffs when they find a damaged structural improvement so Plaintiffs can repair the damage, Defendants wait until the grazing season is over, cite Plaintiffs for violations of their grazing permits, and withhold information about which, if any, structural improvements are out of compliance.

57.    The current administration has frustrated management by requiring Plaintiffs to receive written permission before they can leave designated roadways to check structural improvements, failing to clean up downed timber, and requiring logging companies to leave slash scattered over the rangeland such that Plaintiffs

cannot easily navigate the Allotment.  When Plaintiffs identify water developments for improvement they must wait for Defendants to authorize the improvements, secure funding, and provide the necessary materials before Plaintiffs can complete the work.

58.    Although tree fall is a leading cause of damage to fences and structural improvements, Defendants do not remove trees or allow logging around fences and water developments, so Plaintiffs' efforts to maintain structural improvements become an exercise in futility.  In addition, many of the water sources on the Allotment are ephemeral, making repairs superfluous after the sources have dried up.

59.    Prior to 2015, the USFS cooperated and consulted with Plaintiffs regarding management on the Allotment.  When the USFS had concerns, it brought them to the Plaintiffs' attention immediately so Plaintiffs could address the issues rather than waiting for the grazing season to conclude before bringing them up. When the former district ranger identified an area of heavy livestock use in the Allotment, she met Plaintiffs on the Allotment, showed them the area of concern, discussed options to restrict livestock access, and ultimately decided on a solution. The issue was addressed and resolved collaboratively, no punitive action was needed.

60.     Prior to 2015, the USFS did not resort to punitive actions unless collaborative efforts failed.   Collaborative efforts have never failed on Dry Cottonwood Allotment.

History of Events in 2015

61.     In March of 2015, Plaintiffs were informed that an administration change had taken place at the Pintler Ranger District and that Cameron Rasor and Amanda Weaver would be the new rangeland management specialists on the Allotment.  Weaver would be the primary contact.

62.     In 2015, Plaintiffs used the Allotment much as they had in the past. They hired a rider to check the Allotment twice each week and other riders were on the Allotment weekly as time permitted.

63.     Weaver did not communicate much with Plaintiffs, and Plaintiffs did not communicate much with her in 2015.

64.     The 2015 grazing season was uneventful.  Defendants did not inform Plaintiffs of any issues on the Allotment during or after the 2015 grazing season.

History of Events in 2016

65.     On May 4, 2016, Plaintiffs met with Weaver for their annual meeting to discuss the coming grazing season.   Plaintiffs proposed a different grazing rotation that would divide the cattle into two herds.  Weaver accepted the proposal.

66.    Weaver informed Plaintiffs that they were now individually responsible for certain structural improvements within the Allotment.  Plaintiffs explained that Weaver's system would require them to duplicate each other's efforts and that in the past they had worked together and taken turns checking structural improvements based on who was in certain pastures at certain times. Weaver stated that Plaintiffs were to use her system regardless.

67.    Defendants did not discuss rangeland health or allowable use concerns at the 2016 meeting.  Defendants never suggested that Plaintiffs had exceeded livestock grazing standards during the 2015 grazing season.

68.    On June 9, 2016, Defendants sent Plaintiffs their Annual Operating Instructions ("AOI") for 2016.  Defendants described the instructions as "our agreement about the management and operation of the Dry Cottonwood Allotment for the upcoming grazing season."  The AOI explained the new grazing rotation and the new system for maintaining structural improvements and provided other general instructions and template language.  The AOI did not state that Plaintiffs had exceeded allowable use standards in 2015 or otherwise indicate that forage utilization was an issue.

69.    USFS policy provides that the USFS will pay fifty percent (50%) of the cost of structural improvements (typically by buying the supplies) and the permittees will pay the other fifty percent (50%) (typically by supplying the labor).

70.    In June of 2016, Rick Cline of R Bar N identified a water development that needed a new headbox and requested supplies from Weaver. Weaver informed Mr. Cline that she did not have funds available. R Bar N and Broken Circle Ranch purchased the materials and rebuilt the headbox at their own expense.

71.    Throughout 2016, Plaintiffs informed Weaver that they were having trouble accessing all areas of the Allotment and maintaining structural improvements due to the number of new fences around private inholdings, downed trees and logging slash left according to USFS policy, and trees falling on fences and structural improvements. Weaver explained that she had no control over forest management.

72.    A person who allows livestock to enter or remain on National Forest System lands without a permit violates federal law. If a landowner fails to maintain fences between his property and National Forest System lands such that the landowner's livestock can and do access land belonging to the USFS, that landowner violates 36 C.F.R. § 261.7.

