John E. Bloomquist
Calli J. Michaels
BLOOMQUIST LAW FIRM, P.C.
220 South Pacific Street
P.O. Box 1418
Dillon, MT 59725-1418
(406) 683-8795
cmichaels@helenalaw.com
        *Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| **2-BAR RANCH LIMITED PARTNERSHIP, a Montana limited partnership, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**UNITED STATES FOREST SERVICE, et al.,**<br><br>**Defendants.** | **Case No.: CV 18-33-BU-SEH**<br><br><br>**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………ii

INTRODUCTION ............................................................................ 1

STATEMENT OF THE CASE ........................................................... 1

    A.    Statement of Facts ............................................................1

    B.    Procedural Posture ...........................................................7

STANDARD OF REVIEW ............................................................... 8

ARGUMENT................................................................................... 9

**I.**    **The 2009 Forest Plan's standards govern grazing on Dry Cottonwood Allotment because no site-specific standards exist (Counts 1, 2, 3, and 4)**................................................................10

    A.    The 1996 AMP does not replace the 2009 Forest Plan on Dry Cottonwood Allotment because it is not valid. .................................14

    B.    The 1995 IRMM are not site-specific standards, and they were superseded by the 2009 Forest Plan standards....................................16

**II.**    **The 2016 and 2017 NONCs should be set aside because they do not comply with the 2009 Forest Plan or due process (Counts 5 and 6)**.......17

    A.    The 2016 and 2017 NONCs should be set aside because they do not apply the standards set forth in the 2009 Forest Plan.........................18

    B.    The 2016 and 2017 NONCs are invalid because they do not comply with due process. ................................................................20

**III**.    **The Forest Service wrongly denied Plaintiffs fees and expenses under EAJA based on an error of law (Count 7)**. .............................23

CONCLUSION ..............................................................................28

CERTIFICATE OF COMPLIANCE...................................................29

i

# TABLE OF AUTHORITIES

## Cases

*Ramirez–Alejandre v. Ashcroft*,
319 F.3d 365 (9th Cir. 2003)........................................................... 9

*Anchustegui v. Dep't of Agric.*,
257 F.3d 1124 (9th Cir. 2001).....................................20, 22, 25

*Buckingham v. Sec'y of U.S. Dep't of Agric.*,
603 F.3d 1073 (9th Cir. 2010)......................................................10

*Cal. Energy Comm'n v. Dep't of Energy*,
585 F.3d 1143 (9th Cir. 2009)........................................................ 9

*Collard v. U.S. Dep't of Interior*,
154 F.3d 933 (9th Cir. 1998).........................................................24

*Friends of Ses. Future v. Morrison*,
153 F.3d 1059 (9th Cir. 2003)........................................................ 9

*Goodrich v. United States*,
434 F.3d 1329 (Fed. Cir. 2006).....................................................14

*Grason Elec. Co. v. Nat'l Labor Relations Bd.*,
951 F.2d 1100 (9th Cir. 1991)........................................................23

*Idaho Conservation League v. Mumma*,
956 F.2d 1508 (9th Cir. 1992)........................................................16

*Mont. Wilderness Ass'n v. Connell*,
725 F.3d 988 (9th Cir. 2013)........................................................ 8

*Native Ecosystems Council v. U.S. Forest Serv.*,
418 F.3d 953 (9th Cir. 2005)..........................................8, 9, 10

*Sw. Marine, Inc. v. United States*,
43 F.3d 420 (9th Cir. 2994)...........................................................26

*Western Watersheds Project v. Interior Board of Land Appeals*,
624 F.3d 983 (9th Cir. 2010).........................................................25

## Statutes

5 U.S.C. § 504 ....................................................................23, 24, 26, 27
5 U.S.C. § 554 ....................................................................24
5 U.S.C. § 558 ....................................................................20, 25
5 U.S.C. § 706 ....................................................................9
16 U.S.C. § 1604 ................................................................10, 14, 15
28 U.S.C. § 2412 ................................................................26
42 U.S.C. § 4332 ................................................................14, 15
43 U.S.C. § 1752 ................................................................10, 14, 15

## Regulations

7 C.F.R. § 1.181....................................................................23
7 C.F.R. § 1.182....................................................................23,24
7 C.F.R. § 1.183....................................................................27
7 C.F.R. § 1.193....................................................................26, 27
7 C.F.R. § 1.195....................................................................27
36 C.F.R. § 214.9 .................................................................25
36 C.F.R. § 214.12 ...............................................................25
36 C.F.R. § 214.14.................................................................26, 27
36 C.F.R. § 214.18.................................................................26
36 C.F.R. § 214.19.................................................................26
36 C.F.R. § 219.7..................................................................10
36 C.F.R. § 220.4..................................................................14, 16
36 C.F.R. § 222.2..................................................................10, 14

## Legislative history

H.R. Rep. No. 96–1418 (1980)
    *reprinted in* 1980 U.S.C.C.A.N. 4953……...............23, 24, 25, 27, 28

H.R. Rep. No. 96–1434 (1980)
    *reprinted in* 1980 U.S.C.C.A.N. 5003 ............................................24

# INTRODUCTION

A forest plan, once enacted, has the force and effect of law. The Forest Service violated federal law by deviating from the *2009 Beaverhead–Deerlodge National Forest Land and Resource Management Plan* ("2009 Forest Plan") and by disregarding due process requirements. In its final administrative decision, the Forest Service adopted an allotment management plan for Dry Cottonwood Allotment that does not comply with law, implemented standards that violate the forest plan, and issued notices of noncompliance that apply unlawful standards and which do not comport with due process. Plaintiffs request a judgment from this Court finding the actions unlawful. Plaintiffs also request an award of attorney's fees for their administrative appeal.

