**MARK STEGER SMITH**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**2601 Second Avenue North, Suite 3200**
**Billings, MT 59101**
**Phone: (406) 247-4667**
**Fax: (406) 657-6058**
**Email: mark.smith3@usdoj.gov**

**ATTORNEY FOR DEFENDANT**
**UNITED STATES OF AMERICA**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BUTTE DIVISION**

| | |
|---|---|
| **2-BAR RANCH LIMITED PARTNERSHIP, a Montana limited partnership, et al.,** | **CV 18-33-BU-SEH** |
| **Plaintiffs,** | **FEDERAL DEFENDANTS' BRIEF IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND COMBINED RESPONSE TO PLAINTIFFS' SUMMARY JUDGMENT MOTION** |
| **vs.** | |
| **UNITED STATES FOREST SERVICE, et al.,** | |
| **Defendants.** | |

# TABLE OF CONTENTS

Table of Authorities ....................................................................... iii

Introduction ................................................................................. 1

Factural Background ...................................................................... 2

Analysis ..................................................................................... 10

I.  Individual Plaintiffs and claims that lack Article III standing must be
dismissed .................................................................................. 10

    A.  Broken Circle is no longer a permittee. ................................................11

    B.  The 2018 Annual Operating Instructions are moot. ...............................11

    C.   The notices of non-compliance are not justiciable final
        agency actions. ...................................................................13

    D.   Plaintiffs lack prudential standing for NEPA claims. ..........................16

    E.   A favorable decision cannot enact 2009 Forest Plan
        grazing standards. ................................................................18

II.  USFS's substantive grazing management determinations were not arbitrary
and capricious. ............................................................................ 22

    A.  USFS's determination that interim standards from the 2009
        Forest Plan do not apply to the Dry Cottonwood allotment
        was not arbitrary and capricious. ..........................................27

        1.  Plaintiffs claims under NEPA or NFMA, and FLPMA
            are time-barred, and lack merit; the 1996 AMP was
            properly adopted. ..........................................................30

        2.  Site-specific Riparian Mitigation Measures for Dry
            Cottonwood allotment were not superseded by the 2009
            Forest Plan. .................................................................36

B. The 2016 and 2017 notices of non-compliance were not arbitrary and capricious. .........................................................................38

    1. The notices of non-compliance were properly based on allotment management standards from the 1996 AMP. ..................39

    2. USFS complied with APA and provided all process that was due for the 2016 and 2017 notices of non-compliance. ....................................................................................41

III. USFS correctly determined Plaintiffs were not entitled to repayment of attorneys' fees for the administrative adjudication........................................... 47

Conclusion ..................................................................................... 56

Certificate of Compliance ............................................................. 57

Certificate of Service ................................................................... 58

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Aageson Grain & Cattle v. U.S. Dep't of Agric.*,
    500 F.3d 1038 (9th Cir. 2007) .......................................................47
*Air Brake Sys., Inc. v. Mineta*,
    357 F.3d 632 (6th Cir. 2004) .........................................................15
*Air California v. U.S. Dep't of Transp.*,
    654 F.2d 616 (9th Cir. 1981) .........................................................14
*American Rivers v. Nat'l Marine Fisheries Service*,
    126 F.3d 1118 (9th Cir. 1997) ................................................ 10, 11
*Anchustegui v. Dep't of Agric.*,
    257 F.3d 1124 (9th Cir. 2001) ....................................... 41, 42, 43
*Armstrong v. Manzo*,
    380 U.S. 545 (1965)........................................................................45
*Auer v. Robbins*,
    519 U.S. 452 (1997)................................................................ 24, 36
*Bennett v. Spear*,
    520 U.S. 154 (1997)........................................................................14
*Bensman v. U.S. Forest Serv.*,
    408 F.3d 945 (7th Cir. 2005) .........................................................31
*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*,
    149 F.3d 971 (9th Cir. 1998) .........................................................45
*Buckingham v. Sec'y of U.S. Dep't of Ag.*,
    603 F.3d 1073 (9th Cir. 2010) .......................................................46
*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)........................................................................35
*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985)........................................................................45
*Collord v. U.S. Dep't of Interior*,
    154 F.3d 933 (9th Cir. 1998) .........................................................52
*Concrete Pipe & Products v. Construction Laborers Pension Trust*,
    508 U.S. 602 (1993)................................................................ 24, 29
*Conservation Cong. v. U.S. Forest Serv.*,
    720 F.3d 1048 (9th Cir. 2013) ................................................ 23, 40
*Daniels v. Williams*,
    474 U.S. 327 (1986)........................................................................45
*Deakins v. Monaghan*,
    484 U.S. 193 (1988)........................................................................10

*Douglas County v. Babbitt*,
   48 F.3d 1495 (9th Cir. 1995) .......................................................16
*Ecology Ctr., Inc. v. U.S. Forest Serv.*,
   192 F.3d 922 (9th Cir. 1999) ........................................ 15, 16, 22
*F.T.C. v. Standard Oil Co.*,
   449 U.S. 232 (1980)....................................................................13
*Fairchild Farms v. USDA*,
   406 F.Supp.2d 1132 (2005) ................................................ 48, 53
*Federal Power Comm'n v. Idaho Power Co.*,
   344 U.S. 17 (1952).......................................................................12
*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985)....................................................................18
*Forest Guardians v. U.S. Forest Serv.*,
   329 F.3d 1089 (9th Cir. 2003) ...................................................25
*Friends of the Earth v. Hintz*,
   800 F.2d 822 (9th Cir. 1986) .....................................................23
*Gallo Cattle Co. v. U.S.D.A.*,
   159 F.3d 1194 (9th Cir. 1998) ...................................................13
*Grason Elec. Co. v. N.L.R.B.*,
   951 F.2d 1100 (9th Cir. 1991) ...................................................52
*Gros Ventre Tribe v. United States*,
   344 F. Supp. 2d 1221 (D. Mont. 2004)......................................22
*Handron v. Sebelius*,
   669 F. Supp. 2d 490 (D.N.J. 2009)............................. 47, 49, 51, 54
*Hapner v. Tidwell*,
   621 F.3d 1239 (9th Cir. 2010) ...................................................29
*Hecla Min. Co. v. U.S. E.P.A.*,
   12 F.3d 164 (9th Cir. 1993) .......................................................13
*Hells Canyon Alliance v. U.S. Forest Serv.*,
   227 F.3d 1170 (9th Cir. 2000) ...................................................25
*Ill. Pub. Telecomms. Ass'n v. FCC*,
   123 F.3d 693 (D.C. Cir. 1997)....................................................19
*Irvine Med. Ctr. v. Thompson*,
   275 F.3d 823 (9th Cir. 2002) .....................................................23
*Jacks v. Crabtree*,
   114 F.3d 983 (9th Cir. 1997) .....................................................44
*Lake Pilots Ass'n, Inc. v. U.S. Coast Guard*,
   257 F. Supp. 2d 148 (D.D.C. 2003)............................................12
*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) .....................................................23

*Lewis v. Continental Bank Corp.*,
   494 U.S. 472 (1990)....................................................................10

*Loumiet v. Office of Comptroller of Currency*,
   650 F.3d 796 (D.C. Cir. 2011)...................................................54

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)........................................................... 10, 21

*Lujan v. National Wildlife Federation*,
   497 U.S. 871 (1990)....................................................................17

*Marsh v. Or. Natural Res. Council*,
   490 U.S. 360 (1989)....................................................................24

*Nat. Res. Def. Council, Inc. v. Hodel*,
   624 F. Supp. 1045 (D. Nev. 1985)............................................33

*National Helium Corp. v. Morton*,
   455 F.2d 650 (10th Cir. 1971) ...................................................22

*Native Ecosystems Council v. Dombeck*,
   304 F.3d 886 (9th Cir. 2002) .....................................................22

*Nat'l Wildlife Fed'n v. Burford*,
   871 F.2d 849 (9th Cir. 1989) .....................................................23

*Nevada Land Action Ass'n v. USFS*,
   8 F.3d 713 (9th Cir. 1993) ................................................. 17, 18

*North Carolina v. Rice*,
   404 U.S. 244 (1971)....................................................................10

*Norton v. S. Utah Wilderness Alliance*,
   542 U.S. 55 (2004)............................................................. 20, 21

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
   361 F.3d 1108 (9th Cir. 2004) ...................................................16

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998)....................................................................25

*Or. Natural Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir. 2006) ........................................... 26, 27, 28

*Oregon Nat. Desert Ass'n v. United States Forest Serv.*,
   No. 3:03-CV-0213-PK, 2018 WL 1811467 (D. Or. Apr. 16, 2018) .............35

*Pacificorp v. Thomas*,
   883 F.2d 661 (1988)....................................................................14

*Parratt v. Taylor*,
   451 U.S. 527 (1981)....................................................................45

*Pierce v. Underwood*,
   487 U.S. 552 (1988)....................................................................54

*Preiser v. Newkirk*,
   422 U.S. 395 (1975)....................................................................10

*Reed v. Salazar*,
744 F.Supp.2d 98 (D.D.C. 2010) ................................................................. 19

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ..................................................................................... 24

*Rowell v. Sullivan*,
813 F.Supp. 78 (D.D.C.1993) ....................................................................... 51

*San Luis & Delta-Mendota Water Auth.*,
747 F.3d 581 (9th Cir. 2014) ................................................................. 18, 23

*Sierra Club v. Penfold*,
857 F.2d 1307 (9th Cir. 1988) ....................................................................... 31

*Sierra Club v. Slater*,
120 F.3d 623 (6th Cir. 1997) ......................................................................... 30

*Sisseton-Wahpeton Sioux Tribe v. United States*,
895 F.2d 588 (9th Cir. 1990) ......................................................................... 31

*Smith v. Marsh*,
787 F.2d 510 (10th Cir. 1986) ....................................................................... 30

*Sohappy v. Hodel*,
911 F.2d 1312 (9th Cir. 1990) ....................................................................... 48

*Spencer v. Kemna*,
523 U.S. 1 (1998) ............................................................................. 10, 13, 27

*St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*,
309 F.3d 680 (10th Cir. 2002) ....................................................................... 28

*Sullivan v. Hudson*,
490 U.S. 877 (1989) ................................................................................ 49, 50

*Sw. Williamson Cty. Cmty. Ass'n, Inc. v. Slater*,
173 F.3d 1033 (6th Cir. 1999) ....................................................................... 30

*Swan View Coal. v. U.S. Forest Serv.*,
782 F. Supp. 2d 1132 (D. Mont. 2011) .......................................................... 30