73.    In 2016, Plaintiffs informed Weaver that Lampert Ranch was not maintaining its boundary fences and that forty (40) to sixty (60) pairs of the neighbor's cattle were trespassing in Butte–Pacific Pasture every day. Plaintiffs also informed Weaver that Gail Duncan was pushing Lampert Ranch's cattle onto

the Allotment to keep them off private land she wanted to lease.  Plaintiffs moved the trespass cattle off the Allotment and back to Lampert Ranch multiple times per week, but the cattle returned daily.  In the past, when trespass cattle entered the Allotment, the USFS had sent the offending party a letter and the problem was corrected.  Plaintiffs repeatedly asked Defendants to enforce USFS regulations that prohibit unauthorized livestock from entering and remaining on National Forest System Lands, but the trespasses continued.  To Plaintiff's knowledge, Defendants took no action to enforce 36 C.F.R. § 261.7.

74.     Failing to reclose any gate on National Forest System lands is a federal offense.  36 C.F.R. § 261.7.

75.     In 2016, Plaintiffs contacted Weaver on multiple occasions to inform her that USFS gates were being left open between Hilltop Pasture and Butte–Pacific Pasture, such that Plaintiffs could not keep their livestock in the pasture authorized under their AOI.  Plaintiffs' rider was on the allotment two to three times per week moving livestock back to the correct pasture and closing the gates.

76.     Plaintiffs asked that the gates be locked since the public could use the adjacent cattle guard.  Weaver informed Plaintiffs she would not lock the gates and suggested putting up "Please Close the Gate" signs.  Plaintiffs informed her that the gates already had signs, but they were not working.  Defendants took no action to cure the problem or enforce 36 C.F.R. § 261.7(c).

77.     In 2016, Butte–Pacific Pasture received exceptionally high use due to Plaintiffs' cattle moving from Hilltop Pasture to Butte–Pacific Pasture through the gates left open by the public and the forty (40) to sixty (60) pairs of trespass cattle entering Butte–Pacific Pasture from Lampert Ranch.  Plaintiffs knew the pasture was being grazed to heavily, but were helpless to cure the situation without Defendants' cooperation.  Defendants did nothing to assist.

78.     On August 15, 2016, Mr. Cline of R Bar N left two blocks of salt near Perkins Gulch in Butte–Pacific Pasture.  The following day, while Mr. Cline was on the Allotment working on a spring, Weaver saw the salt and informed him that it was too close to a riparian area.  The salt was removed within an hour.  The salt was near Perkins Gulch for less than 48 hours before it was moved.

79.     On September 23, 2016, then-district ranger Charlene Bucha sent Plaintiffs a letter reminding them of the AOI provisions on salting and off-road motorized vehicle use.  The letter did not indicate that Plaintiffs had violated either provision, but simply reminded Plaintiffs of them.

80.     On November 15, 2016, Defendants sent Plaintiffs a Notice of Noncompliance identifying three alleged violations: (1) inappropriate salting; (2) lack of structural improvement maintenance; and (3) exceeding grazing allowable use standards.

81.    Plaintiffs were aware of the salting incident, which had been corrected immediately after Weaver informally addressed the issue with Mr. Cline.   The Notice of Noncompliance, however, said nothing about the violation having been corrected and treated the incident as an on-going issue to be corrected in 2017.

82.    Plaintiffs were also aware that allowable use standards had been exceeded on at least part of Butte–Pacific Pasture as a result of the unauthorized use by trespass cattle.  The Notice of Noncompliance, however, blamed Plaintiffs for the heavy utilization and did not even mention the issues with Lampert Ranch's trespass cattle or gates being left open.   Instead, the Notice of Noncompliance portrayed the salting incident as the sole cause of heavy utilization in Butte–Pacific Pasture *even though* the salt was in place for less than 48 hours.

83.    The Notice of Noncompliance also stated that two other sites had exceeded one or more allowable use standards, but the monitoring results and summary provided in the Notice of Noncompliance did not support the allegation. At most, the results showed that utilization had been high at one location along two creeks in the Allotment, but exceeding utilization standards at one location is not a violation, as explained in the 2009 Forest Plan and Plaintiffs' 2016 AOI.   Up to fifteen percent (15%) of the sampled habitat can exceed standards, so long as the remaining eighty-five percent (85%) meets the standards.

84.     Weaver had mentioned that certain problem areas along creeks where access had become an issue were receiving heavy use, but otherwise Defendants had not spoken to Plaintiffs about alleged resource concerns or taken them into the field to show them the alleged problems.  Plaintiffs had no reason to suspect they were not meeting allowable use standards—other than in Butte–Pacific Pasture— prior to receiving the 2016 Notice of Noncompliance.