# STATEMENT OF THE CASE

A.     Statement of Facts

Plaintiffs are permittees on Dry Cottonwood Allotment in the Beaverhead– Deerlodge National Forest.[1] Two Bar Ranch obtained its first grazing permit for the Allotment in 1910.[2] Broken Circle Ranch and R Bar N became permittees in

---

[1] Broken Circle Ranch waived its term grazing permit to a successor-in-interest earlier this year. Although no longer a permittee, Broken Circle Ranch retains an interest in this lawsuit for purposes of recovering fees and costs incurred in the administrative adjudication.

[2] The partnership known as "Two Bar Ranch" did not exist until 1992, but the same family has owned and operated the ranch since 1909. AR 001671–72.

1

2004 and 2006, respectively.[3]  For years, Plaintiffs have maintained a strong, cooperative relationship with the Pintler Ranger District, which manages the Allotment.[4]  Plaintiffs are attentive to Forest Service requirements and respond promptly to instructions.[5]  Before 2016, Plaintiffs had never received a notice of noncompliance ("NONC") for grazing on the Allotment.[6]

In 2015, the Pintler Ranger District hired a new rangeland management specialist to administer Dry Cottonwood Allotment.[7]  Prior specialists had applied the allowable use standards in Plaintiffs' term grazing permits,[8] but the new specialist created her own standards, which she incorporated into Plaintiffs' permits through their Annual Operating Instructions ("AOIs").[9]  The specialist did not notify Plaintiffs before changing the standards or give them an opportunity to comment.  In 2015, the change was insignificant,[10] and Plaintiffs satisfied her new standards.  The specialist acknowledged Plaintiffs' compliance in her 2015 Allotment Compliance Report.[11]

---

[3] AR 001381, 001505.
[4] AR 001672, 001681–82, 001688–89.
[5] AR 001673, 001681, 001689.
[6] AR 001672, 001680, 001688–89.
[7] AR 000117.
[8] *See* AR 000114.
[9] AR 000123–24.
[10] *Compare* AR 000123–24 *with* AR 000149–52 (showing the 2015 AOI standards were similar to the standards attached to Plaintiffs' permits).
[11] AR 000974–75.

The change in 2016 was more significant and less timely. In 2016, the specialist allowed Plaintiffs to graze under the 2015 AOI standards[12] all season and then—after the grazing season ended[13]—created new, more restrictive, allowable use standards to determine compliance.[14] Using the <u>new</u> standards (which Plaintiffs had never seen), the specialist found Plaintiffs out of compliance for the 2016 grazing season.[15] The new 2016 standards were significantly different from prior standards because they allowed the Forest Service to find Plaintiffs out of compliance if utilization on *any* portion of the Allotment—no matter how small— exceeded the levels the specialist selected.[16] Prior standards had allowed utilization to exceed allowable use levels on fifteen percent of the management area before a violation occurred[17] and had prohibited the Forest Service from taking measurements in high traffic areas, such as at stream crossings or stock tanks.[18]

---

[12] *Compare* AR 000123–24 (2015 AOI) *with* AR 000160–61 (2016 AOI).

[13] AR 000157 (showing the 2016 grazing season ended on September 30).

[14] *See* AR 000165–66.

[15] AR 000165–66 (showing an NONC was issued on November 15, 2016).

[16] *See* AR 000165–66.

[17] *See* AR 004375, 000151–52, 000160.

[18] *See* AR 000151 (noting that measurements should not be taken "in isolated areas that are heavily damaged if the remainder of the pasture is in better condition" or in areas "such as next to water developments [that are] impacted to a greater extent than other riparian areas").

The Forest Service issued Plaintiffs' 2017 AOIs on May 5, 2017.[19]  For the third time in two years, the specialist unilaterally changed the allowable use standards for Dry Cottonwood Allotment without notifying Plaintiffs.[20]  Like the 2016 NONC standards, the 2017 AOI standards did not allow any portion of the management area to exceed allowable use levels.[21]  Not surprisingly, the Forest Service found Plaintiffs in noncompliance under the new 2017 standards as well.[22]

The 2017 NONC was issued on November 30, 2017: two months after the grazing season ended and too late for Plaintiffs to attempt compliance.[23]  In the NONC, the Forest Service informed Plaintiffs their grazing privileges would be suspended for exceeding allowable use standards in 2015,[24] 2016, and 2017.[25]  Plaintiffs immediately requested a meeting with the District Ranger to resolve the issues,[26] but the District Ranger informed them it was too late to attempt compliance and that their only option was administrative appeal.[27]  On December 15, 2017, the District Ranger formally suspended twenty percent of

---

[19] AR 000172.
[20] AR 000175.
[21] *Compare* AR 000175 *with* AR 000165–66.
[22] AR 000179.
[23] AR 000178.
[24] Plaintiffs complied with allowable use standards in 2015.  AR 000974–75.
[25] AR 000178, 000181–82.
[26] AR 001677–78, 001686.
[27] AR 001686.

Plaintiffs' term grazing permits for allegedly failing to maintain structural improvements[28] and meet allowable use standards.[29]

After Plaintiffs received the formal suspension, Evan Johnston (Two Bar Ranch) and Rick Cline (R Bar N) visited the Pintler Ranger District office to review their permittee files and the allotment file for monitoring data.[30]  The files the Forest Service produced did not contain monitoring data.[31]  Plaintiffs filed a Freedom of Information Act ("FOIA") request seeking any recent monitoring data for Dry Cottonwood Allotment.[32]  The Forest Service did not include any monitoring data in its FOIA response.[33]

On January 29, 2018, Plaintiffs appealed the suspension.[34]  On February 20, 2018, the District Ranger filed a responsive statement and appeal record.[35]  The appeal record included two documents purporting to be monitoring data for 2016 and 2017, neither of which had been in the FOIA response or included in the files

---

[28] It is unclear why the District Ranger suspended Plaintiffs' permits on this basis after finding that Plaintiffs adequately maintained structural improvements in 2017.  *See* AR 000178.