*Taylor-Callahan-Coleman Ctys. Dist. Adult Prob. Dep't v. Dole*,
948 F.2d 953 (5th Cir. 1991) ......................................................................... 16

*Thomas Jefferson Univ. v. Shalala*,
512 U.S. 504 (1994) ................................................................................ 28, 29

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
136 F.3d 641 (9th Cir. 1998) ................................................................... 12, 13

*United States v. Backlund*,
689 F.3d 986 (9th Cir. 2012) ......................................................................... 15

*United States v. Chi Tong Kuok*,
671 F.3d 931 (9th Cir. 2012) ......................................................................... 50

*United States v. Fifty-Three (53) Eclectus Parrots*,
685 F.2d 1131 (9th Cir. 1982) ....................................................................... 44

*West Penn Power Co. v. Train,*
 522 F.2d 302 (3rd Cir. 1975) ...................................................................14
*Western Watersheds Project v. Interior Board of Land Appeals,*
 624 F.3d 983 (9th Cir. 2010) ...................................................................52
*Willis v. Sullivan,*
 931 F.2d 390 (6th Cir. 1991) ...................................................................51

## Statutes

5 U.S.C. § 504(a)(1)............................................................... 46, 47, 48, 54
5 U.S.C. § 551 ............................................................................................43
5 U.S.C. § 554 ................................................................................ 47, 49, 51
5 U.S.C. § 556 ............................................................................................53
5 U.S.C. § 556(e) .......................................................................................54
5 U.S.C. § 558 ............................................................................................41
5 U.S.C. § 558(c) .......................................................................................42
5 U.S.C. § 701 ............................................................................................22
5 U.S.C. § 704 ..................................................................................... 13, 15
5 U.S.C. § 706(2)(A) ........................................................................... 12, 22
7 U.S.C. § 1011(f) .....................................................................................52
16 U.S.C. § 472 ..........................................................................................52
16 U.S.C. § 551 ..........................................................................................52
16 U.S.C. § 1604 ........................................................................................25
16 U.S.C. § 1604(i) ............................................................................. 25, 26
28 U.S.C. § 2401(a) ...................................................................................30
42 U.S.C. § 4321 ........................................................................................17
42 U.S.C. § 4332(2)(C) ..............................................................................24
43 U.S.C. § 315(b) .....................................................................................41
43 U.S.C. §§ 1701-1787 ............................................................................26
43 U.S.C. §§ 1702(p) .................................................................................26

## Regulations

36 C.F.R. § 214.16(e) ................................................................................54
36 C.F.R. § 214.4 .........................................................................................8
36 C.F.R. § 214.16 .....................................................................................53
36 C.F.R. § 214.19(a) .................................................................................46
36 C.F.R. § 214.2 .......................................................................................53
36 C.F.R. § 214.8(a) ...................................................................................46
36 C.F.R. § 222.1(b)(1)..............................................................................26
36 C.F.R. § 222.1(b)(5)..............................................................................26

36 C.F.R. § 251 ...................................................................................15

40 C.F.R. § 1502.24 ............................................................................25

40 C.F.R. § 1508.9(a)(1).....................................................................24

# INTRODUCTION

Plaintiffs are grazing permittees that run livestock on public lands in the Beaverhead-Deerlodge National Forest. They advance numerous claims under the Administrative Procedures Act (APA) that the Forest Service (USFS) treated them unfairly, arbitrarily and capriciously imposing incorrect resource management standards on their grazing, resulting in two erroneous Notices of Non-Compliance. But, as set forth in greater detail below, Plaintiffs are wrong.

Contrary to Plaintiffs' claims, USFS applied the proper site-specific management standards from a 1996 Allotment Management Plan (AMP), and followed all the procedural and substantive rules for administering grazing permits. USFS's interpretation of its own regulations, including the Beaverhead-Deerlodge Forest Plan, is presumptively correct and entitled to great deference. In this case, USFS's interpretation accords with common sense and the black letter of the Forest Plan, which calls for utilization of the 1996 AMP and standards incorporated therein.

The Notices of Non-Compliance that arose a result of Plaintiffs' violation of those standards were neither improper nor a deprivation of due process. The Notices derived from Plaintiffs' history of repeatedly damaging public land and water resources through overgrazing, failing to monitor, and failing to build fences and watering structures. They were not a final agency action, they

imposed no penalties, and they were issued after repeated non-compliance and repeated unsuccessful efforts to informally resolve the problem. As such, Plaintiffs' claims concerning the Notices are not justiciable under the APA. Even if they were justiciable, the claims lack all merit.

Plaintiffs also argue USFS arbitrarily and capriciously denied their claim for repayment of attorneys' fees for the administrative appeal in this matter. But Plaintiffs are not entitled to such fees. The appeal is explicitly categorized as ineligible for such fee-shifting. The appeal was just an exchange of documents, which by definition cannot be "adversarial" and capable of supporting fee-shifting under the APA or the Equal Access to Justice Act. The position of the United States was not represented by counsel or otherwise, the proceeding was not formal, and was not required to be on the record. As such, USFS's determination to deny attorney fees was correct.

## FACTUAL BACKGROUND

The Dry Cottonwood allotment is National Forest System land where the Forest Service (USFS) has previously allowed livestock grazing under permit. It is part of the Beaverhead-Deerlodge National Forest, and is located primarily in the northeast part of Deer Lodge County, Montana.

Between 1987 and 2009, all Dry Cottonwood permits were administered under the 1987 Deerlodge Forest Plan. In July 1995, the Deerlodge Forest Plan

was amended by the INFISH Decision. G-05:2671-2708. The INFISH

decision sought to remedy water quality and fish habitat degradation caused by

several factors, including overgrazing and trampling of riparian areas. *Id*.

INFISH added the following standard to the Deerlodge Forest Plan:

> GM-1 Modify grazing practices (e.g., accessibility of
> riparian areas to livestock, length of grazing season,
> stocking levels, timing of grazing, etc.) that retard or prevent
> attainment of Riparian Management Objectives or are likely
> to adversely affect inland native fish. Suspend grazing if
> adjusting practices is not effective in meeting Riparian
> Management Objectives.

AR G-05:2699. In September 1995, USFS developed Riparian Mitigation

Measures to meet the INFISH Riparian Management Objectives. H-03:4903.

These measures prescribed Allowable Use Levels (AULs) for stream

disturbance, stubble height, woody utilization and forage utilization. *Id*. at

4903-4905.

In November 1995, USFS conducted an Environmental Analysis (EA)

under the National Environmental Policy Act (NEPA) to determine whether

livestock grazing should continue on the Dry Cottonwood allotment, and if so,

under what conditions. H-03:4903-4905. In January 1996, USFS issued a

Decision Notice / Finding of No Significant Impact which continued to permit

grazing on the Dry Cottonwood Allotment. H-08:4912-4922. Grazing could

continue at the existing stocking rate, using the established rest-rotation grazing

system, but permittees would need to build a new water development, and build fences to prevent livestock grazing along the South Fork of Girard Creek. H-03:4874-4875.  Further, permittees would be required to monitor range conditions, and implement Riparian Mitigation Measures.  *Id.*

Site-specific AULs for the Dry Cottonwood allotment were the same as prescribed in the September 1995 Riparian Mitigation Measures.  H-03:4903-4905.  Under these conditions, the decision determined grazing could meet USFS's riparian management objectives under the Forest Plan and under INFISH.  H-03:4876; H-08:4914-4915 ("…mitigation measures are believed to be sufficient to achieve Forest Plan standards for riparian areas").

Following the decision, USFS drafted an Allotment Management Plan (AMP) to implement the grazing decision.  H-11:4925, H-12:4928.   Riparian Mitigation Measures were updated in 1997: Allowable Use Levels remained the same, but specified certain measurement methods.  J-01:5784-5787.

USFS authorizes up to four entities to graze cattle on this allotment, three of which are plaintiffs here: 2-Bar Ranch, R Bar N Ranch, and Broken Circle Ranch.  USFS issued a 10-year term grazing permit to 2-Bar Ranch in June 1996.  This permit attached and incorporated management standards and AULs from the 1995 Riparian Mitigation Measures.  A-05:14-23.  USFS issued a second 10-year grazing permit to 2-Bar Ranch in June, 2006.  A-31:70-80.  The

2006 permit incorporated management standards and AULs from the 1997

iteration of the Riparian Mitigation Measures.  The permit states,

> The Environmental Assessment and Allotment Management
> Plan (AMP) for the Dry Cottonwood Allotment, approved
> January 23, 1996, is hereby made a part of this permit. …
> The Deerlodge Riparian Use Criteria, approved March 12,
> 1997, are attached (Pages 8-10) and are hereby made a part
> of this permit.

AR A-31:76.

In April 2016, 2-Bar Ranch received another 10-year term grazing permit

with same provisions, including the 1997 Riparian Mitigation Measures.  When

2-Bar signed each of the foregoing permits, it attested that it had "reviewed and

accepted the terms of this permit."  *See*, A-31:70, A-58:144, A-59:154.

USFS issued a term grazing permit to R Bar N Ranch in May 2006.  The

permit attached and incorporated the same 1997 Deerlodge Riparian Mitigation

Measures and AULs discussed above.  C-09:546-556.  In April 2016, R Bar N

Ranch received another 10-year term grazing permit with the same AULs.

C-41:647-655.  The 2016 permit states it is subject to the Beaverhead-

Deerlodge Forest Plan, and explicitly incorporates the 1996 AMP and 1997

Riparian Mitigation Measures.  *Id*. at 651 (noting they are "hereby made a part

of this permit.").  R Bar N Ranch expressly accepted the terms and conditions

of both permits.  C-09:546, C-41:647.

USFS issued a 10-year term grazing permit to Broken Circle Ranch in October 2004. B-05:301-310. Broken Circle accepted the terms of the permit, including special terms and conditions like the 1997 Riparian Use Criteria and maintenance responsibilities. *Id*. USFS renewed Broken Circle's 10-year term permit when it expired in 2014. B-34:389-399. The renewed permit included the same terms and conditions, which were again explicitly accepted by Broken Circle. *Id*. On July 31, 2018, Broken Circle voluntarily surrendered its grazing permit, which was then terminated by USFS. B-67:518-519.

USFS repeatedly notified the Dry Cottonwood permittees when they failed to maintain structural improvements, or exceeded Allowable Use Levels, as required by their permits. *See*, e.g. A-11:34, A-14:38, A-18:44, A-36:90, and A-37:91.