85.     The final violation alleged in the 2016 Notice of Noncompliance— structural improvement maintenance—also came as a surprise.  Plaintiffs had communicated with Weaver about structural improvements throughout 2016 as they performed regular maintenance and improved the developments identified in the 2016 AOI.  Defendants had never indicated that Plaintiffs were not meeting expectations.

86.     The 2016 Notice of Noncompliance claimed that Plaintiffs had needed to improve maintenance on structural improvements, but failed to identify a single fence or structural improvement that was in disrepair.   The only water developments identified in the Notice of Noncompliance were the three Plaintiffs had assessed for reconstruction in 2017 so Defendants would have time to purchase the necessary supplies.

87.     The 2016 Notice of Noncompliance did not instruct Plaintiffs on how to correct the alleged violations or give them deadlines by which the corrections

should be completed.  Instead, the Notice of Noncompliance referred generally to objectives for the 2017 grazing season as though the Notice of Noncompliance was no more than an AOI.

88.    Having never received a Notice of Noncompliance before and not finding any clear violations or instructions for how to correct the alleged violations in the Notice of Noncompliance, Plaintiffs assumed all of the alleged violations had—like the salting incident—already been corrected.  Plaintiffs treated like the Notice of Noncompliance like operating instructions, which is how it was worded.

History of Events in 2017

89.    On May 3, 2017, Plaintiffs met with Defendants to plan for the 2017 grazing season.  As usual, the meeting focused on structural improvements and grazing rotation.  Weaver indicated that all structural improvements should be complete before Plaintiffs turned livestock into the Allotment.  Plaintiffs explained that many of the structural improvements were still inaccessible with snow and downed timber and that maintaining any of them before they were ready for use was inefficient because falling trees, weather, and wildlife caused continual damage.  Weaver agreed that Plaintiffs could work on the structural improvements throughout the summer.

90.     Weaver did not discuss the 2016 Notice of Noncompliance, offer to work with Plaintiffs on allowable use monitoring, or otherwise indicate that Plaintiffs needed to alter grazing practices during the 2016 meeting.

91.     Defendants issued the 2017 AOI on May 5, 2017.  The AOI referred to the Notice of Noncompliance and reminded Plaintiffs that "failing to correct these violations" could result in suspension or cancellation procedures, but failed to explain what the violations were, how they could be corrected, or when they should be corrected.

92.     Without additional guidance from the meeting with Defendants or the AOI, Plaintiffs continued to believe that all of the alleged violations had already been corrected.

93.     Throughout the summer of 2017, Plaintiffs maintained structural improvements and updated Weaver with text messages containing photographs documenting their progress.  Tree fall continued to be an issue, Broken Circle Ranch cut more than sixty (60) downed trees off a single stretch of fence in the Allotment.   Weaver documented most of the updates via email and noted Plaintiffs' frustrations, but did not offer solutions.

94.     The summer of 2017 was unusually hot and dry.  Plaintiffs asked to postpone work on some water developments due to fire danger, and Weaver agreed to let them delay the work until fall.  Plaintiffs also adjusted their grazing pattern—

with Defendants' permission—to reduce pressure on the riparian areas because their cattle were spending more time than usual in the cooler riparian areas to cope with the exceptionally hot weather.

95.   On September 6, 2017, Weaver observed heavy use on the north end of Hilltop Pasture.  Weaver called Mr. Cline and asked him to move the cattle off the north end.  Plaintiffs promptly moved the cattle and opened the gates to their private property to allow the cattle to drift off the Allotment.

96.   Apart from adjustments made in response to the weather, the 2017 grazing season was uneventful.  The only time Weaver asked Plaintiffs to move their cattle, Plaintiffs obeyed immediately.  Weaver did not express any other concerns about allowable use or structural improvement maintenance with Plaintiffs, despite being on the Allotment several times throughout the summer.

97.   On November 30, 2017, District Ranger Cameron Rasor sent Plaintiffs a Notice of Noncompliance advising them that, due to their failure to meet allowable use standards, "management options" would be implemented for the 2018 and 2019 grazing seasons.

98.   The 2017 Notice of Noncompliance claimed that "[i]n **2015**, resource concerns were documented on the allotment" and cited excessive streambank disturbance and utilization as the causes.  Defendants had not previously indicated to Plaintiffs, either formally or informally, that allowable use standards had been

exceeded in 2015.  To date, Defendants have presented no evidence to support their claim that allowable use standards were exceeded in 2015.