[29] AR 000184.

[30] AR 001686–87.

[31] AR 001686–87.

[32] AR 001377–78.

[33] AR 001756–57, 001789–90.

[34] AR 001379, 001503, 001626.

[35] AR 001758.

at the Pintler Ranger District.[36]  The appeal record also included a 2017 correspondence memo for Two Bar Ranch.[37]  The Forest Service had produced the memo in its FOIA response on February 16, 2018, but the document in the appeal record had been altered.[38]  The altered document included a new entry with 'evidence' that responded to allegations in Plaintiffs' Notices of Appeal.[39]  The 'evidence' is not supported anywhere else in the appeal record.

After the appeal was fully briefed, the Forest Supervisor reversed the suspension and reinstated Plaintiffs' full grazing privileges.[40]  Although she reversed the suspension, the Forest Supervisor issued final findings, conclusions, and directions that negatively impact Plaintiffs.  First, the Forest Supervisor required Plaintiffs to comply with 1996 AMP and 1995 Interim Riparian Mitigation Measures ("1995 IRMM") after finding that the 1996 AMP and 1995 IRMM supply site-specific standards that replaced the 2009 Forest Plan

---

[36] *See* AR 001009–19, 001083–88, 001788–90.

[37] AR 000190–91.

[38] *See* AR 001789; *compare* AR 001802 (document produced in FOIA response) *with* AR 000190–91 (document provided by the District Ranger).

[39] *See* AR 000190 (claiming (a) the Forest Service found and informally consulted Plaintiffs about resource concerns in 2015; (b) Plaintiffs "acknowledge[d] their lack of adequate maintenance of assigned developments"; and (c) the Forest Service was "open to" remedies at the 2017 NONC meeting).

[40] AR 001822.

standards.[41]   Second, the Forest Supervisor issued a revised 2017 NONC after finding that the Forest Service is not required to give specific notice and opportunity to comply before suspending a grazing permit.[42]

Plaintiffs requested discretionary review of the Forest Supervisor's findings, conclusions, and directions,[43] but the Regional Forester denied review without considering Plaintiffs' request.[44]   After the Forest Supervisor's decision became final, Plaintiffs requested attorney's fees under the Equal Access to Justice Act ("EAJA") for prevailing on their effort to reverse the suspension.[45]   On June 5, 2018, the Forest Supervisor denied the EAJA application without review.[46]   On June 12, 2018, the Forest Service issued Plaintiffs' 2018 AOIs, which require Plaintiffs to comply with the 1996 AMP and 1995 IRMM.[47]

B.   Procedural Posture

After the Forest Service's decision became final, Plaintiffs filed a Complaint with this Court.   The complaint was later amended.   In their Amended Complaint,

---

[41] AR 001822 ("[R]emedies for noncompliance with the terms and conditions of grazing permits on the Dry Cottonwood Allotment must agree with the [allowable use levels] specified in the 1996 [Decision Notice].").

[42] AR 001820.

[43] AR 001825–26.

[44] AR 001828–29 (showing that the Regional Forester issued her decision before receiving Plaintiffs' timely request for discretionary review).

[45] AR 001830–56.

[46] AR 001857.

[47] *See* AR 000213–14.

Plaintiffs identified seven counts by which the Forest Service had violated the Administrative Procedure Act ("APA"), National Forest Management Act ("NFMA"), National Environmental Policy Act ("NEPA"), and Federal Land Policy and Management Act ("FLPMA").[48]   Section I of this Brief (Counts 1 through 4) shows that the 2009 Forest Plan standards apply to Dry Cottonwood Allotment because (A) the 1996 AMP is invalid and (B) the 1995 IRMM identified in the 1996 AMP are not site-specific standards that replace the 2009 Forest Plan standards.   Section II of this Brief (Counts 5 and 6) asks that the 2016 and 2017 NONCs be set aside because they apply unlawful standards and do not comport with procedure required by law.   Section III (Count 7) shows that the Forest Service erred as a matter of law by denying Plaintiffs' request for attorney's fees under EAJA.   The parties stipulated that the case was appropriate for resolution through summary judgment.[49]   Plaintiffs request summary judgment on all counts.

## STANDARD OF REVIEW

Claims under the NEPA, FLPMA, and NFMA are reviewed under the APA. *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005); *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 994 (9th Cir. 2013). Under the APA, the Court must "set aside agency action, findings, and

---

[48] Doc. 13-1.
[49] Doc. 27, at 2.

conclusions" that are arbitrary, capricious, an abuse of discretion, not in accordance with law, unconstitutional, or without observance of procedure required by law. 5 U.S.C. § 706(2). A reviewing court may "uphold an agency decision *only* on the basis of the reasoning articulated therein." *Cal. Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143, 1150 (9th Cir. 2009). The decision should be overturned if the agency provided a "rationale that runs counter to the evidence" or "made a clear error in judgment." *Id.* at 1150–51.

Although an agency's interpretation of its own regulations is entitled to deference, the "agency's interpretation 'does not control, where . . . it is plainly inconsistent with the regulation at issue.'" *Native Ecosystems Council*, 418 F.3d at 960 (quoting *Friends of Ses. Future v. Morrison*, 153 F.3d 1059, 1069 (9th Cir. 2003)). A forest plan is an agency regulation. *See id.* Whether an agency's procedures comport with due process is a question of law that is reviewed de novo. *Ramirez–Alejandre v. Ashcroft*, 319 F.3d 365, 377 (9th Cir. 2003) (en banc) (explaining that the Court does not defer to an agency on due process questions).