In 2009, USFS approved a revised Forest Plan for the Beaverhead-Deerlodge National Forest. G-08:2820-2870. Livestock Grazing Standard 1 imposed interim AULs for "any allotment management plan lacking riparian management objectives and guides designed specifically for that allotment." G-10:4374. Because the Dry Cottonwood allotment already had riparian management objectives and guides specifically applicable to that allotment, the 2009 Forest Plan interim AULs did not, and do not, apply to Dry Cottonwood. Plaintiffs accepted these terms when they signed their permits in 2006 and

2016.  *See* A-31:76, A-59:154, C-09:546, C-41:647.  The 2009 Forest Plan did not replace existing standards on the allotment, and nothing required riparian management objectives to post-date the Forest Plan.  *See* generally G-10.

During the 2015 grazing season, USFS conducted range inspections on the Dry Cottonwood allotment, noted conditions, and completed a compliance worksheet, using standards set by the permits, including the 1997 Riparian Mitigation Measures.  E-15:909, E-17:974.  During the 2016 grazing season, USFS again inspected the Dry Cottonwood allotment, and compiled reports, using the 1997 criteria specified in the permits.  E-18:976, E-19:1009-1019, E-21:1062-1063.  In November 2016, USFS sent a notice of non-compliance to all permit holders on the Dry Cottonwood Allotment.  The notice detailed several violations including inappropriate salting, failure to maintain structural improvements, and exceeding Allowable Use Levels (AULs).  A-62:164-168.

Notices of Non-Compliance are issued based on terms and conditions in grazing permits.  In 2016 and 2017, USFS inspectors compiled allotment notes for Dry Cottonwood.  *See* E-18, E-34.  They describe USFS's repeated attempts to informally resolve permit violations primarily associated with maintaining and constructing water developments and moving cattle out of heavily used pastures. *Id*.  Despite these efforts at informal resolution, Dry Cottonwood

permittees continued to overgraze allotment pastures and fail to abide with required AULs.  F-04:1676-77, 1684-86, 1689.  Details of the permit violations were explained in the Notices.  A-62:164-166, A-74:198-201.  The 2017 Notice of Non-Compliance states "Failing to correct these violations and complete the management actions and remedies within the prescribed timeframes…my result in the initiation of permit suspension…"  A-74:203.

USFS sent a second Notice of Non-Compliance to the permittees in November 2017, detailing exceedances of Allowable Use Levels.  A-67:178-183.  The Allotment Inspection Report (E-34:1089-1113) and data sheets (E-33:1083-1088) document USFS's monitoring methods and data relevant to the Notices.

On December 15, 2017, District Ranger Cameron Rasor issued a decision suspending 20% of the grazing for all permittees on the Dry Cottonwood Allotment.  A-68:184-189.  The decision was a result of the permittees' repeated failures to meet allowable use standards in 2015, 2016, and 2017.  *Id.* at 184.  The permittees administratively appealed this decision pursuant to 36 C.F.R. §214.4.

In the appeal, Plaintiffs complained the allowable use standards in their permits were confusing.  In the appeal decision, Supervisor Glossa noted that AULs under the permits must be consistent with the 1996 Decision Notice

authorizing continued grazing.  F-15:1822.  Supervisor Glossa remedied any possible confusion undergirding the permit suspensions by reversing the 20% suspension of grazing privileges and restoring permittees' full grazing privileges. F-15:1819-1823.  Ranger Rasor formally lifted the permit suspension and notified Plaintiffs they would be authorized to graze full permitted numbers in 2018.  A-73:196, C-59:704.

Permittees sought to recover attorneys' fees for the administrative appeal. F-20.  This request was denied because the appeal regulations at 36 CFR §214.14(i) do not permit recovery of fees for administrative appeals: "Each party to an appeal shall bear its own expenses, including costs associated with preparing the appeal, participating in an oral presentation, obtaining information regarding the appeal, and retaining professional consultants or counsel." F-21:1857.

Supervisor Glossa initiated procedures for discretionary review (F-15:1823, F-16:1824) but Regional Forester Marten declined to review Glossa's decision.  F-17:1825, F-18:1828.

# ANALYSIS

## I.  INDIVIDUAL PLAINTIFFS AND CLAIMS THAT LACK ARTICLE III STANDING MUST BE DISMISSED.

<u>Standard of review</u>.

Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies.  *Deakins v. Monaghan*, 484 U.S. 193, 199 (1988); *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975).  Plaintiffs have the burden of demonstrating Article III standing, and must show (1) they have suffered an "injury in fact" (i.e., actual or imminent invasion of a concrete and judicially cognizable interest); (2) a causal connection between the injury and the conduct complained of; (3) the injury is fairly traceable to the challenged action; and (4) it is likely (not merely speculative) the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

At all times during the pendency of litigation, Article III requires a plaintiff to be suffering, or to be threatened with, "an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)).  Federal courts "are without power to decide questions that cannot affect the rights of litigants in the case before them," so where Article III standing is lacking, the claim must be dismissed.  *North*

*Carolina v. Rice*, 404 U.S. 244, 246 (1971) (*per curium*); *American Rivers v. Nat'l Marine Fisheries Service*, 126 F.3d 1118, 1123 (9th Cir. 1997).

<u>Argument</u>.

In the instant case, there is no actual, ongoing case or controversy supporting Article III standing for parties and claims.

## A.      Broken Circle is no longer a permittee.

As Plaintiffs concede in their brief, Broken Circle has waived its term grazing permit on the Dry Cottonwood Allotment.  Doc. 63 ("Br.") at 1, n 1; *see* also B-67:518-519.  Because Broken Circle is no longer a permittee, they lack any actual, ongoing dispute or controversy with USFS over the manner in which grazing is managed on the allotment.  Indeed, Plaintiffs concede Broken Circle's sole ongoing interest in this lawsuit is "for purposes of recovering fees and costs incurred in the administrative adjudication."  *Id*.  In light of this admitted lack of Article III standing, Broken Circle's claims under Counts 1-6 of the amended complaint (Doc. 16) should be summarily adjudicated in favor of the United States.

## B.      The 2018 Annual Operating Instructions are moot.

As the name suggests, "<u>Annual</u> Operating Instructions" apply specific management instructions to a grazing allotment for one grazing season.  Thus, the 2018 Annual Operating Instructions for the Dry Cottonwood Allotment lost

all ongoing force and effect on September 30, 2018, when the 2018 grazing season ended.  Doc. 50 at 8, and n 39.  USFS will issue new Annual Operating Instructions for the 2019 grazing season before Plaintiffs begin grazing on June 16, 2019.

Because Plaintiffs' claims all sound in the APA (*see infra*, § II standard of review), their remedy is limited to a court order invalidating or remanding the disputed agency action.  *See* 5 U.S.C. § 706(2)(A); *Lake Pilots Ass'n, Inc. v. U.S. Coast Guard*, 257 F. Supp. 2d 148, 154 (D.D.C. 2003); *Federal Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952).  Plaintiffs have claimed 2018 Dry Cottonwood management standards, including Annual Operating Instructions, required them to work harder, and spend more money to comply.  Doc. 23 at 17;  Doc. 23-1 at ¶ 21 (Johnston), ¶¶ 12-13, 19 (Cline).  But even if this were true, Plaintiffs cannot seek money damages under the APA.  *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998) ("By its own terms, § 702 does not apply to claims for 'money damages'….").

Because the 2018 AOIs have already expired, they have no ongoing legal force or effect.  There is no agency "action" extant for the Court to invalidate or remand.  Plaintiffs specifically ask the Court to "set aside those portions of the 2018 AOIs that require Plaintiffs to comply with the 1995 IRMM and 1996 AMP."  Doc. 62 at ¶ 2; Br. at 17.  Yet the 2018 AOIs are a dead letter, and no

part of them require Plaintiffs to do anything. There is therefore no injury for the Court to rectify, and no effective relief that would remedy any such purported injury. Plaintiffs lack a redressible injury capable of supporting Article III standing, and their AOI-based arguments and claims should be dismissed. *Spencer*, 523 U.S. at 7.

**C.     The notices of non-compliance are not justiciable final agency actions.**

Plaintiffs' claims can only be judicially reviewed under the APA's waiver of sovereign immunity. *See infra* § II standard of review. The APA waives sovereign immunity and permits suit against the United States (*Tucson Airport*, 136 F.3d at 644-450), but that waiver is subject to several limitations, including § 704's requirement of "final agency action." *See*, e.g., *Gallo Cattle Co. v. U.S.D.A.*, 159 F.3d 1194, 1198 (9th Cir. 1998). Where a plaintiff seeks review of an agency action, the APA only applies to "final agency action for which there is no other adequate remedy in a court." *Id.*; *Tucson Airport*, 136 F.3d at 644-45, citing 5 U.S.C. § 704.

To demonstrate final agency action, Plaintiff must show the action was a definitive statement of the agency's position, had a direct and immediate effect on the day to day business of the complaining party, had the status of law, and that immediate compliance with the decision was expected. *F.T.C. v. Standard Oil Co.*, 449 U.S. 232, 239-40 (1980); *Hecla Min. Co. v. U.S. E.P.A.*, 12 F.3d

164, 165 (9th Cir. 1993). The action must be the "consummation" of the agency's decision-making process, or must determine the "rights and obligations" of the parties such that "legal consequences will flow" from the action. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

Here, Plaintiffs argue the 2016 and 2017 notices of non-compliance were erroneous because they were not based on the 2009 Forest Plan. Br. at 17-20. But a notice of non-compliance is not a "final agency action" representing the "consummation" of USFS's decision-making process. The notices did not, in themselves, immediately impart any penalty: Plaintiffs were given an opportunity to comply with the corrective actions listed in the notices. *See* infra, § II(B)(2). Where a notice of non-compliance exists simply to "make the recipient aware that the 'definitive' regulations are not being met and to trigger the statutory mechanism for informal accommodation which precedes any formal enforcement measures," the notice itself is not a final agency action justiciable under the APA. *Air California v. U.S. Dep't of Transp.*, 654 F.2d 616, 621 (9th Cir. 1981), quoting *West Penn Power Co. v. Train*, 522 F.2d 302 (3rd Cir. 1975) (FAA notice of violation not reviewable under APA); *see* also *Pacificorp v. Thomas*, 883 F.2d 661 (1988) (EPA notice of violation not reviewable under APA).