99.    The 2017 Notice of Noncompliance next explained that Plaintiffs had "adequately remedied" the improvement maintenance and inappropriate salting issues cited in the 2016 Notice of Noncompliance, but that allowable use standards had not been remedied.

100.    The Notice of Noncompliance provided monitoring "results." Vegetation monitoring is a scientific process that requires the data collector to identify plant types, take measurements, and make calculations to determine the results.  Defendants did not provide the field notes and monitoring data on which the results were based.  Instead, Defendants provided photographs.  Stubble height, streambank disturbance, and utilization cannot be calculated from photographs or by visual observation alone.  Further, the "results" did not show that Plaintiffs had, in fact, violated the terms of their grazing permits because, as previously explained, a violation does not occur unless utilization exceeds the standards on more than fifteen percent (15%) of the relevant management area.

101.    The 2017 Notice of Noncompliance informed Plaintiffs that they could choose between two sanctions as a result of their failure to meet allowable use standards in 2015, 2016, and 2017.  The Notice of Noncompliance did not give

Plaintiffs any options for curing the alleged violations before sanctions were implemented.

102.   The Notice of Noncompliance described "remedies" to be implemented during the 2018 grazing season after sanctions had been imposed. The "remedies" included developing two new springs and reconstructing others. Defendants had not previously authorized or asked Plaintiffs to develop the springs.  The "remedies" Defendants provided were actually first-time instructions that should have been provided in an AOI rather than a Notice of Noncompliance.

103.   Until Plaintiffs received the 2017 Notice of Noncompliance, Plaintiffs were unaware that Weaver had conducted utilization monitoring on the Allotment. Despite being on the Allotment multiple times throughout the summer, Weaver never informed Plaintiffs she was conducting vegetation monitoring, offered to show Plaintiffs the results of her monitoring, described her methods to Plaintiffs, or otherwise took any informal steps to address the alleged allowable use issues.

104.   Plaintiffs were not given the opportunity to assess the areas that were allegedly out of compliance themselves or to collect their own monitoring data in the same locations.   Instead, in both 2016 and 2017, Defendants withheld any discussion of alleged allowable use violations late November when Plaintiffs could no longer conduct their own monitoring for comparison.

105.   Upon receiving the 2017 Notice of Noncompliance, Plaintiffs set up a meeting with District Ranger Rasor to discuss ways to resolve the alleged issues.

106.   District Ranger Rasor met with Plaintiffs, but refused to discuss options to cure.  He informed Plaintiffs of his qualifications, his background, and his decision to suspend twenty percent (20%) of Plaintiffs' term grazing permits for the 2018 and 2019 grazing season through a reduction in period of use.  When Plaintiffs tried to offer remedies to the alleged violations or alternatives to the proposed sanction, he refused to discuss them.

107.   Plaintiffs explained that a suspension of period of use would not address the allowable use concerns and that other solutions, such as fencing and off-stream water developments, would be more appropriate.  District Ranger Rasor rejected the options and repeated that his decision was made and that their only option was to appeal.

108.   On December 15, 2017, District Ranger Rasor sent Plaintiffs letters informing them that he had suspended twenty percent (20%) of each of their term grazing permits for the 2017 and 2018 grazing seasons because Plaintiffs had (a) "failed to meet allowable use standards in 2015, 2016, and 2017 as requested" and (b) failed to "effectively maintain [their] range improvements as instructed."  The latter reason was a significant change from the 2017 Notice of Noncompliance,

which had stated that structural improvement maintenance was "adequately remedied."

109.   Plaintiffs have always obeyed the USFS's informal recommendations and directions.   Plaintiffs have never refused to comply with an instruction. Defendants needed only to bring their concerns to Plaintiffs' attention and work with them to resolve the issues; instead Defendants jumped directly to punitive action.

110.   After Plaintiffs received the December 15, 2017 letter, confirming the suspension, Evan Johnston of Two Bar Ranch and Rick Cline of R Bar N visited the Pintler Ranger District to review the evidence against them.   Defendants provided files to Plaintiffs, but the files contained no monitoring data, photographs, or other documentation to support the alleged violations.

111.   On January 18, 2018, Plaintiffs made a Freedom of Information Act ("FOIA") Request to determine whether Defendants had any evidence to support the alleged violations.   Plaintiffs specifically requested monitoring data.   Plaintiffs' counsel reiterated the request for monitoring data in a phone call from the USFS in which the USFS asked for clarification.