## ARGUMENT

The 2009 Forest Plan provides the allowable use standards for livestock grazing on Dry Cottonwood Allotment. Federal statutes, regulations, caselaw, and agency handbooks dictate the procedure the agency must follow to comply with due process. In this matter, the Forest Service violated federal law by (1) finding

that the 1995 IRMM and 1996 AMP provide site-specific standards that replace the 2009 Forest Plan standards on Dry Cottonwood Allotment, (2) issuing NONCs that apply unlawful standards and violate due process, and (3) denying Plaintiffs attorney's fees under EAJA based on an error of law.  No material facts are in dispute, and Plaintiffs are entitled to summary judgment as a matter of law.

I.   **The 2009 Forest Plan's standards govern grazing on Dry Cottonwood Allotment because no site-specific standards exist (Counts 1, 2, 3, and 4).**

The 2009 Forest Plan governs grazing management on Dry Cottonwood Allotment.  The Forest Service manages its lands under NFMA.  *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1076 (9th Cir. 2010).  NFMA requires the Forest Service to develop a forest plan for each unit within the National Forest System and manage the unit according to that plan.  16 U.S.C. § 1604(a); 36 C.F.R. § 219.7.  "[F]ailure to comply with the provisions of a Forest Plan is a violation of NFMA."  *Native Ecosystems Council*, 418 F.3d at 961.  The Forest Service administers livestock grazing on National Forest System lands pursuant to FLPMA.  *Buckingham*, 603 F.3d at 1076.  The grazing permits, AMPs, and AOIs issued under FLPMA must be "consistent with the applicable Forest Plan."  *Id.* at 1077 (citing 16 U.S.C. § 1604(i)); *see also* 43 U.S.C. § 1752; 36 C.F.R. § 222.2(c).

The Forest Service manages the Beaverhead–Deerlodge National Forest under the 2009 Forest Plan. Prior to 2009, the Forest Service had managed the Deerlodge unit under the *1987 Deerlodge National Forest Plan* ("1987 Deerlodge Plan") and the Beaverhead unit under the *1986 Beaverhead National Forest Plan* ("1986 Forest Plan"), each with its own amendments. AR 002720. Management on the Deerlodge unit was further divided by the continental divide. Allotments east of the divide were managed under the original 1987 Deerlodge Plan, while allotments west of the divide—including Dry Cottonwood Allotment—were managed under a 1995 amendment based on the Inland Native Fish ("INFISH") strategy.[50] AR 002758, 002674. The Forest Service developed the 1995 IRMM to satisfy INFISH on all allotments west of the continental divide. AR 000021 ("These mitigation measures were developed as an interim step to assist the Forest in maintaining or moving toward riparian desired conditions).

In 1996, the Forest Service began a permit reissuance effort to incorporate the 1995 IRMM into grazing permits throughout the Deerlodge unit. AR 002733, 004869. Dry Cottonwood Allotment was one of the many allotments to which the 1995 IRMM were applied. AR 002733, 004869. The Forest Service considered delaying permit reissuance until it could develop site-specific standards for Dry

---

[50] INFISH replaced existing direction on forests throughout the western United States, not just in Montana. AR 002709.

Cottonwood Allotment, but it rejected that alternative after finding the 1995 IRMM "sufficient to achieve Forest Plan standards for riparian areas." AR 004914–15. Thus, rather than developing site-specific standards, the Forest Service used the 1995 IRMM to provide interim guidance until a new forest plan could be developed. AR 002749 (explaining that the 1995 IRMM were "only intended as interim direction until Forest Plans could be revised").

The Forest Service enacted a revised forest plan in 2009. The 2009 Forest Plan was intended to provide comprehensive, forest-wide direction for the entire Beaverhead–Deerlodge National Forest. AR 002720–21, 004360. The interim livestock grazing standards in the 2009 Forest Plan replaced existing standards under the 1987 Deerlodge Plan, the 1986 Beaverhead Plan, and their amendments (including the 1995 IRMM amendment). AR 002901 (explaining that, although the Beaverhead and Deerlodge unit each developed riparian grazing standards "to achieve the same objectives, the interim direction was slightly different," so the 2009 Forest Plan consolidated the direction for use across the entire forest). The 2009 Forest Plan standards apply to Dry Cottonwood Allotment, just as they apply to every other allotment that lacks direction retained by the 2009 Forest Plan. *See* AR 004374–76 (livestock grazing standards); AR 004360 (explaining that the "standards apply forest[-]wide" with the only exceptions listed in Chapter 4); AR 004460 (showing no additional standards in Chapter 4 for the East Deerlodge

Management Area, which includes Dry Cottonwood Allotment). These standards will continue to apply until the Forest Service develops site-specific standards for the Allotment that comply with the 2009 Forest Plan. AR 002842 (explaining that the 2009 Forest Plan standards apply "*until* specific . . . allowable use levels have been designed through individual [AMPs] and site-specific NEPA decisions" (emphasis added)).

In its final administrative decision, the Forest Service concluded that the 2009 Forest Plan standards do *not* apply to Dry Cottonwood Allotment because the Allotment is managed under a 1996 AMP that incorporates site-specific allowable use standards (the 1995 IRMM). AR 001820. The Forest Service's conclusion is wrong for two reasons. First, as explained in subsection (A) below, the 1996 AMP is not valid because it was not implemented pursuant to NEPA and FLPMA, and does not comply with NFMA. Second, even if the 1996 AMP were valid, the 1995 IRMM are not site-specific standards. As explained in subsection (B) below, the 1995 IRMM are interim forest-wide standards from the amended 1987 Deerlodge Plan. Because no site-specific standards have been prepared for Dry Cottonwood Allotment, the 2009 Forest Plan standards apply.