As specifically applied to use and occupancy of National Forest lands, USFS notices of non-compliance are not a "final agency action." Forest Service Handbook 2209.13, Chapter 16 establishes the proper use and requirements for notices of noncompliance. *See* J-06; www.fs.fed.us/dirindexhome/field/r1/fsh/ 2209.13/r1id-2209.13-2012-1.doc. The Handbook is clear that a notice of noncompliance is neither a decision nor a final agency action: "Because this is a 'notice' rather than a 'decision' regarding the administration of a term grazing permit, it is not appealable under 36 C.F.R. §251, and appeal rights language must not be included in the NONC." FSH 2209.13 at § 16.31.

In *United States v. Backlund*, 689 F.3d 986, 998 (9th Cir. 2012), the Ninth Circuit confirmed this interpretation, holding that a USFS decision to revoke a mining permit was only reviewable under the APA following an appeal, and after the deciding officer rendered a written disposition. *Id*. Notices of non-compliance could not constitute "final agency action" because plaintiffs had yet to exhaust administrative remedies. *Id*. "A preliminary, procedural, or intermediate agency action or ruling [is] not directly reviewable," and may be examined by a federal court only through "review of the final agency action" itself. 5 U.S.C. § 704; *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 638 (6th Cir. 2004); *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922,

925 (9th Cir. 1999) (APA review not available for "…steps leading to an agency decision, rather than the final action itself.").

Neither the 2016 nor the 2017 notice of non-compliance determined the Dry Cottonwood grazing permittees' legal "rights and obligations." *Id*. Accordingly, neither the 2016 nor the 2017 notice of non-compliance was "final agency action" capable of supporting APA review. A lack of final agency action under the APA means that there is no subject matter jurisdiction over the dispute. *Taylor-Callahan-Coleman Ctys. Dist. Adult Prob. Dep't v. Dole*, 948 F.2d 953, 956 (5th Cir. 1991). As such, all Plaintiffs' claims (Doc. 16 at Counts 5 & 6) and arguments (Br. at § 2) based on the notices should be rejected and summarily adjudicated in favor of the United States.

## D.    Plaintiffs lack prudential standing for NEPA claims.

In addition to demonstrating standing under Article III of the Constitution, parties seeking review under the APA also must meet prudential standing requirements. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005). Plaintiffs must show there has been a final agency action which adversely affected them, and that their injury falls within the zone of interests protected by the substantive statute they claim was violated. *Douglas County v. Babbitt*, 48 F.3d 1495, 1499 (9th Cir. 1995). In the context of a NEPA claim, plaintiffs must show a connection between

themselves and projected harm or injury to the environment. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990). NEPA was enacted in order "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321 (1988). "The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions." *Nevada Land Action Ass'n v. USFS*, 8 F.3d 713, 716 (9th Cir. 1993). In *Nevada Land*, the Ninth Circuit held that ranchers lacked standing under NEPA to pursue grazing-related claims. *Id*. This was the case because the ranchers asserted primarily economic injury – even though the ranchers claimed USFS's action affected "the human environment" and thereby "caused 'lifestyle loss' as well as economic loss." *Id*. The ranchers did not fall within the scope of NEPA even though they asserted "an economic interest in maintaining the forest resources and therefore in protecting the environment." *Id*.

The correlations to the instant case are clear: As in *Nevada Land*, Plaintiffs' interests here are fundamentally economic. *See* Doc. 23-1 at ¶ 21 (Johnston) (describing the Dry Cottonwood grazing allotment as an "essential part" of the Two Bar ranch operation, sustaining 25% of its cattle); ¶¶ 12-13, 19 (Cline) (alleging economic harms to R-N Ranch). Despite their ancillary claims that they *also* enjoy hunting and recreating on the allotment, Plaintiffs do not

allege the diminution of riparian protections and the increased grazing that they seek would benefit the environment. *See* Br. at 3-4 (complaining of USFS using "more restrictive" allowable use standards, finding violations based on smaller areal exceedances, and measurements in high use riparian areas).

As in *Nevada Land*, Plaintiffs' lawsuit here is "more likely to frustrate than to further" the objectives of NEPA. 8 F.3d at 716. Fundamentally, Plaintiffs want to protect their economic interests, while diminishing riparian protections and rangeland health standards. *See* e.g. *infra*, § II(B)(1). Despite their claims of enjoying hunting and recreating on the Allotment, Plaintiffs' claims are not within NEPA's zone of interest, they lack prudential standing, and all claims that rely upon NEPA (Br. at 14-17, 19) should be summarily adjudicated in favor of the United States.

**E.    A favorable decision cannot enact 2009 Forest Plan grazing standards.**

If the agency's action is found to be arbitrary and capricious, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Id*.; *see also San Luis & Delta-Mendota Water Auth.*, 747 F.3d 581, 601 (9th Cir. 2014) (court "may not substitute [its]

judgment for that of the agency"). When a court determines an agency action is unlawful, the presumptive and default remedy is to simply vacate the action. *Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997); *Reed v. Salazar*, 744 F.Supp.2d 98, 119 (D.D.C. 2010).

Plaintiffs seek to invalidate the 1996 AMP <u>and</u> to have their grazing permits administered under the 2009 Forest Plan's interim grazing standards. *See* Doc. 62 at ¶ (1) (seeking a "remand with instructions for the Forest Service to apply the interim livestock grazing standards in the *2009 Beaverhead-Deerlodge National Forest Land and Resource Management Plan*"). But such an order would go beyond a simple remand and vacatur, and would take the additional affirmative step of assigning new grazing management standards to the Dry Cottonwood allotment. Such an order would be invalid under the APA.

As an initial matter, neither the amended complaint (Doc. 16) nor Plaintiffs' summary judgment brief (Doc. 63) can be fairly construed to advance a "failure to act" claim under APA § 706(1). There is no reference to such a claim and no citation to § 706(1) in either document. To the contrary, Plaintiffs' summary judgment brief explicitly identifies APA § 706(2) as the basis for review. Br. at 8-9. In other words, Plaintiffs' fundamental APA claim is that USFS did something incorrectly, i.e., acted in a manner that was

"arbitrary and capricious." Plaintiffs do not argue that USFS failed to act in contravention of some legally mandated duty.

This distinction is significant because the only precedent for courts directing an executive branch agency to affirmatively undertake particular action involve APA § 706(1) claims seeking to compel plainly prescribed and ministerial actions required by law. As the Supreme Court has explained,

> [T]he only agency action that can be compelled under the APA is action legally required.... The limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law).

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63-65 (2004). Moreover, courts cannot prescribe the way an agency implements a legally mandated directive: "…the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." *Id*.

In the instant case, Plaintiffs' requested relief – essentially an affirmative injunction requiring enactment of interim grazing standards from the 2009 Forest Plan – would require a legal determination that application of those specific standards was "demanded by law." But USFS is not compelled by any law, regulation, or Forest Plan provision to apply the 2009 interim standards to the Dry Cottonwood allotment.

As Plaintiffs concede, the 2009 interim standards apply only to grazing allotments lacking site-specific management standards. *See* Br. at 13. To date, USFS has managed the Dry Cottonwood allotment under the 1996 AMP because it provides site-specific management parameters. If the 1996 AMP were somehow invalidated, no law, regulation, or Forest Plan provision would dictate "the manner" in which USFS manages grazing on the Dry Cottonwood allotment – let alone that such grazing would continue. USFS could revert to site-specific standards that preceded the 1996 AMP. USFS could suspend all grazing while evaluating the riparian effects of ongoing grazing, or while engaging in a detailed NEPA analysis of new site-specific management parameters. Under either scenario, management of the Dry Cottonwood allotment under the 2009 Plan's interim standards would not be "demanded by law." *Norton*, 542 U.S. at 63.

Because the law does not clearly demand that USFS manage grazing on the Dry Cottonwood allotment according to interim standards from the 2009 Forest Plan, the APA does not allow for such a remedy. Because Plaintiffs' purported injury cannot be redressed by a favorable order from this Court (*Lujan*, 504 U.S. at 560), Plaintiffs lack Article III standing and the forest plan consistency claim must be dismissed.

## II.    USFS'S SUBSTANTIVE GRAZING MANAGEMENT DETERMINATIONS WERE NOT ARBITRARY AND CAPRICIOUS.

<u>Standard of Review</u>.

Plaintiffs' brief presents claims based on the National Environmental Policy Act (NEPA), the Federal Lands Policy Management Act (FLPMA) and the National Forest Management Act (NFMA).  *See* Br. at 9-20.  Each statute advances distinct substantive requirements, described below.  None of these statutes, however, confers a waiver of sovereign immunity.  *National Helium Corp. v. Morton*, 455 F.2d 650, 654-55 (10th Cir. 1971); *Gros Ventre Tribe v. United States*, 344 F. Supp. 2d 1221, 1225 (D. Mont. 2004), *aff'd*, 469 F.3d 801 (9th Cir. 2006); *Ecology Center Inc. v. United States*, 192 F.3d 922, 924 (9th Cir. 1999).  Rather, claims sounding in NEPA, NFMA, and FLMPA must be reviewed under the waiver of sovereign immunity in the APA.  *Id*., 5 U.S.C. §701 et seq.; *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002).

Under APA §706(2), an agency action must be upheld unless it is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Id*. (quoting 5 U.S.C. § 706(2)(A)).  The Ninth Circuit has explained that:

> [a] decision is arbitrary and capricious only if the agency
> relied on factors Congress did not intend it to consider,

> entirely failed to consider an important aspect of the
> problem, or offered an explanation that runs counter to the
> evidence before the agency or is so implausible that it could
> not be ascribed to a difference in view or the product of
> agency expertise. Agency action is valid if the agency
> considered the relevant factors and articulated a rational
> connection between the facts found and the choices made.

*Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013)

(internal quotation marks and citations omitted); *see also Nat'l Wildlife Fed'n v.*

*Burford*, 871 F.2d 849, 855 (9th Cir. 1989) ("The [agency's] action . . . need be

only a reasonable, not the best or most reasonable, decision."); *Friends of the*

*Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) ("The court may not set aside

agency action as arbitrary or capricious unless there is no rational basis for the

action.").

This "standard of review is highly deferential." *San Luis & Delta-*

*Mendota Water Auth.*, 747 F.3d at 601 (internal quotation marks omitted). The

reviewing court begins from an initial presumption that the agency's actions

were valid. *Irvine Med. Ctr. v. Thompson*, 275 F.3d 823, 830–31 (9th Cir.

2002). The reviewing court is most deferential "when reviewing scientific

judgments and technical analyses within the agency's expertise." *Conservation*

*Cong.*, 720 F.3d at 1054.