112.   The FOIA response was provided on February 16, 2018.   It contained no monitoring data from 2015, 2016, or 2017.

113.   Among other things, the FOIA response included internal memos documenting correspondence with Plaintiffs.   None of the memos included a discussion of the December 6, 2017 meeting held in response to the 2017 Notice of Noncompliance, although the memos did include entries for dates *after* the meeting.   The omission was not unusual, because notes from the 2017 annual meeting were also left off the memos.

Administrative Appeal

114.   Plaintiffs appealed the suspension to Forest Supervisor Melany Glossa on January 29, 2018, citing procedural defects, errors of law, and errors of fact.

115.   District Ranger Rasor issued his Responsive Statement on February 20, 2018, together with his compilation of the Appeal Record.

116.   Plaintiffs had already obtained most of the documents in the Appeal Record through their FOIA request, but not everything in the Appeal Record had been provided previously.

117.   Upon a careful review of the Appeal Record, Plaintiffs discovered that one of the memos documenting correspondence in 2017 had been altered since the FOIA response.   The memo for Two Bar Ranch included an entry for December 6, 2017, the date of the meeting concerning the Notice of Noncompliance.   The entry contained allegations that specifically responded to arguments contained in

Plaintiffs' Notices of Appeal and which misrepresented the discussions during the meeting.

118.   Among other misrepresentations, the fabricated entry included a claim that Defendants had informed Plaintiffs of resource concerns and development maintenance issues in 2015 and tried to resolve them informally with Plaintiffs. The claim is not supported anywhere else in the record, and Plaintiffs have no recollection of any allowable use discussions prior to 2016.

119.   In addition to the added entry for December 6, 2017, the Appeal Record submitted by District Ranger Rasor suddenly produced monitoring data for the 2016 and 2017 grazing seasons.  Defendants did not explain why the data had not been available previously or when it had been created.

120.   On April 18, 2018, Forest Supervisor Glossa reversed the suspension, thereby reinstating Plaintiffs' full grazing privileges for Dry Cottonwood Allotment.  Although Forest Supervisor Glossa ruled in Plaintiffs' favor, her decision contained erroneous legal findings and conclusions that adversely affect Plaintiffs by requiring them to adhere to outdated, unrealistic, and inflated standards that do not conform with law (the 2009 Forest Plan).  Forest Supervisor Glossa also dismissed Defendants' duty to attempt to resolve issues informally, provide notice, and provide an opportunity to cure before taking adverse administrative action, thereby depriving Plaintiffs of their procedural rights.

121.  Plaintiffs' requested discretionary review of Forest Supervisor Glossa's decision to correct the erroneous legal findings and conclusions.  On May 1, 2018, Regional Forester Leanne M. Marten declined discretionary review, rendering Forest Supervisor Glossa's decision the final administrative decision (the "Decision"), attached as **Exhibit B**.  Plaintiffs' received Regional Forester Marten's letter declining review on May 5, 2018.

## VI.  CLAIMS FOR RELIEF

Count 1:   Defendants' violated the APA, NFMA, and associated regulations by finding that the allowable use standards set forth in the 2009 Forest Plan do not apply to Dry Cottonwood Allotment.

122.  Plaintiffs reassert and reallege the allegations in ¶¶ 1 through 121 as if fully set forth herein.

123.  Defendants violated the APA and NFMA by disregarding the allowable use standards set forth in the 2009 Forest Plan and applying outdated allowable use standards that are inconsistent with, and which were expressly revoked by, the 2009 Forest Plan.

124.  Under NFMA, Defendants are required to develop and maintain land and resource management plans ("forest plans") for all National Forest System lands.  16 U.S.C. § 1604(a).  After the forest plan has been implemented, Defendants must manage the forest according to the terms of the plan.  *Id.*  All

permits and allotment management plans must be modified such that they are consistent with the forest plan.  16 U.S.C. § 1604(i).

125.   In 2009, after seven years of NEPA analysis, the USFS implemented a new forest plan for the Beaverhead–Deerlodge National Forest (the 2009 Forest Plan).  The 2009 Forest Plan contains Interim Livestock Grazing Standards that apply to the entire Beaverhead–Deerlodge National Forest and which were intended to consolidate and replace the three separate sets of riparian mitigation measures previously used on the forest.  FEIS, 15.  The Final Environmental Impact Statement for the 2009 Forest Plan analyzed six alternatives.  The first alternative would have retained the INFISH-1995 standards set out in the Deerlodge Forest Plan for allotments west of the Continental Divide.  The INFISH-1995, as stated in the Deerlodge Forest Plan, are the standards Defendants have tried to apply to Dry Cottonwood Allotment in lieu of the 2009 Forest Plan.  The USFS pointedly *rejected* the INFISH-1995 standards and the terms of the Deerlodge Forest Plan in the Final Environmental Impact Statement.  The USFS instead adopted the INFISH-2005 standards and forest-wide direction.  FEIS, 129.