A.   The 1996 AMP does not replace the 2009 Forest Plan on Dry
     Cottonwood Allotment because it is not valid.

The 1996 AMP cannot supplant the 2009 Forest Plan because it does not

comply with NEPA, FLPMA, and NFMA.  An AMP must comport with NEPA.

*Goodrich v. United States*, 434 F.3d 1329, 1331 (Fed. Cir. 2006).  Under NEPA,

the Forest Service must prepare a detailed statement addressing environmental

effects and alternatives for every major federal action significantly affecting the

quality of the human environment.  42 U.S.C. § 4332; 36 C.F.R. § 220.4(c).  Under

FLPMA, an AMP must be developed through "careful and considered

consultation, cooperation, and coordination with the . . . permittees . . . involved."

43 U.S.C. § 1752(d); 36 C.F.R. § 222.2(b).  NFMA requires an AMP to be

consistent with the applicable forest plan.  16 U.S.C. § 1604(i).

The 1996 AMP was not developed in accordance with NEPA, FLPMA, or

NFMA.  The Forest Service introduced the 1996 AMP for the first time in response

to Plaintiffs' appeal.[51]  Doc 23-1, at 2, 12–13 (showing that neither Evan Johnston

nor Rick Cline had seen the document before the appeal).  The document is not

signed or dated.  AR 000869.  The Forest Service has not produced NEPA analysis

---

[51] Although Plaintiffs' grazing permits reference an AMP from 1996, the
document was never provided to Plaintiffs.  Doc 23-1, at 2, 12–13.  The Forest
Service instead provided Plaintiffs with a document it referred to as its "2001
AMP."  *See* AR 000166, 000178, 000181, 000883–84.  The Forest Service has
acknowledged that the 2001 AMP is invalid.  AR 001768.

for the document[52] or shown that it was created through consultation with the permittees in compliance with FLPMA. *See* 42 U.S.C. § 4332; 43 U.S.C. § 1752(d). In addition, the administrative record contains no evidence that an AMP was implemented in 1996. *Compare* AR 005810 (requiring AMP to be "developed concurrently with the completion of the site-specific analysis and project-level decision" and to "become a part of Part 3 of the grazing permit") *with* AR 000019 (showing that part 3 of Two Bar Ranch's 1996 grazing permit did not include an AMP). Even the Forest Service had created an AMP in 1996, it has not been amended to conform with the 2009 Forest Plan, as required by NFMA. *See* 16 U.S.C. § 1604(i). Because the 1996 AMP was not implemented pursuant to NEPA and FLPMA, and does not comply with NFMA, it is invalid. Even if the 1996 AMP were valid, however, the standards it provides—the 1995 IRMM— would not replace the 2009 Forest Plan standards because the 1995 IRMM are not site-specific standards, as explained below.

---

[52] As explained in Plaintiffs' Brief in Support of Motion for Preliminary Injunction, Doc. 18, at 12–13, the 1995 Environmental Assessment ("EA") and 1996 Decision Notice ("DN") are not NEPA analysis for the 1996 AMP. The 1995 EA and 1996 DN were NEPA analysis for the 1996 permit reissuance effort. The 1995 EA was—by its own terms—"limited to the proposed authorization of livestock grazing and associated practices." AR 004870. It did "not address general management," *id.*, which would be addressed later in AMPs or AOIs. AR 004922.

B.  The 1995 IRMM are not site-specific standards, and they were
    superseded by the 2009 Forest Plan standards.

The 1995 IRMM do not replace the 2009 Forest Plan standards.  The 2009

Forest Plan livestock grazing standards apply "unless or until specific . . .

allowable use levels have been designed through individual resource management

plans or site-specific NEPA decisions."  AR 004374.  When the Forest Service

develops site-specific standards, it must do so according to NEPA and NFMA.  *See*

36 C.F.R. § 220.4(c); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1512

(9th Cir. 1992).  The Forest Service has not produced NEPA analysis for standards

specific to Dry Cottonwood Allotment, nor has it produced site-specific standards.

The 1995 IRMM are not site-specific standards.  The 1995 IRMM were

developed for all allotments west of the continental divide in the Deerlodge unit.

AR 002758.  That area includes the *entire* Pintler Ranger District and part of the

Butte Ranger District.  *Id.*  The standards were prepared for a region, not a specific

Allotment.

The 2009 Forest Plan standards superseded the 1995 IRMM.  The 1995

IRMM were intended only "as *interim* direction until Forest Plans could be

revised."  AR 002749 (emphasis added).  When the 2009 Forest Plan superseded

the 1987 Deerlodge Plan and its amendments, the 2009 Forest Plan's forest-wide

interim livestock grazing standards superseded the 1987 Deerlodge Plan's

1995 IRMM.  AR 002895 (noting that the 2009 Forest Plan consolidated the 1995 IRMM and other direction "into a comprehensive strategy for the entire Forest"); 002901 (explaining that the 2009 Forest Plan livestock grazing standards consolidated existing interim measures).  The Forest Service considered *and rejected* an alternative that would have retained the 1995 IRMM standards for allotments west of the continental divide.  AR 003008–09.