The Court's "proper role is simply to ensure that the [Agency] made no

'clear error of judgment.'" *The Lands Council v. McNair*, 537 F.3d 981, 993

(9th Cir. 2008) (en banc), rev'd on other grounds, (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).  USFS's interpretation of its regulations is "controlling" unless "'plainly erroneous or inconsistent with the regulation.'"  *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citations omitted).  Review of USFS's fact findings is *more deferential* than review of a district court's fact findings under the clearly erroneous standard.  *Concrete Pipe & Products v. Construction Laborers Pension Trust*, 508 U.S. 602, 623 (1993).

### National Environmental Policy Act.

NEPA requires agencies to take a "hard look" at the potentially significant environmental consequences of contemplated actions before making a final decision to proceed.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).  NEPA establishes procedures for agencies to consider the environmental impacts of their actions, but does not dictate substantive results.  *Id*. at 350.  Agencies must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The agency may prepare an environmental assessment ("EA") to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).

An agency must ensure the "professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" and identify any methodologies used." 40 C.F.R. § 1502.24. The agency satisfies these requirements if its "analysis is sufficient for reasoned decision-making" and if its methodology complies with the "rule of reason." *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 & 1182 (9th Cir. 2000).

**National Forest Management Act.**

NFMA provides for forest planning and management at two levels: the forest level and the project level. 16 U.S.C. § 1604; *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998). For each National Forest, the agency develops a Land and Resource Management Plan ("Forest Plan"). Once approved, USFS implements the Forest Plan by approving or denying site-specific actions. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1092 (9th Cir. 2003). While NFMA requires that site-specific actions be consistent with the governing Forest Plan (16 U.S.C. § 1604(i)), USFS's interpretation and implementation of its own forest plan is entitled to substantial deference. *Forest Guardians*, 329 F.3d at 1097, 1099.

**Federal Land Policy and Management Act.**

USFS authorizes grazing within the National Forest System on "allotments" pursuant to the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701-1787. "Allotments" are "designated area[s] of land available for livestock grazing." 36 C.F.R. § 222.1(b)(1). Under FLPMA, USFS can permit grazing on allotments by three different site-specific actions, which must be consistent with the applicable Forest Plan. *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 979-80 (9th Cir. 2006); 16 U.S.C. § 1604(i).

First, USFS issues grazing permits, which are "document[s] authorizing livestock to use National Forest System or other lands under USFS control for the purpose of livestock production." 36 C.F.R. § 222.1(b)(5); *see also* 43 U.S.C. §§ 1702(p), 1752(a). USFS "is authorized to cancel, modify, or suspend grazing and livestock use permits in whole or in part" if the permittee fails to comply with the requirements of his or her permit, or with governing regulations. *Id*. § 222.4(a)(4).

Second, USFS develops an "allotment management plan" (AMP), which "specifies the program of action designed to reach a given set of objectives" as to a specific allotment, including "the manner in and extent to which livestock operations will be conducted in order to meet the multiple-use, sustained yield,

economic, and other needs and objectives as determined for the lands, involved." *Id*. § 222.1(b)(2).

Third, USFS develops and issues annual operating instructions (AOIs), which conveys the more long-term directives from AMPs "into instructions to the permittee for annual operations." *Or. Natural Desert*, 465 F.3d at 980. "Because an AOI is issued annually, it is responsive to conditions that the Forest Service could not or may not have anticipated and planned for in the AMP or grazing permit...." *Id*. at 980–81. USFS typically incorporates the AOI into the grazing permit, which then "governs the permit holder's grazing operations for the next year." *Id*. at 980.

Argument.

**A.      USFS's determination that interim standards from the 2009 Forest Plan do not apply to the Dry Cottonwood allotment was not arbitrary and capricious.**

The mainstay of Plaintiffs' claims is that USFS improperly managed the Dry Cottonwood allotment because it did not use interim grazing standards from the 2009 Beaverhead-Deerlodge Forest Plan. *See* Br. at 9-17. Plaintiffs say the 2009 Forest Plan applies interim grazing standards to the Dry Cottonwood Allotment "until the Forest Service develops site-specific standards for the Allotment that comply with the 2009 Forest Plan." *Id*. at 12-13. This suggests the 2009 Plan invalidated and replaced all grazing

management plans extant, until later addressed via site-specific standards. The actual text of the 2009 Forest Plan, however, contains no such language:

> The interim standards in Table 6 apply to livestock grazing operations **unless or until specific long-term objectives, prescriptions, or allowable use levels have been designed through individual resource management plans or site-specific NEPA decisions**….

AR G-10:4374 (boldface added).

"Unless" is the key term. According to the plain language of the 2009 Forest Plan, the interim grazing standards only applied to allotments lacking "specific long-term objectives, prescriptions, or allowable use levels." The Dry Cottonwood allotment lacked none of these: In a 1996 Decision Notice, USFS adopted new provisions that contained all three categories of management standards. H-08:4912. The decision contained long term objectives ("objectives are to restore and maintain riparian plant communities…"), prescriptions ("[t]hese measures will change current grazing practices…"), and Allowable Use Levels (permitting 556 cow/calf pairs during the season). *Id*. Because the 1996 EA and Decision had already enacted these site-specific grazing standards in a NEPA-approved process, the interim standards of the 2009 Forest Plan never applied to Dry Cottonwood.

Judicial review of an agency's interpretation of its own regulations is "substantially deferential." *St. Anthony Hosp. v. U.S. Dep't of Health & Human*

*Servs.*, 309 F.3d 680, 691–92 (10th Cir. 2002). A Forest Plan is equivalent to a regulation in this regard. *Hapner v. Tidwell*, 621 F.3d 1239, 1251 (9th Cir. 2010). Rather than "decide which among several competing interpretations best serves the regulatory purpose," courts give the agency's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

Here, USFS's interpreted its own 2009 Forest Plan to not apply interim standards where site-specific standards had already been enacted by the 1996 AMP. Because the plain language of the 2009 Forest Plan does not compel an alternative reading consistent with Plaintiffs' theory, the Court must defer to USFS's interpretation. *Thomas Jefferson Univ.*, 512 U.S. at 512.[1]

Plaintiffs try to avoid this result by arguing the 1996 AMP was invalid because "it was not implemented pursuant to NEPA and FLPMA, and does not comply with FLPMA." Br. at 13. They claim the 1996 AMP is invalid because it contains standards (the 1995 Riparian Mitigation Measures) that are not themselves site-specific. *Id.* As set forth below, both contentions fail.

---

[1] To the extent this inquiry implicates a fact question (i.e., whether site-specific grazing standards were enacted in 1996), the Court's review is even more deferential than review under the clearly erroneous standard. *Concrete Pipe*, 508 U.S. at 623. Plaintiffs do not advance any such premise, and the record clearly establishes USFS's 1996 action.

1.  **Plaintiffs claims under NEPA or NFMA, and FLPMA are time-barred, and lack merit; the 1996 AMP was properly adopted.**

Plaintiffs argue the 1996 AMP was not adopted in accordance with NEPA, NFMA, or FLPMA because they were not involved in or consulted with on the decision, the AMP was never enacted or enforced until this dispute, and the AMP was outmoded by the 2009 Forest Plan. Br. at 14-15. All these claims lack merit.

As an initial matter, Plaintiffs cannot protest about the manner in which the 1996 AMP was adopted because the time for that complaint elapsed long ago. Claims arising under NEPA, NFMA, and FLPMA are all governed by the six-year general statute of limitation for actions brought under the APA. 28 U.S.C. § 2401(a); *Sierra Club v. Slater*, 120 F.3d 623 (6th Cir. 1997) (NEPA); *Swan View Coal. v. U.S. Forest Serv*., 782 F. Supp. 2d 1132, 1142 (D. Mont. 2011) (NFMA); *Smith v. Marsh*, 787 F.2d 510, 512 (10th Cir. 1986) (FLPMA). Plaintiffs must file a complaint within six (6) years after the claim accrues, i.e., from the time of the disputed "final agency action." *Sw. Williamson Cty. Cmty. Ass'n, Inc. v. Slater*, 173 F.3d 1033, 1036 (6th Cir. 1999).

The Decision Notice adopting the 1996 AMP was signed on January 23, 1996. H-08:4919. Therefore, Plaintiffs had until January 23, 2002 to file NEPA, NFMA, and FLPMA claims attacking that action. Plaintiffs failed to do

so. Their original complaint here was filed May 31, 2018 – more than 16 years too late. Expiration of the statute of limitations divested this Court of subject matter jurisdiction. *Sisseton-Wahpeton Sioux Tribe v. United States*, 895 F.2d 588, 592 (9th Cir. 1990), cert. denied, 498 U.S. 824 (1990). As such, Plaintiffs' NEPA, NFMA, and FLPMA attacks against the 1996 AMP must be rejected. *Sierra Club v. Penfold*, 857 F.2d 1307, 1316 (9th Cir. 1988).

Furthermore, Plaintiffs' claims do not withstand substantive scrutiny. Plaintiffs argue USFS "introduced the 1996 AMP for the first time in response to Plaintiffs' appeal" in this matter. Br. at 14. Yet the record demonstrates the Decision Notice adopting the grazing standards was distributed to interested Forest users, and publicized in the Montana Standard, in January, 1996. H-10:4924. Plaintiffs cannot avoid the legal effect of that notice by willful blindness, or by failing to diligently inquire – especially where each Plaintiff's grazing permit explicitly incorporated those allotment management provisions. *See*, e.g., A-31:76 (Two Bar) ("The Environmental Assessment and Allotment Management Plan for the Dry Cottonwood Allotment, approved January 23, 1996, is herby [sic] made a part of this permit."); B-05:307 (same re Broken Circle); C-09:553 (same re R Bar N). *Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 964 (7th Cir. 2005).

Indeed, USFS consulted directly with the Dry Cottonwood permittees on the new grazing standards: The EA and Decision Notice were mailed to the Dry Cottonwood permittees, and Plaintiffs and their predecessors-in-interest are among the "individuals and businesses" USFS explicitly consulted. *See* H-03:4901 (showing personal consultation with Robert Evans (Two-Bar Ranch), and Bud Jacobson and Sons (R Bar N)). Indeed, these entities submitted comments on the proposed grazing standards as part of the NEPA process. H-06. Thus, Plaintiffs' claim that they never saw or were somehow oblivious to the 1996 grazing standards simply does not hold water.