126.   Although the 2009 Forest Plan clarifies that its interim standards only apply until site-specific allowable use standards have been designated through revised allotment management plans, no such plans exist for Dry Cottonwood

Allotment.    Dry Cottonwood Allotment does not have a valid allotment management plan in place.

127.   Even if the draft document presented by Defendants as an allotment management plan were valid, the plan does not contain site-specific allowable use standards that would override those provided in the 2009 Forest Plan.    The standards in the draft document are nothing more than a reiteration of the INFISH-1995 standards as provided in the outdated Deerlodge Forest Plan, which was expressly revoked by the 2009 Forest Plan.    Finally, the 2009 Forest Plan announces that no site-specific standards exist for Dry Cottonwood Allotment. Under the East Deerlodge Management Area, which includes Dry Cottonwood Allotment, the 2009 Forest Plan states "Standards in Addition to Forestwide Standards[:]  None."  2009 Forest Plan, 111.

128.   Defendants found that the allowable use standards in an outdated Environmental Assessment applied in lieu of the standards provided in the 2009 Forest Plan and modified Plaintiffs' term grazing permits accordingly.  The finding and modification place Plaintiffs in the impossible position of trying to comply with vague, poorly defined standards that are no longer scientifically accepted and which do not comport with the law (the 2009 Forest Plan).  Defendants' finding and their decision to modify Plaintiffs' permits were each errors of law that should be set aside under NFMA and the APA.

<u>Count 2</u>:     Defendants' decision to modify Plaintiffs' term grazing permits to incorporate an unsigned, undated, and otherwise invalid draft allotment management plan that contradicts the 2009 Forest Plan violates the APA, NFMA, and associated regulations.

129.   Plaintiffs reassert and reallege the allegations in ¶¶ 1 through 128 as if fully set forth herein.

130.   Under NFMA, all resource plans and permits for the use and occupancy of National Forest System lands must be consistent with the applicable land management plan.  16 U.S.C. § 1604(i); 36 C.F.R. § 222.2(c).

131.   The 2009 Forest Plan is the applicable land management plan on Dry Cottonwood Allotment.  The Plan provides allowable use standards (referred to as "Livestock Grazing Standards") for the entire Beaverhead–Deerlodge National Forest.  Although the 2009 Forest Plan reserved certain site-specific standards and allowed new site-specific standards to be developed through revised allotment management plans, no site-specific standards were reserved for Dry Cottonwood Allotment, nor have any revised allotment management plans been created for it.

132.   Defendants violated NFMA by modifying Plaintiffs' permits to include a draft allotment management plan that is inconsistent with, and which directly contradicts, the allowable use standards set forth in the 2009 Forest Plan. Defendants' decision to modify Plaintiffs' permits should be set aside as an error of law under NFMA and the APA.

Count 3:    Defendants' decision to modify Plaintiffs' term grazing permits to incorporate an unsigned, undated, and otherwise invalid draft allotment management plan violates the APA, NEPA, and NEPA's implementing regulations.

133.   Plaintiffs reassert and reallege the allegations in ¶¶ 1 through 132 as if fully set forth herein.

134.   Under NEPA, Defendants must prepare a detailed statement that addresses environmental effects and alternatives for every major federal action significantly affecting the quality of the human environment.  Defendants must also provide an opportunity for the public to review and comment on the statement. 42 U.S.C. § 4332; 40 C.F.R. § 1506.6; 36 C.F.R. §§ 220.4(c), 220.7.

135.   Defendants failed to prepare a detailed statement analyzing the proposed allotment management plan alongside different alternatives.  They also failed to analyze the vegetative communities on Dry Cottonwood Allotment or the resiliency/resistance determinations for the riparian areas in a NEPA compliant document.   In addition, Defendants did not consult with Plaintiffs before incorporating an unsigned, undated, and otherwise invalid draft allotment management plan into their permits.

136.   Plaintiffs were denied any opportunity to comment on the validity of the draft allotment management plan, to point out its deficiencies, to express concern with using outdated environmental standards that are no longer

scientifically accepted, or to otherwise address the environmental impacts of applying the draft document.

137.   Defendants' decision to modify Plaintiffs' grazing permits to include a NEPA-deficient document should be set aside under the APA.

<u>Count 4</u>:   Defendants' decision to modify Plaintiffs' term grazing permits to incorporate an unsigned, undated, and otherwise invalid draft allotment management plan violates the APA, FLPMA, and federal regulations.