By disregarding the 2009 Forest Plan and applying unlawful standards and an invalid AMP, the Forest Service violated NFMA, NEPA, and FLPMA.  The Court should reverse the Forest Service's conclusion that the 1996 AMP and 1995 IRMM govern management on Dry Cottonwood Allotment and remand with instructions for the Forest Service to apply the 2009 Forest Plan standards.  The Court should also set aside those portions of the 2018 AOIs that require Plaintiffs to comply with the 1995 IRMM and 1996 AMP.  Finally, the Court should set aside the 2016 and 2017 NONCs, which were issued based on the use of unlawful standards, as explained below.

## II.     The 2016 and 2017 NONCs should be set aside because they do not comply with the 2009 Forest Plan or due process (Counts 5 and 6).

The 2016 and 2017 NONCs should be set aside because they were issued based on the use of unlawful standards and without the proper procedure.  NONCs are cumulative.  AR 005869.  The Forest Service considers recent NONCs when

deciding whether to suspend or cancel a grazing permit. AR 005869. The presence of a NONC on a permittee's grazing record is, therefore, detrimental to the permittee. AR 005869. When a NONC is found to be invalid based on the use of unlawful standards or procedure, the NONC should be removed from the permittee's grazing record to prevent improper agency action.

In 2016 and 2017, the Forest Service issued NONCs to Plaintiffs based on their alleged violation of allowable use standards. The standards the Forest Service used to find Plaintiffs in noncompliance were unlawful. In addition, each NONC was issued with no prior attempt at informal resolution and no subsequent opportunity to comply. Plaintiffs challenged the NONCs in their administrative appeal. The Forest Supervisor agreed that the NONCs had applied the wrong allowable use standards, but she *reissued* the 2017 NONC with the 1995 IRMM standards. AR 001821–22. As explained in Section I of this brief, the 1995 IRMM standards are also unlawful. The 2016 NONC and 2017 NONC should be set aside because they are based on unlawful standards and do not comply with procedure required by law.

A.     The 2016 and 2017 NONCs should be set aside because they do not apply the standards set forth in the 2009 Forest Plan.

The 2016 and 2017 NONCs should be set aside because they were based on the use of unlawful standards. In 2016 and 2017, the standards the Forest Service

used to find Plaintiffs in noncompliance were unilaterally created by a rangeland management specialist without any procedure under NEPA or FLPMA. *See supra* pp. 4–6. In her final administrative decision, the Forest Supervisor revised and reissued the 2017 NONC with the 1995 IRMM standards. As explained in Section I above, the 1995 IRMM are also unlawful because they do not comply with the 2009 Forest Plan.

The record does not show that Plaintiffs violated the 2009 Forest Plan standards in 2016 or 2017. Under the 2009 Forest Plan standards, a permittee is not out of compliance unless more than fifteen percent of the management area exceeds allowable use levels. AR 004375. The Forest Service's monitoring results from 2016 and 2017 do not show that allowable use levels were exceeded on more than fifteen percent of the management area. *See* AR 000165–66, 000199. The Forest Service found Plaintiffs in noncompliance in 2016 and 2017 only by using unlawful standards that did not permit utilization to exceed allowable use levels *anywhere* on the allotment, even in isolated areas at stream crossings, stock tanks, or corrals. *See* AR 000165–66, 000199, 000202–03. Because the record does not support a finding that Plaintiffs violated the 2009

Forest Plan standards in 2016, or 2017,[53] the 2016 and 2017 NONCs should be set aside. The NONCs should also be set aside because they do not comply with due process, as explained below.

B.    The 2016 and 2017 NONCs are invalid because they do not comply with due process.

Due process requires the Forest Service to give permittees written notice of "facts or conduct which may warrant" adverse administrative action and an "opportunity to demonstrate or achieve compliance" before their permits are suspended. 5 U.S.C. § 558(c); *see also Anchustegui v. Dep't of Agric.*, 257 F.3d 1124, 1129 (9th Cir. 2001). Before issuing a NONC, the Forest Service must make documented attempts to resolve concerns informally. AR 005869. If informal efforts fail, the Forest Service must issue a NONC that (1) specifically describes the permit violation, (2) explains the action required to demonstrate compliance "including specifications for satisfactory accomplishment," (3) identifies the date by which the corrective action must be completed, and (4) warns that failure to correct may result in adverse administrative action. AR 005861–62, 005867. Suspension proceedings are inappropriate unless the permittee and Forest Service

---

[53] The 2017 NONC also states that Plaintiffs exceeded allowable use standards in 2015, but the appeal record contradicts that finding. *Compare* AR 000198 *with* AR 000974–75 (showing Plaintiffs in full compliance in 2015).

"cannot work out their differences after a meeting <u>and</u> the permittee refuses to take the corrective action outlined in the NONC." AR 005862 (emphasis added).

The 2016 and 2017 NONCs do not comply with due process. First, the Forest Service issued the NONCs without attempting informal resolution. AR 001676–77, 001684–86, 001689. Second, the NONCs did not specifically describe the alleged permit violations.[54] *Compare* AR 005871 (requiring specific description) *and* AR 005863 (sample NONC with detailed description) *with* AR 000165 (2016 NONC stating generally "more maintenance . . . needs to occur"). Third, the NONCs failed to identify corrective action Plaintiffs could take or provide a timeframe for completion.[55] *Compare* AR 005863 (sample NONC requiring a water gap to "be maintained to standards . . . by May 30, 2002) *with* AR 000167, 000201–02 (stating generally that Plaintiffs must maintain all structural improvements before grazing). Finally, the 2016 and 2017 NONCs were issued *after* the grazing season was over, when Plaintiffs could no longer cure.