Plaintiffs also fail to identify any legitimate deficiency under NEPA, NFMA, or FLPMA. Plaintiffs argue there was no NEPA analysis for the 1996 AMP, and that the AMP was not created through consultation with the permittees. Br. at 14-15. But the AMP merely implements the Forest-level decision to allow grazing on the Dry Cottonwood allotment, under certain conditions:

> The decision to authorize grazing is made in the NEPA-based decision document whose major focus is on maintaining or achieving the desired land condition. The grazing permit, accompanying allotment management plan (AMP) (sec. 94.1) as appropriate, and annual operating instructions (sec. 94.3) all serve to implement the project-level decision to authorize grazing (sec. 96).

USFS Handbook 2209.13 Chapter 94; *See also* USFS Handbook 2209.13, 94.1.

Here, USFS determined to allow ongoing grazing on the Dry Cottonwood allotment – and the conditions necessary for such grazing – in the 1995 EA (H-03) and 1996 Decision Notice / Finding of No Significant Impact (H-08). As noted above, that decision and the associated criteria were publicized, and Plaintiffs fully participated in that process. Following that decision, USFS drafted the AMP to implement the grazing decision. H-11:4925, H-12:4928. As stated in the EA, no additional NEPA analysis accompanied the AMP. H-03:4870. Because it did not add new terms beyond what was analyzed in the 1995-96 NEPA process, the AMP did not require an independent NEPA analysis or consultation. *Nat. Res. Def. Council, Inc. v. Hodel*, 624 F. Supp. 1045, 1051 (D. Nev. 1985), aff'd, 819 F.2d 927 (9th Cir. 1987) (no requirement for separate NEPA analysis of AMPs so long as actual environmental effects of particular permits are addressed). Plaintiffs fail to identify any significant environmental effect from the AMP that was not sufficiently analyzed in the EA and Decision Notice, so their NEPA claim must fail.

Plaintiffs argue the 1995 EA and 1996 Decision Notice "are not NEPA analysis for the 1996 AMP" because the EA excludes "general management." Br. at n 52, citing H-3:4870, 4922. But Plaintiffs' cites do not support their argument. The EA addressed the authorization of grazing and all associated

practices.  H-3:4870.  While the EA states it does not cover "general management" of the area (*Id.*), Plaintiffs fail to establish that exclusion pertains to any facet of livestock grazing.  *Id.*  Indeed, context clearly reveals the opposite: The EA provided all information "pertinent to the decision of whether to authorize livestock grazing on the Dry Cottonwood allotment and, if so, under what conditions."  *Id.*  Thus, when the EA refers to "general management," that is not "documented in this EA," it is referring to non-grazing management.  The Forest Plan addresses a slew of goals, objectives, and standards (e.g., recreation, travel planning, wildlife, cultural resources, etc.) that fall under the rubric of "general management" (G-03:2605) and that are not addressed in the EA and Decision Notice.  G-03:2399-2430.

Plaintiffs' FLPMA claim fares no better.  Plaintiffs complain the 1996 AMP was not formulated "through consultation with the permittees," in violation of FLPMA § 1752(d).  Br. at 15.  Yet Plaintiffs fail to define how much consultation is required, and fail to cite a single case where an AMP has been rendered invalid for lack of such consultation.  As set forth above, USFS *did* consult with Plaintiffs on the grazing management standards that the 1996 AMP put into effect: Plaintiffs and their predecessors were given notice and an opportunity to comment (and did comment) on those standards.  H-06.

Plaintiffs lack any legal authority for the proposition that this quantum of consultation was inadequate under § 1752(d).

Plaintiffs also fail to identify any component of the AMP that changed grazing management in an undisclosed way. Under the terms of the 1996 AMP, grazing was allowed to continue at the pre-existing stocking rate. H-03:4874-4875. Plaintiffs were allowed to continue using the established rest-rotation grazing system. *Id*.; 4869. The permittees had to build a new water development, and build fences to prevent livestock grazing along the South Fork of Girard Creek – but these requirements were divulged and analyzed in the EA. *Id*. at 4877. The riparian mitigation measures were described in detail. *See*, e.g., 4885, 4890, Appendix A. In short, Plaintiffs identify no component of the AMP on which they were not consulted.

Section 1752 gives USFS "ultimate discretion" on when and how to adopt AMPs. *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, No. 3:03-CV-0213-PK, 2018 WL 1811467, at *2 (D. Or. Apr. 16, 2018). Here, USFS interpreted § 1752(d) to allow AMP consultation during the NEPA process adopting the operative grazing standards. That interpretation is entirely reasonable, is consistent with the black letter of § 1752(d), and Plaintiffs present no countervailing case precedent. Accordingly, the Court should defer to USFS's interpretation. *Id*., citing *Chevron, U.S.A., Inc. v. Natural Resources*

*Defense Council, Inc.*, 467 U.S. 837 (1984), *Auer v. Robbins*, 519 U.S. 452 (1997).

Plaintiffs' NFMA claim consists of a single sentence, arguing the 1996 AMP is invalid because it was not amended to conform to the 2009 Forest Plan. Br. at 15. But as noted above, this analysis gets it backwards: The 1996 AMP implements the site-specific NEPA decision setting long-term objectives, management prescriptions, and allowable use levels for the Dry Cottonwood allotment. G-10:4374. That site-specific plan preempts the interim standard from the 2009 Plan – as specifically required by the 2009 Plan. *Id*. Thus, Plaintiffs' NFMA claim fails.

> ### 2. Site-specific Riparian Mitigation Measures for Dry Cottonwood allotment were not superseded by the 2009 Forest Plan.

Plaintiffs next argue the standards provided within the 1996 AMP – i.e., the 1995 Riparian Mitigation Measures – were not site specific, were not enacted through NEPA, and were supplanted by the 2009 Forest Plan's interim grazing standard. Br. at 16-17. Plaintiffs are wrong on all counts.

First, while the 1995 Riparian Mitigation Measures are not site-specific in themselves, they were analyzed as specifically applied to the Dry Cottonwood allotment in the 1995 EA and 1996 Decision. For example, the EA states:

> Continued grazing along the allotment streams, even with
> application of the riparian mitigation measures, will result in
> some disturbance of streambanks and removal of streamside
> vegetation. The amount of bank disturbance allowed under
> the riparian mitigation measures is based on the the [sic]
> ability of the soils to withstand and recover from
> disturbance. <u>Streams in the allotment flow through granitic
> soils and are not very resilient</u>; thus the amount of allowable
> streambank disturbance is correspondingly low.

H-03:4890 (underlines added).  *See also* 4892 ("…the riparian zones continue

to provide valuable habitat for many species"), 4897 (showing mitigation

measures will benefit western toad, willow flycatcher, and beaver on the

allotment).  Thus, contrary to Plaintiffs' claim, the mitigation measures were

customized to the Dry Cottonwood Allotment.

Second, the Riparian Mitigation Measures were analyzed in the 1995 EA

and approved in the 1996 Decision Notice / Finding of No Significant Impact.

*Id*.; H-08:4914 (Decision Notice describing how additional riparian mitigation

measures were not analyzed in detail because site-specific analysis showed the

proposed mitigation measures "are believed to be sufficient to achieve Forest

Plan standards for riparian areas.").  Thus, Plaintiffs are simply wrong that the

Riparian Mitigation Measures did not undergo NEPA analysis.

Finally, precisely because the Riparian Mitigation Measures analyzed

and approved in the 1995-96 NEPA process *were* site-specific, they were not

replaced by the 2009 interim grazing standards.  As noted above, the plain

language of the 2009 Plan applies the interim standard only where specific prescriptions have not previously been enacted through site-specific NEPA decisions.  G-10:4374.

Plaintiffs claim the 1995 Mitigation Measures were intended to be interim direction, "until Forest Plans could be revised."  Br. at 16, citing G-7:2749.  But the document Plaintiffs' cite (a 2002 Forest-wide Draft Analysis of the Management Situation) speaks to INFISH management direction, not the 1995 mitigation measures.  *Id*.  More importantly, it does not address situations like Dry Cottonwood where general mitigation measures have been evaluated on a site-specific basis and found sufficient to achieve Forest Plan standards. H-08:4914.  Plaintiffs lack any basis to assert these site-specific and effective riparian mitigation measures are "interim."

**B.** **The 2016 and 2017 notices of non-compliance were not arbitrary and capricious.**

Plaintiffs' second major dispute with USFS's grazing management pertains to the 2016 and 2017 notices of non-compliance.  Br. at 17-23.  As set forth above (§I(C)), the notices are not justiciable under the APA because they are not final agency action.  All Plaintiffs' arguments under this heading should therefore be rejected outright.  But even if the Court reaches the merits, Plaintiffs' claims fail.

### 1. The notices of non-compliance were properly based on allotment management standards from the 1996 AMP.

Plaintiffs argue the notices of non-compliance were improper because "The record does not show that Plaintiffs violated the 2009 Forest Plan standards in 2016 or 2017." Br. at 19. Plaintiffs then recite standards from the 2009 Forest Plan, and claim they were not violated, i.e., USFS monitoring did not establish exceedance of allowable use limits on more than 15% of the management area. *Id.*, citing G-10:4375 (the Interim Livestock Grazing Standards). The first problem with this argument is that, as repeatedly established above, the Interim Livestock Standards from the 2009 Forest Plan do not govern the Dry Cottonwood allotment. Rather, the 1996 AMP controls.

The second and related problem is Plaintiffs apply the wrong management criteria to the wrong data. The operative standard is not "15% of the management area can exceed allowable use levels." Br. at 19. Instead, Plaintiffs' permits and AOIs required at least 85% *of the grazed stream reach within a pasture* to meet assigned parameters. A-58:151, A-60:160 (italics added). In other words, the "management area" does not define the denominator in allowable use, or 100%. Rather, permittees must ensure they meet allowable use limits on 85% of the stream reaches where they graze.

Plaintiffs are also wrong in asserting that USFS is prohibited from measuring use levels in high traffic areas like stream crossings. Br. at 3. Sites

that naturally accumulate higher traffic can account for no more than 5% of the 15% non-compliance on a repeat basis year-to-year. *Id*. The existence of that metric obviously presupposes that use in higher traffic areas is measured annually. The metric is also fundamentally at odds with Plaintiffs' construction: Plaintiffs want a free pass on all high traffic areas – regardless of damage to the resource. USFS is trying to mitigate grazing impacts in these areas by reducing such impacts in successive years.