138.   Plaintiffs reassert and reallege the allegations in ¶¶ 1 through 137 as if fully set forth herein.

139.   Under FLPMA, an allotment management plan must be developed through "careful and considered consultation, cooperation and coordination with the . . . permittees . . . involved." 43 U.S.C. 1752(d); 36 C.F.R. § 222.2.

140.   Defendants modified Plaintiffs' permits to include an unsigned, undated, unsupported document on the theory that, because it is the only document they have that *could* be an allotment management plan for Dry Cottonwood Allotment, it *must* be the appropriate allotment management plan. Despite Plaintiffs' repeated requests, Defendants have produced no evidence to suggest that an allotment management plan was ever enacted for Dry Cottonwood Allotment. Apart from vague references to a 1996 allotment management plan in Plaintiffs' permits, Defendants have no evidence to suggest that an allotment management

plan was ever developed, much less that it was developed through consultation, cooperation, and coordination with Plaintiffs (the permittees).

141.   Defendants violated FLPMA by failing to consult, cooperate, and coordinate with Plaintiffs before modifying Plaintiffs' term grazing permits to include what can only be described as a draft allotment management plan. Defendants' decision to modify Plaintiffs' permits without consultation, cooperation, or coordination is a violation of FLPMA that should be set aside under the APA.

Count 5:   Defendants' violated the APA, federal caselaw, and agency guidance by issuing a notice of noncompliance that does not adequately describe the alleged violations or provide an opportunity to comply and which was not preceded by an attempt to resolve issues informally.

142.   Plaintiffs reassert and reallege the allegations in ¶¶ 1 through 141 as if fully set forth herein.

143.   Before an agency can suspend a license, including a grazing permit, it must (a) give written notice of the facts or conduct that may warrant adverse action, and (b) provide the licensee an opportunity to demonstrate or achieve compliance.  5 U.S.C. § 558(c).  In addition to the written notice and opportunity to comply required by statute, USFS guidance requires Defendants to attempt to resolve issues informally before commencing adverse administrative action. Forest Service Handbook 2209.13, at ¶16.4.

144. Any Notice of Noncompliance **must** (a) describe the permit violation(s) in detail, (b) identify the action the permittee must take to correct the violation, including specifications for satisfactory accomplishment, (c) specify the timeframe within which the permittee must complete the corrective action, and (d) issue a warning that administrative actions may be initiated if the permittee fails to take the corrective action within the specified timeframe.   Forest Serv. Handbook 2209.13, § 16.31–33.  If, for example, Defendants find that a float valve on the tank at Hilltop Spring 1 is broken, the Notice of Noncompliance should provide the following information: the float valve on Hilltop Spring 1 is broken; permittees must repair or replace the broken float valve by June 15, 2018; and failure to repair or replace the broken float valve by June 15, 2018 may result in the initiation of permit suspension or cancellation procedures.

145. Defendants issued two Notices of Noncompliance (one for the 2016 grazing season and one for the 2017 grazing season) without first attempting to resolve the alleged issues informally.  Neither Notice of Noncompliance described the alleged violations in sufficient detail for Plaintiffs to understand the purpose of the notice.   Neither Notice of Noncompliance identified corrective actions Plaintiffs could take or timeframes in which the actions needed to be completed.

146. The "remedies" provided in the Notices of Noncompliance are not responsive to the alleged violations.   For example, the 2017 Notice of

Noncompliance lists reconstruction of structural improvements as a remedy even though structural improvement maintenance was not identified as a violation in the Notice.

147.   In their final administrative decision, Defendants stated that they were not required to attempt informal resolution or to provide notice and opportunity to comply before taking adverse administrative action.  Defendants also directed that a new Notice of Noncompliance be issued for the 2017 grazing season.  The new Notice of Noncompliance is deficient in the same respects as the former Notices of Noncompliance.

148.   Defendants' finding that they are not required to attempt informal resolution or to provide notice and opportunity to comply directly contradicts the APA, caselaw, and agency guidance.  Defendants' finding and their issuance of a new Notice of Noncompliance that is procedurally deficient should both be set aside as violations of the APA, caselaw, and agency guidance.

Count 6:    Defendants' decision to issue a Notice of Noncompliance for 2017 violates the APA because it is arbitrary, capricious, an abuse of discretion, not otherwise in accordance with law, and/or not supported by substantial evidence.

149.   Plaintiffs reassert and reallege the allegations in ¶¶ 1 through 148 as if fully set forth herein.

150.   The APA directs reviewing courts to hold unlawful and set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an

abuse of discretion, not in accordance with law, or unsupported by substantial evidence.