---

[54] The 2016 NONC cited Plaintiffs for failing to maintain structural improvements, but did not identify any improvements Plaintiffs failed to maintain. The three springs identified in the 2016 NONC were springs Plaintiffs and the Forest Service assessed for reconstruction in <u>2017</u>, they were not neglected in 2016. *See* AR 000165, 001711. Plaintiffs are not aware of any improvements they failed to maintain in 2016.

[55] The 2016 NONC cited Plaintiffs for improper salt placement. Plaintiffs acknowledge the violation, but the salt was discovered within 48 hours and was removed immediately. The incident was resolved three months before the Forest Service issued the 2016 NONC. *See* AR 001684.

*Compare* AR 005863 (sample NONC: issued one day after violation discovered) *with* AR 000164–65 (2016 NONC: issued 45 days after grazing season ended and 90 days after concerns identified); AR 000178 (2017 NONC: issued 60 days after grazing season ended and 90 days after concerns identified). In addition, the 2017 NONC deprived Plaintiffs of *any* opportunity to cure by serving as both the notice and decision. *See Anchustegui*, 257 F.3d at 1129 (finding that the Forest Service violated due process by initiating cancellation proceedings without first giving the permittee a chance to achieve compliance).

The Forest Service erred in finding that it was not required to give notice and opportunity to comply. Plaintiffs challenged the 2016 and 2017 NONCs in their administrative appeal. *See* AR 001642–54. In its final decision, the Forest Service determined it was not required to provide an opportunity to comply before initiating suspension proceedings.[56] AR 001821. The Forest Service then reissued the 2017 NONC without correcting its procedural deficiencies. *See* AR 001822, 000198–203. The 2016 and 2017 NONC should be set aside because they do not apply the correct standards and do not comply with due process.

---

[56] The Forest Service claimed it was not required to provide opportunities to comply for repeated incidents of noncompliance. AR 001821. This case does not involve repeated incidents of noncompliance. Until the Forest Service began unilaterally changing allowable use standards in 2016, Plaintiffs had never received a NONC. In both 2016 and 2017, the Forest Service waited until *after* the grazing season was over to find Plaintiffs in noncompliance, denying them any opportunity to cure during the season.

**III.   The Forest Service wrongly denied Plaintiffs fees and expenses under EAJA based on an error of law (Count 7).**

Plaintiffs are entitled to attorney's fees for prevailing in their administrative appeal of the District Ranger's December 15, 2017 decision to suspend a portion of their term grazing permits.  Under EAJA, an agency must award fees and expenses to the prevailing party in an adversary adjudication unless the agency's position was substantially justified or special circumstances make an award unjust. 5 U.S.C. § 504(a)(1); *see also* 7 C.F.R. §§ 1.181, 1.182.  The Forest Service bears the burden of showing that its actions were substantially justified.  H.R. Rep. No. 96–1418, at 11 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4953, 4989.  "[T]he agency does not have discretion to deny attorney fees; the award is mandatory unless an exception applies or unless a party fails to qualify."  *Grason Elec. Co. v. Nat'l Labor Relations Bd.*, 951 F.2d 1100, 1101 (9th Cir. 1991).  "EAJA grew out of Congress' concern that the high costs of litigation might deter small entities from vindicating their rights when faced with an adverse action by a federal agency."  *Id.*  Congress recognized "that small businesses are the target of agency action precisely because they do not have the resources to fully litigate the issue." H.R. Rep. No. 96–1418, at 10, 1980 U.S.C.C.A.N. at 4988.

EAJA "applies to all civil actions except . . . those already covered by existing fee-shifting statutes."  *Id.* at 18, 1980 U.S.C.C.A.N. at 4997.  It allows a

prevailing party to recover attorney's fees after a final decision has been issued in an adversary adjudication. 5 U.S.C. § 504(a); 7 C.F.R. § 1.182. EAJA defines "adversary adjudication" as "an adjudication under [5 U.S.C. § 554] in which the position of the United States is represented by counsel or otherwise." 5 U.S.C. § 504(b)(1)(C); *see also* 7 C.F.R. § 1.183. Section 554 applies to every "adjudication required by statute to be determined on the record after opportunity for an agency hearing." § 554(a). Section 554 also applies when due process requires the opportunity for a hearing.[57] *Collard v. U.S. Dep't of Interior*, 154 F.3d 933, 936 (9th Cir. 1998).

Congress's sole focus in limiting EAJA to "adversary adjudications" was to ensure that the United States would "not be liable in an administrative proceeding in which its interests [were] not represented." H.R. Rep. No. 96–1418, at 12, 1980 U.S.C.C.A.N. at 4991; *see also* H.R. Rep. No. 96–1434, at 23 (1980), *reprinted in* 1980 U.S.C.C.A.N. 5003, 5012 (explaining that an adversary adjudication means any adjudication in which "the agency takes a position through representation" and that a non-adversarial adjudication can become adversarial if "the agency . . . take[s] a position at some point in the adjudication"). Adjudications involving the suspension of a license are subject to EAJA, and "[a] party who prevails in [those]

---

[57] For a more thorough discussion of Section 554's applicability in due process hearings, see Doc. 57, at 9–13.

circumstances is entitled to an award of attorney fees." H.R. Rep. No. 96–1418, at 15, 1980 U.S.C.C.A.N. at 4994; *see also Western Watersheds Project v. Interior Board of Land Appeals*, 624 F.3d 983, 988 (9th Cir. 2010). Grazing permits are licenses. *Anchustegui*, 257 F.3d at 1129.