Third, Plaintiffs wrongly portray the 2016 and 2017 notices of non-compliance as based on picayune fly-specking, i.e., exceedances in "isolated areas" (Br. 19), "no matter how small" (Br. 3). The notices state that the areas monitored included the north end of Orofino Creek, the North Fork of Dry Cottonwood Creek, and Perkins Gulch. A-62:165. USFS inspectors found "heavy use through most of the drainage" for Orofino Creek, with "[h]eavy use in a tributary to Orofino as well." E-18:977. There were repeated excessive impacts to Orofino Creek, bank disturbances exceeding use limits, and streambank disturbance so high in Perkins Gulch it could not be measured. *Id*.; E-18:1004-1007. USFS is the expert agency, and entitled to deference in these scientific determinations (*Conservation Cong*., 720 F.3d at 1054) – but even a layman can see these are not isolated or negligible instances of non-compliance.

In short, Plaintiffs' arguments against the 2016 and 2017 notices of non-compliance lack all merit. Even if they are justiciable, these claims should be summarily adjudicated in favor of USFS.

> ## 2. USFS complied with APA and provided all process that was due for the 2016 and 2017 notices of non-compliance.

Plaintiffs contend the 2016 and 2017 notices of non-compliance were invalid because they were issued in violation of their due process rights. Br. at 20, citing *Anchustegui v. Dep't of Agric.*, 257 F.3d 1124, 1129 (9th Cir. 2001) and 5 U.S.C. § 558. In *Anchustegui*, the Ninth Circuit reversed a district court decision that upheld USFS's cancellation of a sheep rancher's grazing permit. *Id.* at 1126. The court recognized the Secretary of Agriculture has the power to issue and cancel grazing permits on public lands, and further recognized that grazing permits do not "create any right, title, interest, or estate." *Id.* at 1128. Even so, the court found that "'grazing privileges ... shall be adequately safeguarded.'" *Id.* (quoting 43 U.S.C. § 315(b)). The basis for this holding, however, was not constitutional due process, but rather APA § 558. *Id.* at 1129 ("Because we find a statutory violation, it is not necessary to reach the constitutional question presented.").

Under APA § 558, "a sanction may not be imposed ... except in cases of willfulness ... before the institution of agency proceedings." 5 U.S.C. § 558.

The permit holder must be given "(1) notice by the agency in writing of the facts or conduct which may warrant the action; and (2) opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C. § 558(c). In *Anchustegui*, the plaintiff received only one document from USFS in which the agency simultaneously gave notice of the plaintiff's violations and cancelled 100% of his permit. *Anchustegui*, 257 F.3d at 1127. The court held that, where the same document gives notice to a permittee of noncompliance <u>and</u> issues a decision suspending that permit, the agency has violated § 558(c). *Id*. at 1129.

*Anchustegui* is factually distinct. Here, unlike *Anchustegui*, the 2016 and 2017 notices of non-compliance did not simultaneously notify and suspend. *See* A-62, A-74. Indeed, the 2016 and 2017 notices did not constitute, and nowhere claimed to constitute, any kind of a permit suspension or cancellation. *Id*. To the contrary, the notices clearly state USFS would only consider permit suspension or cancellation if Plaintiffs failed to correct the deficiencies identified in the notices:

> Per the NONC issued in 2016, you were informed that failing to correct the violations and complete the management actions <u>within the prescribed time-frames</u> or any future violations with the terms and conditions of your Term Grazing Permit may result in the initiation of permit suspension or cancellation procedures in whole or in part.

AR A-74:201 (emphasis added). Thus, unlike *Anchustegui*, the 2016 and 2017 notices did not simultaneously notify and penalize. The notices of non-compliance merely identified violations of permit terms, and prescribed actions to correct those violations. *See* A-62 at 167 (e.g., fix fences so they can hold cattle, place salt in accordance with permit requirements, reconstruct water developments according to an approved list, etc.). None of these actions constitute a "sanction" within the ambit of § 558(c), i.e., something affecting a person's freedom, imposing a penalty, assessing fees, taking property, etc. *See* 5 U.S.C. § 551.

Moreover, even if the corrections required by the notices are somehow deemed a "sanction," they were not immediately imposed by the notices. As Plaintiffs concede, the 2016 and 2017 notices were issued during the off season. *See* Br. at 21 ("…NONCs were issued *after* the grazing season was over…."). Plaintiffs were given abundant additional time (six or seven months) to rectify the deficiencies before the next grazing season began, or within some other prescribed timeframe. *See*, e.g., A-62:167 (fix fences and reconstruct water developments before the next grazing season, assess water developments by May 15, etc.). Thus, again, the 2016 and 2017 notices of non-compliance did not simultaneously provide notice and a penalty. Rather, Plaintiffs were

provided an opportunity "to demonstrate or achieve compliance with all lawful requirements" in accordance with § 558(c).

Plaintiffs complain they were deprived of due process because USFS "must make documented attempts to resolve concerns informally." Br. at 20-21. They argue the notices of non-compliance "must" meet certain criteria to be valid (e.g., they must describe the violations and remedial measures to a certain degree of specificity, must specify a due date for compliance, etc.). *Id*. But the source for these purported "requirements" is a USFS Grazing Permit Administration Handbook. J-06. This presents two problems for Plaintiffs: First, an internal agency handbook that was not promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress does not have the force and effect of law. *United States v. Fifty-Three (53) Eclectus Parrots*, 685 F.2d 1131, 1136 (9th Cir. 1982). Second, the provisions Plaintiffs rely upon within the handbook are explicitly denominated as "guidelines." J-06:5869. They are not mandates USFS is required to follow every time it administers a grazing permit. *Jacks v. Crabtree*, 114 F.3d 983, 985 n. 1 (9th Cir. 1997), cert. denied, 118 S.Ct. 1196 (1998) ("internal agency guidelines" cannot support APA claim). Thus, the handbook cannot support Plaintiffs' due process claims.

Moreover, even if the handbook could support a due process claim, the 2016 and 2017 notices complied with the guidelines in the Handbook. USFS repeatedly tried to informally resolve Plaintiffs' noncompliance before issuing the notices, but Plaintiffs continued overgrazing. E-18, E-34. The violations were spelled out with the required specificity (A-62:164-166, A-74:198-201), and USFS described the necessary corrective actions and deadlines as required (A-62:167, A-71:193-194, A-74:201-203).

Moreover, even if the notices are somehow deemed a penalty in and of themselves, Plaintiffs' due process claim is still critically flawed in that Plaintiffs fully exploited their opportunity for process: Plaintiffs administratively appealed the District Ranger's 20% suspension to the Forest Supervisor, and got it reversed. "The base requirement of the Due Process Clause is that a person deprived of property be given an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 984 (9th Cir. 1998) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). But procedural due process does not require the notice and opportunity to be heard occur <u>before</u> the deprivation. *Parratt v. Taylor*, 451 U.S. 527, 540 (1981), overruled in part on other grounds by *Daniels v. Williams*, 474 U.S. 327 (1986). It can occur by a combination of pre- and post-deprivation procedures. *Cleveland Bd. of Educ. v.*

*Loudermill*, 470 U.S. 532, 547-48 (1985). It can be satisfied with post-deprivation process alone. *Brewster*, 149 F.3d at 984.

Here, before USFS implemented any kind of grazing permit suspension or other penalty, it provided Plaintiffs with ample procedures to ensure they could present their side of the story. Even if the notices (issued November 2017) are somehow deemed a penalty, the post-notice appeal (April 2018) provided Plaintiffs with two levels of administrative review: Plaintiffs were entitled to appeal, and did appeal, to the Forest Supervisor in accordance with 36 C.F.R. Part 214. *See* F-02, F-03, F-04. The Forest Supervisor's decision was then sent to the Regional Forester, presenting another opportunity for review under 36 C.F.R. § 214.19(a). *See* F-16, F-17. Through these appeals, Plaintiffs were entitled to present, and did present, statements about how they were adversely affected by USFS's action, their version of the relevant facts, their analysis of the issues raised by the notices of non-compliance and the 20% suspension, including relevant legal authority and any documents or other supporting information. 36 C.F.R. § 214.8(a). In short, by the time the administrative appeal process concluded, USFS had clearly given Plaintiffs sufficient procedures to satisfy any due process concerns. *Buckingham v. Sec'y of U.S. Dep't of Ag.*, 603 F.3d 1073, 1084 (9th Cir. 2010).

## III. USFS CORRECTLY DETERMINED PLAINTIFFS WERE NOT ENTITLED TO REPAYMENT OF ATTORNEYS' FEES FOR THE ADMINISTRATIVE ADJUDICATION.

Standard of review.

To bring a claim for attorneys' fees incurred during an administrative proceeding, an eligible party must show: (1) the agency proceeding was an adversary adjudication where the position of the United States was represented by counsel or otherwise; (2) the agency proceeding was an adjudication under § 554 of the APA (5 U.S.C. § 554); (3) the party was the "prevailing party"; and (4) the position of the United States was not substantially justified. *See* 5 U.S.C. § 504(a)(1). *Handron v. Sebelius*, 669 F. Supp. 2d 490, 494-95 (D.N.J. 2009).

An agency's determination whether the EAJA applies to a particular administrative proceeding is reviewed under the APA's standard of review, i.e., it is upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Aageson Grain & Cattle v. U.S. Dep't of Agric.*, 500 F.3d 1038, 1041 (9th Cir. 2007).

Argument.

In their summary judgment motion, Plaintiffs argue EAJA entitles them to repayment of attorney fees expended during their administrative appeal of the

20% suspension of their grazing privileges.  Br. at 26.[2]  In support of this

contention, Plaintiffs cite 5 U.S.C. § 504(a)(1).  Section 504(a)(1) allows

recovery of attorneys' fees to the prevailing party "in certain administrative

proceedings" if there has been "an adversary adjudication" in which the

position of the administrative agents was not "substantially justified."  *Fairchild

Farms v. USDA*, 406 F.Supp.2d 1132, 1133 (2005).

In its administrative decision, USFS denied Plaintiffs' request for

attorneys' fees because the appeal regulations (36 CFR §214.14(i)) do not

permit recovery of fees for administrative appeals.  Plaintiffs appealed this

decision to the Regional Forester (F-20), who affirmed the denial of fees

(F21:1857).  Far from being arbitrary and capricious, this determination was

correct.

First, USFS regulations pertaining to this type of administrative appeal

(i.e., 36 C.F.R. Part 214 regarding occupancy or use of National Forest lands

and resources) require parties to pay their own attorneys' fees: "Each party to

an appeal shall bear its own expenses, including costs associated with preparing

the appeal, participating in an oral presentation, obtaining information regarding

---

[2]  Any claim for fees incurred during these judicial proceedings is
premature until a final judgment is entered designating a prevailing party.
*Sohappy v. Hodel*, 911 F.2d 1312, 1321 (9th Cir. 1990).

the appeal, and retaining professional consultants or counsel." *See* 36 CFR §214.14(i). As this Court previously noted in *Fairchild Farms*, fee-shifting under § 504(a)(1) only applies to "certain administrative proceedings." 406 F.Supp.2d at 1133. By its own black letter terms, administrative appeals under 36 C.F.R. §214 are not one of those proceedings. As such, Plaintiffs undertook their appeal knowing full well they were precluded from seeking fees, even if they prevailed.