151.   Defendants issued Notices of Noncompliance to Plaintiffs in 2016 and 2017.  Defendants did not support either Notice of Noncompliance with evidence of the alleged violations.   Defendants provided "results" from vegetation monitoring, but did not provide the data on which the results were based. Defendants also provided photographs, but allowable use cannot be determined based on photographs.

152.   Despite Plaintiffs' informal requests and formal FOIA request for monitoring data, Defendants provided no evidence to support the results stated in the Notices of Noncompliance.   Defendants produced monitoring data for 2016 and 2017 for the first time in their responsive statement.  The monitoring data did not show that Plaintiffs were out of compliance with the terms of their grazing permits in 2016 or 2017.  At worst, the data showed that allowable use standards had been exceeded in isolated, high use areas.   Localized exceedances are not violations.  A violation does not occur unless greater than fifteen percent (15%) of a management area exceeds.  Defendants have not shown that more than fifteen percent (15%) of the management area was out of compliance.

153.   Defendants' 2017 Notice of Noncompliance also referred to resource concerns from 2015.  No prior mention of these concerns is provided in the record,

no monitoring data is provided for 2015, nor is there any evidence that Defendants informally discussed the concerns with Plaintiffs in 2015.  Although the record *now* mentions informal discussions in 2015 that reference was improperly added to the record after Plaintiffs had filed their Notices of Appeal and is not supported by fact or evidence in the Appeal Record.

154.   Defendants' decision to issue a new Notice of Noncompliance for 2017 citing allowable use exceedances in 2015, 2016, and 2017 is arbitrary, capricious, an abuse of discretion, and without support from substantial evidence.  Defendants have provided *no* data to support their contention that Plaintiffs violated allowable use standards in 2015, 2016, or 2017.

## VII.   REQUESTS FOR RELIEF

For the reasons stated above, Plaintiffs request the following relief:

155.   A declaration that the allowable use standards set forth in the 2009 Forest Plan apply to Dry Cottonwood Allotment;

156.   A declaration that Defendants violated the APA, NFMA, and agency regulations and guidance by applying allowable use standards from an outdated Environmental Assessment;

157.   A declaration that the unsigned, undated document presented by Defendants as the applicable allotment management plan for Dry Cottonwood Allotment is invalid;

158.   A declaration that Defendants violated the APA, NFMA, and agency regulations by modifying Plaintiffs' term grazing permits to include an invalid allotment management plan that contradicts the 2009 Forest Plan;

159.   A declaration that Defendants violated the APA, NEPA, and agency regulations by modifying Plaintiffs' term grazing permits to include a draft allotment management plan that is not NEPA-compliant;

160.   A declaration that Defendants violated the APA, FLPMA, and agency regulations by modifying Plaintiffs' term grazing permits to include a draft allotment management plan without first consulting with Plaintiffs;

161.   A declaration that Defendants violated the APA, federal common law, regulations, and agency guidance by failing to attempt informal resolution, clearly describe alleged violations in a written notice, identify corrective actions Plaintiffs could take to cure the alleged violations, specify a time to complete the corrective actions, and grant Plaintiffs an opportunity to comply before commencing adverse administrative actions;

162.   An order directing Defendants to attempt informal resolution before resorting to adverse administrative actions;

163.   An order directing Defendants to clearly describe the alleged violations in a written notice, identify corrective actions that Plaintiffs can take to cure the alleged violations, identify the time frame within which Plaintiffs must

complete the corrective action, and provide Plaintiffs with an opportunity to complete the corrective action before commencing adverse administrative actions;

164.   A declaration that Defendants violated the APA by arbitrarily and capriciously issuing a Notice of Noncompliance and commencing adverse administrative action without evidence that Plaintiffs exceeded allowable use standards on Dry Cottonwood Allotment;

165.   An order revoking the 2016 and 2017 Notices of Noncompliance;

166.   Injunctive relief preventing Defendants from modifying Plaintiffs' term grazing permits to include the draft allotment management plan and standards from the 1995 Environmental Assessment;

167.   An award granting Plaintiffs their costs, expenses, and attorney's fees under EAJA; and

168.   Any such further relief as may be just, proper, and equitable.

DATED this 31st day of May, 2018.

/s/ Calli J. Michaels
John E. Bloomquist
Calli J. Michaels
BLOOMQUIST LAW FIRM, P.C.
*Attorneys for Grazing Permittees*
*Two Bar Ranch, Broken Circle*
*Ranch, and R Bar N*