Plaintiffs are entitled to attorney's fees for their successful administrative appeal of the suspension decision. The Forest Service suspended twenty percent of Plaintiffs' term grazing permits on December 15, 2017. AR 000184–89, 000444–49, 000686–91. Plaintiffs timely appealed the suspension to the Forest Supervisor (Deciding Officer). AR 001626; 36 C.F.R. § 214.9. In their appeal, Plaintiffs challenged the Forest Service's decision to suspend on the basis of three primary errors: (1) failure to provide notice and opportunity to comply pursuant to 5 U.S.C. § 558(c), *see* AR 001642–54, 001777–84; (2) use of unauthorized allowable use standards, AR 001660–62, 001784–88; and (3) lack of substantial evidence, AR 001662–67; 001790–97. Plaintiffs also asserted that the Forest Service acted in bad faith by altering and withholding information. AR 001788–90 (asserting that the Forest Service "deliberately withheld or fabricated evidence after the [Forest Service's] decision to suspend was issued"). The District Ranger (Responsible Officer) appeared on behalf of the United States and provided argument for the United States in the adversary adjudication. *See* AR 002758–73; 36 C.F.R. § 214.12(a). Based on the parties' arguments, the Forest Supervisor

reversed the suspension and reinstated Plaintiffs' full grazing privileges. AR 001822; 36 C.F.R. § 214.18. The Regional Forester (Discretionary Reviewing Officer) denied review. AR 001828; 36 C.F.R. § 214.19(e). Neither the Forest Service nor the Plaintiffs appealed the reversal, rendering that "discrete substantive portion of the proceeding" final and unreviewable. 7 C.F.R. § 1.193(a); *see also* 5 U.S.C. § 504(a)(2).

Attorney's fees are not available as a matter of right under Forest Service regulations, *see* 36 C.F.R. § 214.14(i), so Plaintiffs must pursue them under EAJA. "EAJA provides a limited waiver of sovereign immunity for recovery of costs and fees by small businesses against the United States[] in both administrative and court proceedings." *Sw. Marine, Inc. v. United States*, 43 F.3d 420, 421 (9th Cir. 2994) (citing 5 U.S.C. § 504 for administrative proceedings and 28 U.S.C. § 2412 for judicial proceedings). Thus, a party who prevails on discrete issues at both the administrative and judicial levels can recover fees and costs under 5 U.S.C. § 504 for the administrative proceedings and under 28 U.S.C. § 2412 for the judicial proceedings. *See id.* Plaintiffs currently seek fees and expenses under 5 U.S.C. § 504 for prevailing on their administrative appeal of the permit suspensions. If they prevail on a substantive issue in federal court, they can later seek fees and expenses under 28 U.S.C. § 2412 for the judicial proceedings.

A request for attorney's fees under 5 U.S.C. § 504 begins with the deciding officer who issued the favorable decision at the administrative level. *See* 5 U.S.C. § 504(a)(1)–(2), (b)(1)(D). Plaintiffs filed a timely application with the Forest Supervisor (Deciding Officer). *See* AR 001830–56; 7 C.F.R. § 1.193(a). The Forest Service did not oppose the application. *See* 7 C.F.R. § 1.195 (requiring the Forest Service to file an answer within 30 days if it opposes the application). Nonetheless, the Forest Supervisor denied Plaintiffs' request without review. The Forest Supervisor concluded that because 36 C.F.R. § 214.14(i) does not grant attorney's fees in grazing permit appeals, Plaintiffs could not seek attorney's fees under EAJA. AR 001857. The Forest Supervisor erred as a matter of law. EAJA and 36 C.F.R. § 214.14(i) are not related.

EAJA applies only when attorney's fees are not *already* available. H.R. Rep. No. 96–1418, at 18, 1980 U.S.C.C.A.N. at 4997. If a statute or regulation makes fees and costs available to the prevailing party automatically, EAJA does not apply. *Id.*, 1980 U.S.C.C.A.N. at 4997. Thus, contrary to the Forest Supervisor's conclusion, EAJA applies *because* 36 C.F.R. § 214.14(i) does not automatically allow fee awards against the United States in grazing permit appeals, not vice versa. *Id.*, 1980 U.S.C.C.A.N. at 4997.

Plaintiffs request for attorney's fees under EAJA was proper. *See* 7 C.F.R. § 1.183(b) (explaining that if there is question regarding whether a proceeding is

covered by EAJA, the question is "an issue for resolution in proceedings on the application"). The Forest Service erred as a matter of law by denying Plaintiffs' request for attorney's fees under EAJA without considering their application. The Forest Service's decision to suspend Plaintiffs' grazing permits based on the use of unlawful standards and procedure was unsubstantiated. Plaintiffs prevailed on appeal, and the Forest Service did not oppose their request for attorney's fees. Accordingly, Plaintiffs' fees and expenses for the administrative proceedings should be awarded as a matter of law. *See* H.R. Rep. No. 96–1418, at 5–6, 15, 1980 U.S.C.C.A.N. at 4984, 4994.

## CONCLUSION

The Forest Service violated federal law by disregarding the 2009 Forest Plan, failing to comply with due process, and denying Plaintiffs' request for fees and expenses under EAJA. For the reasons set forth above, Plaintiffs request summary judgment on all counts set out in Plaintiffs' Amended Complaint.

RESPECTFULLY submitted this 14th day of December, 2018.

/s/ Calli J. Michaels
John E. Bloomquist
Calli J. Michaels
BLOOMQUIST LAW FIRM, P.C.
*Attorneys for Plaintiffs*
*Two Bar Ranch, Broken Circle*
*Ranch, and R Bar N*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(d)(2)(E), I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 6420, excluding caption, certificate of compliance, table of contents, and table of authorities.

/s/ Calli J. Michaels
John E. Bloomquist
Calli J. Michaels
BLOOMQUIST LAW FIRM, P.C.
*Attorneys for Plaintiffs*
*Two Bar Ranch, Broken Circle*
*Ranch, and R Bar N*