Second, USFS correctly determined that EAJA does not apply to the administrative grazing permit proceedings in this case. As this Court noted in *Fairchild Farms*, fee-shifting under § 504(a)(1) only applies to "adversary adjudications." 406 F.Supp.2d at 1133; *see* also *Sullivan v. Hudson*, 490 U.S. 877, 891 (1989) ("…a court may never award fees for time spent in nonadversarial administrative proceedings."). Proceedings are "adversary adjudications" under 5 U.S.C. § 554 only where "the position of the United States is represented by counsel or otherwise...." 5 U.S.C. § 504 (b)(1)(C)(i).

Plaintiffs argue the legislative history of EAJA indicates Congress intended the phrase "or otherwise" to cover any situation where "the agency … take[s] a position at some point in the adjudication." Br. at 24, quoting H.R. Rep. No. 96-1413 at 23 (brackets and ellipses Plaintiffs'). But this is clearly wrong. As an initial matter, such an interpretation would render §

504(b)(1)(C)(i) a nullity, because every case would be "adversarial" regardless of whether the position of the United States was presented during the adjudication. Such a construction is therefore to be avoided. *United States v. Chi Tong Kuok*, 671 F.3d 931, 944 (9th Cir. 2012).

Further, courts have examined the same legislative history Plaintiffs rely upon and arrived at the opposite conclusion:

> Even though the EAJA has been in existence since 1980, [ ], a paucity of authority exists precisely defining what "or otherwise" means. For purposes of the present dispute, however, the Court is called upon to squarely decide this issue. Therefore, based on the legislative history of the EAJA, applicable case law, and relevant regulations, **the Court concludes that the phrase "or otherwise" requires that a person physically appear at the adjudication and advocate a position on behalf of the United States**.

*Handron v. Sebelius*, 669 F. Supp. 2d 490, 494 (D.N.J. 2009), aff'd on other grounds sub nom. *Handron v. Sec'y Dep't of Health & Human Servs.*, 677 F.3d 144 (3d Cir. 2012). Thus, in order to be eligible for EAJA fees under § 504 (b)(1)(C)(i), a lawyer or other advocate must be physically present at an adjudication – it is not enough for an agency to merely "take a position."

In this case, the grazing permit appeal was not an "adjudication under § 554" because the position of the United States was not represented "by counsel or otherwise" during the appeal. USFS counsel appear nowhere in the appeal decision (F-15) or any of the associated documents (F-1 through F-21). At no

point did agency counsel or any other USFS representative "physically appear" at an adjudication and advocate a position on behalf of the United States. *Handron*, 669 F. Supp. 2d at 494. Indeed, there was never any hearing where such a "physical appearance" could have occurred. USFS offered Plaintiffs an informal oral presentation (F-10:1774), but Plaintiffs declined that offer (F-12:1807 ("…we do not believe an oral presentation is necessary so long as you have all of the information you need to render your decision.")). Thus, the appeal merely consisted of the submission of documents, and "documents alone" are not sufficient to make a proceeding adversarial. *Hadron*, 669 F.Supp.2d at 498; *Willis v. Sullivan*, 931 F.2d 390, 400 (6th Cir. 1991); *Rowell v. Sullivan*, 813 F.Supp. 78, 81 (D.D.C. 1993). There was no hearing where anyone physically appeared to advocate on behalf of USFS. As such, the administrative grazing permit determination was not "adverse," and fees cannot be awarded under EAJA. *Sullivan*, 490 U.S. at 891.

Even if Plaintiffs had accepted the opportunity for an oral presentation, it would not have made their administrative adjudication eligible for fee-shifting under 5 U.S.C. § 554. Section 554 applies only to formal adjudications "required by statute to be determined on the record after opportunity for an agency hearing." The oral presentation in this case would have met none of these criteria. First, the oral presentation would not have been a "formal

adjudication." As noted in the February 21, 2018 letter proposing the oral presentation,

> Oral presentations are not evidentiary proceedings involving examination and cross-examination of witnesses and <u>are not subject to formal rules of procedure</u>. This presentation will be <u>conducted in an informal manner</u> and limited to clarifying or elaborating upon information that has already been filed with me.

AR F-10:1774 (underlines added).

Second, the oral presentation was not "required by statute to be determined on the record." None of the statutes empowering USFS to regulate occupancy or use of National Forest lands – as with a grazing permit – require formal adjudicatory proceedings. *See*, e.g., 16 U.S.C. §472, 16 U.S.C. §551, 7 U.S.C. §1011(f). Indeed, there is no statute or regulation requiring or allowing these types of administrative appeals to be tried before any kind of adjudicatory body within USFS or USDA.

This is a critical distinction between this case and the cases Plaintiffs rely upon to argue they are entitled to fees for the administrative adjudication: In this case, there was no quasi-judicial body like the National Labor Relations Board (*Grason Elec. Co. v. N.L.R.B.*, 951 F.2d 1100, 1101 (9th Cir. 1991)) or the Interior Board of Land Appeals (*Collord v. U.S. Dep't of Interior*, 154 F.3d 933, 935 (9th Cir. 1998); *Western Watersheds Project v. Interior Board of Land Appeals*, 624 F.3d 983, 988 (9th Cir. 2010)) administering a formal adjudicatory

hearing.  This Court previously held in *Fairchild Farms* that fee shifting was only permissible under § 504(a)(1) where a formal administrative adjudication occurred, on the record, before a quasi-judicial body (in that case, the National Appeals Division).  406 F.Supp.2d at 1132.  Here, there was no hearing, there was no record, and there was no quasi-judicial body.

Unlike cases occurring before quasi-judicial bodies, the "oral presentation" offered in this case explicitly repudiated formality.  Supervisor Glossa's February 21, 2018 letter stated "The oral presentation will follow regulations pursuant to 36 CFR §214.16."  F-10:1774.  Section 214.16 states that oral presentations are "not evidentiary proceedings involving examination and cross-examination or witnesses and are not subject to formal rules of procedure."  36 C.F.R. § 214.16.  They are required to be "conducted in an informal manner."  *Id*.  No administrative law judge presides over such administrative hearings, and no rules of evidence or procedure constrain the appeal.  It is merely an "oral presentation," which is defined as an "informal meeting" where the permittees are allowed to present information in support of their position.  36 C.F.R. §214.2.

This stands in marked contrast to the formal, trial-like procedures required in cases where the APA allows fee-shifting.  *See*, e.g., 5 U.S.C. §556 (requiring an administrative law judge to "preside at the taking of evidence"),

§557 (requiring opportunity for proposed findings and conclusions, and written "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact [and] law"). In formal adjudicatory proceedings, the administrative record consists of "the transcript of any testimony and exhibits." 5 U.S.C. §556(e). By contrast, testimony during Part 214 appeals is not required to be transcribed, and is specifically precluded during discretionary review. *See*, 36 C.F.R. §214.16(e), (h). The mere exchange of documents that occurred in this case is far from the kind of formal adversarial adjudication required for fee shifting.

Plaintiffs fail to even address the question of whether the position of the United States was substantially justified. *See* 5 U.S.C. § 504(a)(1); *Handron*, 669 F. Supp. 2d at 494-95. USFS was "substantially justified" in its litigation position so long as the administrative record made "during the adversary adjudication" (5 U.S.C. § 504(a)(1)) shows it was "justified in substance or in the main." *Loumiet v. Office of Comptroller of Currency*, 650 F.3d 796, 799 (D.C. Cir. 2011), quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). As noted above, there was no adversary adjudication in this case, nor any record made during such an adversary adjudication, so Plaintiffs are not eligible for fees in the first instance. But the records available demonstrate USFS's position was "justified in substance or in the main."

In the appeal decision, Supervisor Glossa finds that the Dry Cottonwood Allotment is supposed to be managed according to the standards in the 1996 Allotment Management Plan: That site-specific AMP preempts the more general interim management standard from the 2009 Forest Plan. F-15:1819-20. As demonstrated above, this interpretation is completely correct. Supervisor Glossa affirmed that Dry Cottonwood permittees are required to maintain structural improvements, and failed to do so. *Id*. at 1820-21. Supervisor Glossa affirmed that these permittees repeatedly failed to comply with permit and management requirements. *Id*. There was never any suggestion that USFS's position was not "justified in substance or in the main." Supervisor Glossa reversed the 20% suspension of grazing privileges not because USFS was wrong, but merely to promote a good relationship with the permittees so they would be better partners in working "to maintain healthy functioning working landscapes" going forward. *Id*. at 1821. USFS's litigation position was completely justified. Therefore, even if this case involved an administrative proceeding amenable to fee-shifting (it does not), Plaintiffs would not be entitled to EAJA fees.

Plaintiffs did not qualify for fee-shifting under § 504(a)(1), and USFS's decision to deny fees was not arbitrary and capricious. Accordingly, Plaintiffs'

fee-shifting claim should be summarily adjudicated in favor of the United

States.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests this matter

be summarily adjudicated in favor of USFS.

**DATED** this 28th day of January, 2019.

**KURT G. ALME**
**United States Attorney**


**/s/ MARK STEGER SMITH**
**Assistant U.S. Attorney**
**Attorney for Federal Defendants**

# CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), the attached brief is proportionately spaced, has a typeface of 14 points and contains 11,941 words, excluding the caption and certificates of service and compliance.

**DATED** this 28th day of January, 2019.


**/s/ MARK STEGER SMITH**
**Assistant U.S. Attorney**
**Attorney for Federal Defendants**

# CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of January, 2019, a copy of the foregoing document was served on the following person by the following means.

  1-2  CM/ECF
_____ Hand Delivery
_____ U.S. Mail
_____ Overnight Delivery Service
_____ Fax
_____ E-Mail

1.  Clerk of Court

2. John E. Bloomquist
Calli J. Michaels
BLOOMQUIST LAW FIRM, P.C.
220 South Pacific Street
P.O. Box 1418
Dillon, Montana 59725-1418
(406) 683-8795 – phone
cmichaels@helenalaw.com
*Attorneys for Plaintiffs*

**/s/ MARK STEGER SMITH**
**Assistant U.S. Attorney**
**Attorney for Federal Defendants**