John E. Bloomquist
Calli J. Michaels
BLOOMQUIST LAW FIRM, P.C.
220 South Pacific Street
P.O. Box 1418
Dillon, MT 59725-1418
(406) 683-8795
cmichaels@helenalaw.com
        *Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| **2-BAR RANCH LIMITED PARTNERSHIP, a Montana limited partnership, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**UNITED STATES FOREST SERVICE, et al.,**<br><br>**Defendants.** | **Case No.:**<br>**CV 18-33-BU-SEH**<br><br>**PLAINTIFFS' COMBINED RESPONSE AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

ARGUMENT....................................................................................................... 6

I.      The 2009 Forest Plan and its interim livestock grazing standards govern
        grazing on Dry Cottonwood Allotment. ......................................................6

        A.      The 2009 Forest Plan's interim livestock grazing standards replaced
                all existing standards on the Beaverhead–Deerlodge National Forest
                except those that were expressly retained under Chapter 4.................7

        B.      The Forest Service's use of the 1995 IRMM contradicts the 2009
                Forest Plan....................................................................................10

        C.      The Forest Service has not produced a valid AMP for Dry
                Cottonwood Allotment....................................................................13

        D.      The Court can, and should, require the Forest Service to comply with
                the 2009 Forest Plan by applying its interim livestock grazing
                standards.......................................................................................16

II.     The 2016 and 2017 NONCs should be set aside because they apply unlawful
        standards, fail to substantiate the alleged violations, and were not issued in
        accordance with procedure required by law. ...............................................18

        A.      The 2016 and 2017 NONCs merged with the final administrative
                decision and became reviewable with it. ..........................................18

        B.      The NONCs are improper because they apply unlawful allowable use
                standards.......................................................................................19

        C.      The 2016 and 2017 NONCs are improper because they were not
                issued in accordance with procedure required by law.......................20

III.   Plaintiffs are entitled to attorney's fees and expenses under EAJA. ............23

    A.   The Forest Service waived its arguments by failing to make them in the administrative proceedings. .........................................24

    B.   The Forest Service's arguments opposing an award of attorney's fees and expenses are without merit. .........................................25

        1.   Forest Service Regulations do not Supersede EAJA............25

        2.   Appeals of grazing permit suspensions are adversary adjudications………………………….…………………..26

            *i. Proceedings on a license suspension are adjudications*.......26

            *ii. Plaintiffs' administrative appeal was adversarial*………..29

    C.   Denying Plaintiffs attorney's fees and expenses under EAJA would lead to an inconsistent application of EAJA in grazing permit appeals………………………………………………………….....30

    D.   The Forest Service's position in the adversary adjudication was not substantially justified. .......................................................31

IV.   The Forest Service's arguments lack merit and their requests for summary judgment should be denied.............................................34

    A.   Plaintiffs have standing regardless of Broken Circle Ranch's status as a permittee. .........................................................34

    B.   The 2018 AOIs are not moot because they continue to impact Plaintiffs. .........................................................35

    C.   Plaintiffs have prudential standing for their NEPA claims. ...............37

CONCLUSION .........................................................40

CERTIFICATE OF COMPLIANCE......................................41

# TABLE OF AUTHORITIES

## Cases

*Alaska Fish & Wildlife Fed'n v. Dunkle*,
    829 F.2d 933 (9th Cir. 1987)......................................................................36

*Am. Rivers v. Nat'l Marine Fisheries Serv.*,
    126 F.3d 1118 (9th Cir. 1997)...................................................................35

*Anchustegui v. Dep't of Agric.*,
    257 F.3d 1124 (9th Cir. 2001).................................................21, 23, 28

*Bell v. Burson*,
    402 U.S. 535 (1971).................................................................................28

*Buckingham v. Sec'y of U.S. Dep't of Agric.*,
    603 F.3d 1073 (9th Cir. 2010)...................................................................28

*Cal. Energy Comm'n v. Dep't of Energy*,
    585 F.3d 1143 (9th Cir. 2009)...................................................................23

*Cantrell v. City of Long Beach*,
    241 F.3d 674 (9th Cir. 2001).....................................................................35

*Collord v. U.S. Dep't of Interior*,
    154 F.3d 933 (9th Cir. 1998).....................................................................27

*Ecology Ctr., Inc. v. Austin*,
    430 F.3d 1057 (9th Cir. 2005)...................................................................21

*Fed. Power Comm'n v. Fla Power & Light Co.*,
    404 U.S. 453 (1972)................................................................................... 2

*Fregozo v. Holder*,
    576 F.3d 1030 (9th Cir. 2009)...................................................................17

*Friends of Southeast's Future v. Morrison*,
    153 F.3d 1059 (9th Cir. 1998)................................................................... 2

*Goodrich v. United States*,
    434 F.3d 1329 (Fed. Cir. 2006).................................................................13

*Grason Elec. Co. v. Nat'l Labor Relations Bd.*,
    951 F.2d 1100 (9th Cir. 1991)..............................................................23, 30

*Handron v. Sebelius*,
    669 F. Supp. 2d 490 (D.N.J. 2009)..................................................29

*Handron v. Sec'y Dep't Health & Human Servs.*,
    667 F.3d 144 (3d Cir. 2012)...............................................................29

*Herr v. U.S. Forest Serv.*,
    803 F.3d 809 (6th Cir. 2015)...............................................................16

*Idaho Conservation League v. Mumma*,
    956 F.2d 1508 (9th Cir. 1992)............................................................11

*Jama v. Dep't of Homeland Sec.*,
    760 F.3d 490 (6th Cir. 2014)...............................................................18

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008)...............................................................21

*Marathon Oil Co. v. Envtl. Prot. Agency*,
    564 F.2d 1253 (9th Cir. 1977)............................................................28

*Merrell v. Block*,
    809 F.2d 639 (9th Cir. 1987)...............................................................25

*Muniz-Alvarado v. Lynch*,
    603 Fed. App'x 637 (9th Cir. 2015)..................................................17

*Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown*,
    567 F.3d 521 (9th Cir. 2009)...............................................................35

*Native Ecosystems Council v. U.S. Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005)............................................................2, 6

*Native Ecosystems Council v. Weldon*,
    697 F.3d 1043 (9th Cir. 2012)............................................................16

*Nw. Envtl. Def. Ctr. v. Gordon*,
    849 F.2d 1241 (9th Cir. 1988)............................................................35

*Or. Natural Desert Ass'n v. Sabo*,
   854 F. Supp. 2d 889 (D. Or. 2012) ............................................36

*Port of Astoria v. Hodel*,
   595 F.2d 467 (9th Cir. 1979) ....................................................37

*Prairie Band of Potawatomi Indians v. Pierce*,
   253 F.3d 1234 (10th Cir. 2001) ................................................36

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078 (9th Cir. 2005) ..................................37

*S. Pac. Terminal Co. v. Interstate Commerce Comm'n*,
   219 U.S. 498 (1911) ................................................................35

*Sierra Club v. U.S. Envtl. Prot. Agency*,
   346 F.3d 955 (9th Cir. 2003) ..................................................... 2

*United States v. Backlund*,
   689 F.3d 986 (9th Cir. 2012) ....................................................19

*W. Watersheds Project v. Interior Bd. of Land Appeals*,
   624 F.3d 983 (9th Cir. 2010) ...............................................27, 30

*Wong Yang Sung v. McGrath*,
   339 U.S. 33 (1950) ..................................................................27

## United States Constitution

   Amend. V ................................................................................28

## Statutes

   5 U.S.C. § 504 ..................................................................passim
   5 U.S.C. § 551 ........................................................................26
   5 U.S.C. § 554 ........................................................................26
   5 U.S.C. § 558 ........................................................................21
   5 U.S.C. § 704 ........................................................................18
   5 U.S.C. § 706 ..............................................................16, 17, 21
   16 U.S.C. § 1604..............................................................passim
   28 U.S.C. § 2401....................................................................16
   42 U.S.C. § 4332....................................................................13
   43 U.S.C. § 1752..........................................................13, 14, 15

## Federal Rules of Civil Procedure

F.R.C.P. 56 ................................................................................. 6

## Federal Regulations

7 C.F.R. § 1.183 ........................................................................ 5

36 C.F.R. § 214.12 ....................................................................30

36 C.F.R. § 214.17 ....................................................................27

36 C.F.R. § 219.15 .............................................................passim

36 C.F.R. § 220.4 ......................................................................11

36 C.F.R. § 222.2 .......................................................... 11, 13, 17

36 C.F.R. § 222.4 ......................................................................17

36 C.F.R. § 222.7 ......................................................................38

## Legislative History

H.R. Rep. No. 96–1418 (1980)
*reprinted in* 1980 U.S.C.C.A.N. 4953 .......................................passim

## INTRODUCTION

The *2009 Beaverhead–Deerlodge National Forest, Land and Resource Management Plan* ("2009 Forest Plan") governs management on the Beaverhead–Deerlodge National Forest. All of the issues in this case can be resolved by asking one question: Did the Forest Service comply with its 2009 Forest Plan? The answer to that question is <u>no</u>. The Forest Service did not manage Dry Cottonwood Allotment in accordance with the 2009 Forest Plan and, in fact, implemented standards that *directly contradicted* the 2009 Forest Plan.[1] All of the Forest Service's arguments in this case—arguments that have changed at every stage of the appeal and which are inconsistent among themselves—are post-hoc efforts to rationalize a decision that violated the 2009 Forest Plan.

The Forest Service *must* comply with its forest plan. This is the most fundamental requirement of the National Forest Management Act ("NFMA"). 16 U.S.C. § 1604. The Forest Service cannot refute it and does not try. Instead, the Forest Service tries to pigeonhole its actions by claiming the 2009 Forest Plan authorized it to use outdated standards from a prior forest plan. The Forest Service offers no law to support its position; it relies entirely on the doctrine of agency

---

[1] In her April 18, 2018 final administrative decision, Deciding Officer Melany Glossa directed the Forest Service to apply the 1995 Interim Riparian Mitigation Measures—direction from the *prior* forest plan—to Dry Cottonwood Allotment. F-15:1820–22. The Forest Service applied the unlawful standards in 2018. A-77:213.

1

deference. Naturally, the Forest Service is entitled to *some* deference in its interpretation of the 2009 Forest Plan, but that deference is far from absolute.[2] *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). No deference is warranted when—as here—the agency's interpretation is "plainly inconsistent with the regulation at issue." *Id.* (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1069 (9th Cir. 1998)).

Only by securing *absolute* deference can the Forest Service prevail: the Forest Service's statements of fact are not supported by the record[3] and its legal interpretations are inconsistent with the plain language of the Forest Plan and NFMA. The Forest Service's entire argument turns on its interpretation of one word: *unless*.[4] Removing that word from its context, the Forest Service tries to convince the Court that the 2009 Forest Plan standards do not apply *unless* no other direction is available. Other direction is *always* available, however, so the

---

[2] The Forest Service tries to invoke the highest level of deference for issues involving technical expertise, but this case does not involve technical expertise. Even if it did, the Court does not defer to the agency when, as here, its determinations lack a "substantial basis in fact." *Sierra Club v. U.S. Envtl. Prot. Agency*, 346 F.3d 955, 961 (9th Cir. 2003, *amended on reh'g*, Dec. 18, 2003) (quoting *Fed. Power Comm'n v. Fla Power & Light Co.*, 404 U.S. 453, 463 (1972)).

[3] The Forest Service claims Plaintiffs exceeded allowable use standards in 2015, Doc.67, at 8, but the record shows they did not, E-17:974. The Forest Service also implies it used only one set of standards was in 2016 and 2017, Doc.67, at 7–8, when in fact it enforced *three* inconsistent sets of direction. *See* A-60:160; A-62:165–66; A-67:183.

[4] *See* Doc.67, at 28.

Forest Service is really arguing that the 2009 Forest Plan's standards <u>never</u> apply. If the Court rules for the Forest Service, it will nullify the 2009 Forest Plan's interim livestock grazing standards and render the Plan's forestwide direction meaningless.[5]

The 2009 Forest Plan implemented interim livestock grazing standards to bring consistency to grazing management across the Beaverhead–Deerlodge National Forest (a forest that had previously been managed as separate units with divergent direction). Prior to 2009, the Forest Service managed riparian areas for livestock grazing under three different sets of direction.[6] On the Beaverhead Unit, the Forest Service applied the "Riparian Amendment," a set of standards adopted in 1997 as a result of the National Wildlife Federation Lawsuit.[7] On the Deerlodge Unit, the Forest Service managed allotments west of the continental divide under the 1995 Interim Riparian Mitigation Measures ("1995 IRMM")—an amendment to the 1987 Deerlodge Forest Plan—and allotments east of continental divide under the standards in the un-amended 1987 Deerlodge Forest Plan.[8] The 2009 Forest Plan replaced all these pre-existing standards with forestwide direction.[9]

---

[5] *See* 16 U.S.C. § 1604(i) (requiring instruments governing use to be made consistent with revised forest plans); 36 C.F.R. § 219.15 (requiring activities on a forest to be consistent with the forest plan).
[6] G-09:2895.
[7] G-07:2758; G-09:3194.
[8] G-07:2758.
[9] G-09:2895.

The 2009 Forest Plan states unequivocally that its standards apply forestwide.[10] The Plan's Analysis of the Management Situation explains *why* the Forest Service chose to replace existing direction with forestwide standards:

> INFISH amended the Deerlodge Plan only for areas west of the Continental divide, leaving **inconsistent** management direction east and west of the Divide. . . .
>
> The Riparian amendment and all remaining standards from the original Beaverhead Plan further fragment management direction across the consolidated [Beaverhead–Deerlodge National Forest], **creating inconsistencies, potential legal risk, and credibility issues with the public**.[11]

In other words, the Forest Service recognized the inherent problems with having multiple, inconsistent livestock grazing standards applied throughout a single forest unit. The 2009 Forest Plan's forestwide standards were intended to remove those inconsistencies, reduce the risk of legal exposure, and improve credibility with the public. To accomplish those goals, however, the Forest Service must actually <u>use</u> the standards. By not applying the 2009 Forest Plan standards on Dry Cottonwood Allotment, the Forest Service violated the Plan and NFMA.

Stripped of its primary position, the Forest Service's remaining arguments fall apart. The 2016 and 2017 Notices of Noncompliance ("NONCs") did not apply the 2009 Forest Plan standards or standards authorized by the 2009 Forest Plan, so they are invalid. The Forest Service has not provided any evidence to suggest

---

[10] G-10:4360.

[11] G-07:2758–59 (emphasis added).

4

Plaintiffs would have been out of compliance under the correct standards, nor has the Forest Service shown that it complied with procedure required by law in issuing the NONCs. With unauthorized standards, unsubstantiated NONCs, and an unlawful suspension, the Forest Service cannot justify its position. Plaintiffs are entitled to attorney's fees and expenses under the Equal Access to Justice Act ("EAJA") for successfully defending against the Forest Service's unjustified position in the administrative proceeding[12] and were unlawfully denied their opportunity to recover them.[13]

The Forest Service presents no argument that would allow the Court to resolve this matter in its favor. The Forest Service contests Broken Circle Ranch's standing, but acknowledges the ranch *has* standing to request attorney's fees and costs under EAJA. The Forest Service challenges Plaintiffs' prudential standing under the National Environmental Policy Act ("NEPA"), but does not dispute their Article III standing. The Forest Service contends the 2018 Annual Operating Instructions ("AOIs") are moot, but tacitly admits the April 18, 2018 final administrative decision on which Plaintiffs base their appeal (and with which the 2016 and 2017 NONCs merged) is ripe for review. Therefore, even if the Forest

---

[12] 5 U.S.C. § 504(a)(1).

[13] *See* 7 C.F.R. § 1.183(b) (requiring the Department of Agriculture to accept and provide procedure for every application filed under EAJA).

Service's arguments had merit they would be immaterial, and Plaintiffs are still entitled to judgment as a matter of law. *See* F.R.C.P. 56(a).

## ARGUMENT

**I.     The 2009 Forest Plan and its interim livestock grazing standards govern grazing on Dry Cottonwood Allotment.**

The Forest Service has not complied with its 2009 Forest Plan. NFMA requires the Forest Service to develop a forest plan and abide by it.[14] It also requires the Forest Service to revise and update its plan at least once every fifteen years to keep abreast of science and changing ecological conditions.[15] To prevent the Forest Service from treating the revision process as a mere formality, NFMA requires the Forest Service to implement the revised Forest Plan by amending all underlying instruments to conform with it.[16]

The 2009 Forest Plan governs grazing on Dry Cottonwood Allotment. It superseded the 22-year-old Deerlodge Forest Plan—and its 1995 IRMM amendment—which had previously provided guidelines for grazing on the Deerlodge National Forest.[17] The 2009 Forest Plan replaced the existing direction

---

[14] 16 U.S.C. § 1604; *Native Ecosystems Council*, 418 F.3d at 961.
[15] 16 U.S.C. § 1604(f)(5).
[16] 16 U.S.C. § 1604(i) (requiring Forest Service to revise all allotment management plans, permits, and other instruments "as soon as practicable to [make them] consistent with" the revised forest plan); 36 C.F.R. § 219.15 (requiring allotment management plans to be evaluated for consistency with the Forest Plan).
[17] G-09:2886.

with "str[onger] forestwide standards for grazing and riparian management."[18] These revised standards apply "until specific long-term objectives, prescriptions, or allowable use levels have been designed through individual allotment management plans [("AMPs")] and site-specific NEPA decisions."[19] The Forest Service's arguments to the contrary are inconsistent with the 2009 Forest Plan and NFMA.

A.   The 2009 Forest Plan's interim livestock grazing standards replaced all existing standards on the Beaverhead–Deerlodge National Forest except those that were expressly retained under Chapter 4.

The 2009 Forest Plan's interim livestock grazing standards apply to the *entire* Beaverhead–Deerlodge National Forest.[20] The only areas not affected by the standards are those identified in Chapter 4 of the Plan as having alternate direction.[21] The Forest Plan does not identify any alternate direction for Dry Cottonwood Allotment,[22] so the 2009 Forest Plan's standards apply. The Forest Service denies this conclusion, but provides no other explanation for Forest Plan's forestwide direction or its intended purpose of replacing divergent direction with consistent management practices for the entire forest.[23]

---

[18] G-08:2842.
[19] G-08:2842; *see also* G-10:4360 (stating the 2009 Forest Plan standards apply forestwide).
[20] G-10:4360.
[21] G-10:4360.
[22] G-10:4460 ("Standards in Addition to Forestwide Standards[:] None").
[23] G-07:2758–59 (explaining why consistent management direction was needed).

Ignoring the plain language of the Forest Plan and its implementing documents, the Forest Service argues that the 2009 Forest Plan standards apply only if no other standards are available. The Forest Service's entire argument turns on a single word: *unless*.[24] The Forest Plan states:

> The interim standards in Table 6 apply to livestock grazing operations *unless* or until specific long-term objectives, prescriptions, or allowable use levels have been designed through individual resource management plans or site-specific NEPA decisions; for example, **revised** [AMPs] or Wilderness management plans.[25]

Disregarding the rest of the sentence and its context within the Forest Plan, the Forest Service focuses exclusively on the word "unless." From that word, the Forest Service concludes that the Plan's interim livestock grazing standards do not apply *unless* no other standards exist for an allotment. This interpretation contradicts the Forest Plan and its NEPA analysis, each of which state that the 2009 Forest Plan's standards <u>replaced</u> existing standards throughout the Beaverhead–Deerlodge National Forest with consistent, forestwide direction.[26] It also contradicts the second portion of the sentence—a clause the Forest Service

---

[24] Doc.67, at 28.

[25] G:10:4374 (emphasis added).

[26] G-10:4360; G-09:3008 (explaining that the 2009 Forest Plan's standards were intended "to improve consistency in riparian management and to address region-wide concerns"); G-07:2760 ("Goals and objectives that reflect consistent management direction between units are needed.").

omits—which explains that the forestwide standards can be supplanted by standards in <u>revised</u> AMPs, not outdated AMPs with inconsistent direction.[27]

In its effort to rationalize its final administrative decision, the Forest Service disregards the more obvious meaning of the word "unless," a meaning that does not contradict the Forest Plan. As explained at the beginning of the Forest Plan's Chapter 3, the interim standards do *not* apply to allotments for which specific direction was retained under Chapter 4, so the word "unless" is necessary to allow for the variances set out in Chapter 4. Because Chapter 4 does not provide alternate direction for Dry Cottonwood Allotment,[28] the word does not apply here.

In addition to being inconsistent with the plain language of the 2009 Forest Plan, the Forest Service's interpretation would render the Plan's livestock grazing standards meaningless. The Forest Service argues, first, that the Forest Plan standards do not apply if any site-specific standards exist for an allotment and, second, that *all* standards become site-specific when they are applied. Because livestock grazing standards have been applied on *every* allotment in the Beaverhead–Deerlodge National Forest, the 2009 Forest Plan's interim livestock grazing standards could *never* apply. This backwards approach to management—

---

[27] *See* G-08:2863–64 (explaining that, after the 2009 Forest Plan has been adopted, its standards must be incorporated into grazing permits through a modified permit or AOIs to meet the "as soon as practicable" provision of NFMA).

[28] G-10:4460 ("Standards in Addition to Forestwide Standards[:] None").

rejecting the current Forest Plan in deference to outdated standards[29]—contradicts

NFMA's requirement that forest plans be regularly revised, updated, and applied.[30]

If the Court were to agree with the Forest Service, it would nullify the 2009

Forest Plan's interim livestock grazing standards. In other words, if the Court finds

the Forest Plan's standards do not apply on Dry Cottonwood Allotment, they will

not apply *anywhere* on the Beaverhead–Deerlodge National Forest. This appears to

be the Forest Service's objective, which begs the question: If the Forest Service did

not intend to use the standards, why did it develop them?

Not only is the Forest Service wrong to reject the Forest Plan's interim

livestock grazing standards, the standards the Forest Service seeks to enforce in

their place—the 1995 IRMM—directly contradict the 2009 Forest Plan.

B.    The Forest Service's use of the 1995 IRMM contradicts the 2009
       Forest Plan.

The 1995 Interim Riparian Mitigation Measures are—as their name states—

*interim* standards that were implemented to bring the 1987 Deerlodge Forest Plan

into compliance with INFISH.[31] The standards applied to all allotments west of the

---

[29] The Forest Service argues this exact position by claiming that it can search its historical records for Dry Cottonwood Allotment to find *any* previous standards to apply instead of the 2009 Forest Plan standards. Doc.67, at 21.
[30] 16 U.S.C. § 1604(f), (i); 36 C.F.R. § 219.15(a).
[31] H-03:4903 ("These mitigation measures were developed as an *interim* step to assist the Forest in maintaining or moving toward riparian desired conditions.")

continental divide in the Deerlodge National Forest.[32] They were not developed for

or "customized to"[33] Dry Cottonwood Allotment.[34] There was no site-specific

NEPA analysis.[35] The 1995 Environmental Assessment, which the Forest Service

tries to convert into NEPA analysis for the 1995 IRMM, did not analyze different

site-specific standards and select a preferred alternative; it simply incorporated

existing, forestwide standards into Plaintiffs' reissued permits.[36]

The 1995 IRMM are forestwide riparian standards from the amended 1987

Deerlodge Forest Plan. Unable to deny this fact, the Forest Service claims that the

measures—which it admits are not site-specific[37]—should be *treated* as site-

specific standards because they were "specifically applied" to Dry Cottonwood

Allotment.[38] By this logic, *all* interim, forestwide standards would become site-

specific as soon as they were implemented, and no new standards could ever take

---

[32] H-03:4903; G-07:2758.

[33] *See* Doc.67, at 37.

[34] Site-specific decisions must be consistent with the applicable forest plan and comply with NEPA. 36 C.F.R. §§ 220.4 (c), 222.2(c); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1512 (9th Cir. 1992). The Forest Service has not shown that the 1995 IRMM are consistent with the 2009 Forest Plan or that they were developed according to NEPA.

[35] The Forest Service has not produced *any* NEPA analysis for the 1995 IRMM.

[36] The 1995 Environmental Assessment determined grazing should be reauthorized using the 1987 Deerlodge Forest Plan's upland grazing standards and the 1995 IRMM's riparian grazing standards. H-08:4912–14. The standards were not specifically analyzed, they were just applied.

[37] Doc.67, at 36.

[38] *Id.*

effect. Management would be regressive (reverting to old forest plans), rather than progressive (implementing new plans).[39] The Forest Service offers no legal support for its argument, nor can it; the argument flies in the face of NFMA. *See* 16 U.S.C. § 1604 (requiring forest plans to be revised at least once every 15 years to keep up with changes in science and ecological conditions).

Perhaps the most glaring problem with the Forest Service's efforts to apply the 1995 IRMM on Dry Cottonwood Allotment is found in its NEPA analysis for the 2009 Forest Plan. In that analysis, the Forest Service *rejected* the 1995 IRMM in favor of forestwide standards.[40] In its Environmental Impact Statement for the 2009 Forest Plan, the Forest Service considered an alternative (Alternative 1) in which the 1995 IRMM would continue to apply to allotments—like Dry Cottonwood Allotment—located west of the continental divide in the Deerlodge unit.[41] The Forest Service rejected Alternative 1 because it "d[id] not have consistent forestwide direction for riparian area protection and [was] not predicted

---

[39] The Forest Service claims the 1995 IRMM were found sufficient to achieve forest plan standards, *see* Doc.67, at 38, but that finding pertained to the <u>1987 Deerlodge Forest Plan</u>, not the 2009 Forest Plan. H-08:4914–15. The 1995 IRMM have *not* been found consistent with the 2009 Forest Plan.

[40] G-09:2901 (explaining that the 2009 Forest Plan's livestock grazing standards replace existing interim riparian grazing direction on the Beaverhead and Deerlodge National Forests).

[41] G-09:3008 (explaining that Alternative 1 would retain "current direction under the Beaverhead and Deerlodge Forest Plans and all amendments"); G-09:3009, Tbl. 20.

to adequately protect riparian area function."[42] The Environmental Impact Statement also concluded that the effects from livestock grazing under the 2009 Forest Plan's interim livestock grazing standards would be significantly less than under the 1995 IRMM.[43] The Forest Service's use of the 1995 IRMM in spite of this language is arbitrary, capricious, and a direct violation of the 2009 Forest Plan.

In addition to having no site-specific standards, the Forest Service has not produced an AMP to apply specific direction to Dry Cottonwood Allotment. As explained below, none of the documents the Forest Service has offered as AMPs are valid.

C. The Forest Service has not produced a valid AMP for Dry Cottonwood Allotment.

Dry Cottonwood Allotment is not managed according to a valid AMP. To be valid, an AMP must be developed in compliance with NEPA, NFMA, and the Federal Land Policy and Management Act ("FLPMA"). *Goodrich v. United States*, 434 F.3d 1329, 1331 (Fed. Cir. 2006); 16 U.S.C. § 1604(i); 43 U.S.C. § 1752(d); 36 C.F.R. § 222.2(b). NEPA requires the Forest Service to prepare a detailed statement of environmental impacts before issuing or revising an AMP. 42 U.S.C. § 4332(C); *Goodrich*, 434 F.3d at 1331. NFMA requires an AMP to be consistent

---

[42] G-09:3008.
[43] G-09:3010, Tbl. 21 (see "Effects from Livestock Management," showing that the 2009 Forest Plan standards (Alternative 6) result in less effects from livestock management than the 1995 IRMM (Alternative 1)).

with the relevant forest plan. 16 U.S.C. § 1604(i). FLPMA requires the Forest Service to develop AMPs in "careful and considered consultation, cooperation and coordination with the . . . permittees . . . involved." 43 U.S.C. § 1752(d).

The Forest Service has not produced an AMP for Dry Cottonwood Allotment that complies with NEPA, FLPMA, or NFMA. The Forest Service claims it issued an AMP for the Allotment in 1996 and tentatively offers two unsigned, undated documents as "the" AMP.[44] Unable to rely entirely on either of them, the Forest Service argues alternately that one of these two documents or a 1996 Decision Notice is the relevant AMP.[45] The 1996 Decision Notice was the culmination of a NEPA analysis that evaluated whether to reissue grazing permits on Dry Cottonwood Allotment.[46] It did not evaluate grazing systems, pasture rotations, or site-specific livestock grazing standards, all of which are key components of an AMP.[47] By its own admission, the 1996 Decision Notice was not an AMP, nor was it NEPA analysis for an AMP.[48]

_____

[44] *See* Doc.67, at 4 (identifying both H-11 and H-12 as the 1996 AMP).
[45] *Id.* at 31.
[46] H-08:4922 (explaining that the NEPA analysis was "limited to the proposed authorization of livestock grazing and associated practices on the Dry Cottonwood Allotment").
[47] H-08:4914–15 (rejecting an alternative that would have analyzed site-specific livestock grazing standards for Dry Cottonwood Allotment)
[48] H-08:4922 (explaining that grazing systems and pasture rotation would be addressed separately in an AMP or AOI).

Contrary to the Forest Service's assertions, no AMP was implemented in 1996. If an AMP *had* existed in 1996, it would have been listed in Two Bar Ranch's 1996 grazing permit. None was listed. *Compare* J-04:5810 (requiring plan to "become part of Part 3 of the grazing permit") *with* A-05:19 (showing Part 3 of Two Bar Ranch's 1996 grazing permit, which lists no AMP). If the Forest Service drafted an AMP *after* 1996, it did not do so in "careful and considered consultation, cooperation and coordination with the . . . permittees . . . involved," because Plaintiffs had no knowledge of it.[49] 43 U.S.C. § 1752(d). Likewise, it cannot have complied with NEPA because no NEPA analysis has been produced.[50] Finally, any AMP issued before 2009 should have been "evaluated for consistency with the [2009 Forest Plan] and amended if necessary." 36 C.F.R. § 219.15(e). The Forest Service has not shown that it conducted the necessary evaluation.

The Forest Service tries to evade review by arguing that Plaintiffs are barred from challenging the hypothetical 1996 AMP because the statute of limitations has expired. The difficulty with the Forest Service's position is, of course, that Plaintiffs could not challenge a document that did not exist. No action accrued

---

[49] *See* Doc.23-1, Exhibit A, at ¶ 5 (showing Plaintiffs had not seen the document the Forest Service now calls its 1996 AMP before the Forest Service suspended their permits); Doc.23-1, Exhibit B, at ¶ 21 (same).

[50] The Forest Service's assertion that it could develop an AMP at any time with no additional NEPA analysis so long as the AMP was consistent with the 1996 Decision Notice is not supported by law. *See* J-04:5810 (requiring AMP to be "developed concurrently with the completion of the site-specific analysis and project-level decision").

until the Forest Service, in its April 18, 2018 final administrative decision, required

Plaintiffs to comply with a never-before-seen plan and outdated direction.[51] *See* 28

U.S.C. § 2401(a); *Herr v. U.S. Forest Serv.,* 803 F.3d 809, 819 (6th Cir. 2015).

Because the action accrued in 2018, Plaintiffs' claims are timely.

With no AMP, no site-specific standards, and no legal basis by which to

evade the 2009 Forest Plan, the Forest Service *must* apply the Forest Plan's interim

livestock grazing standards to Dry Cottonwood Allotment.

      D.    <u>The Court can, and should, require the Forest Service to comply with the 2009 Forest Plan by applying its interim livestock grazing standards.</u>

The Forest Service must comply with law. 5 U.S.C. § 706(2)(A) (requiring

the Court to "hold unlawful and set aside agency action, findings, and conclusions

found to be . . . not in accordance with law"). "The Forest Service's failure to

comply with the provisions of [its] Forest Plan is a violation of NFMA" and,

therefore, not in accordance with law. *Native Ecosystems Council v. Weldon*, 697

F.3d 1043, 1056 (9th Cir. 2012). To comply with its Forest Plan, the Forest Service

must ensure that all of the direction on Dry Cottonwood Allotment is consistent

with the 2009 Forest Plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15(a). The 1995

IRMM are not consistent with the 2009 Forest Plan because (1) the 2009 Forest

Plan's interim livestock grazing standards replaced all existing standards on

_____

[51] F-15:1822.

Dry Cottonwood Allotment, (2) the 1995 IRMM are not site-specific, (3) the 1995 IRMM were not implemented through a valid AMP, and (4) the 1995 IRMM are not consistent with the 2009 Forest Plan because the Forest Service *expressly rejected* them in its NEPA analysis for the 2009 Forest Plan.

Contrary to the Forest Service's assertions, it may not cancel grazing on Dry Cottonwood Allotment while it develops site-specific standards to comply with the 2009 Forest Plan. The *only* reasons for which the Forest Service may cancel, modify, or suspend a grazing permit are provided in 36 C.F.R. § 222.4(a). Lack of site-specific allowable use standards is not a valid basis for suspending a grazing permit, particularly when interim standards are available in the Forest Plan. *See id.*

The Court has authority to compel the Forest Service to comply with law. *See* 5 U.S.C. § 706(2). This includes authority to compel the Forest Service to comply with its Forest Plan. Plaintiffs are entitled to judgment as a matter of law holding the 1995 IRMM and 1996 AMP unlawful and requiring the Forest Service to use the 2009 Forest Plan's livestock grazing standards on Dry Cottonwood Allotment.[52] The Forest Service's request for remand should be denied.

---

[52] The Forest Service's argument that the Court cannot conduct a *de novo* inquiry is off-point. This is a question of law, not of fact; it requires no remand for fact-finding. *See Muniz-Alvarado v. Lynch*, 603 Fed. App'x 637, 637 (9th Cir. 2015) ("We deny Respondent's motion to remand, because this case presents purely legal issues that we review de novo and that do not invoke the agency's expertise.") (citing *Fregozo v. Holder*, 576 F.3d 1030, 1036 (9th Cir. 2009) (finding remand to agency unnecessary where issue is a legal question)).

II.    **The 2016 and 2017 NONCs should be set aside because they apply unlawful standards, fail to substantiate the alleged violations, and were not issued in accordance with procedure required by law.**

The Forest Service found Plaintiffs in noncompliance in 2016 and 2017 by applying unlawful allowable use standards.[53] The Forest Service has not substantiated the alleged violations with evidence, nor has it shown that the NONCs were issued according to procedure required by law. The NONCs are unlawful and should have been set aside when the suspension was reversed. Plaintiffs are entitled to judgment as a matter of law finding the NONCs unlawful and removing them from Plaintiffs' grazing records.

A.    The 2016 and 2017 NONCs merged with the final administrative decision and became reviewable with it.

The 2016 and 2017 NONCs are reviewable along with the agency's final administrative decision. NONCs are intermediary decisions—like interlocutory orders—that become appealable after a final decision has been issued. *See* 5 U.S.C. § 704 ("A[n] . . . intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."); *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 497 (6th Cir. 2014) ("[O]nce the agency has made a final decision . . . then [the plaintiff] may seek review of intermediate agency actions . . . ."). A party may seek judicial review of an agency action after it has

---

[53] Doc.63, at 3–4 (describing how the Forest Service altered Plaintiffs' allowable use standards without notice three times between 2016 and 2017).

exhausted all administrative remedies. *United States v. Backlund*, 689 F.3d 986, 998–99 (9th Cir. 2012).

Plaintiffs seek judicial review of the 2016 and 2017 NONCs through their appeal of the Forest Service's final administrative decision. The NONCs were issued in November of 2016 and 2017.[54] They were the basis for District Ranger Rasor's December 15, 2017 decision to suspend.[55] Plaintiffs challenged the NONCs in their appeal of the suspension.[56] Deciding Officer Glossa reversed the suspension, at which time she should have also set aside the unlawful NONCs. Instead, she retained and reissued the NONCs in her final administrative decision.[57] Plaintiffs sought discretionary review within the agency, but it was denied.[58] Having exhausted their administrative remedies, Plaintiffs' request for judicial review of the NONCs by this Court is proper. Consequently, the Forest Service's motion for summary judgment on the NONCs should be denied.

B.  The NONCs are improper because they apply unlawful allowable use standards.

The 2016 and 2017 NONCs should be set aside because the alleged violations were based on the use of unlawful standards. The Forest Service does not—and cannot—contend that Plaintiffs were out of compliance under the 2009

---

[54] A-62:164; A-67:178.
[55] A-68:184.
[56] F-04:1642–67.
[57] F-15:1822.
[58] F-18:1828.

Forest Plan's livestock grazing standards. The Forest Plan requires at least 85% of the defined management area to meet standards.[59] An exceedance of standards on more than 15% of the area constitutes a violation.[60] The Forest Service's monitoring data does not show that Plaintiffs exceeded standards on more than 15% of the relevant areas,[61] so no violation occurred.

The 2009 Forest Plan's interim livestock grazing standards are the *only* standards the Forest Service can lawfully apply. Plaintiffs did not violate those standards, so they were not out of compliance. Since Plaintiffs were not out of compliance, the NONCs were improperly issued and should be set aside.

C.   The 2016 and 2017 NONCs are improper because they were not issued in accordance with procedure required by law.

The NONCs are unlawful because they did not provide Plaintiffs with adequate notice and opportunity to comply. The Forest Service cannot suspend a grazing permit without first providing written notice of the facts or conduct

---

[59] G-10:4375.

[60] The Forest Service's argument regarding management criteria confuses the standards. Ignoring the 2009 Forest Plan, the Forest Service pulls language from the 1997 Deerlodge Riparian Mitigation Measures. *See* Doc.67, at 39. Ironically, the Forest Service has never argued that the 1997 Deerlodge Riparian Mitigation Measures apply to Dry Cottonwood Allotment.

[61] *See* E-19:1009–18, E-33:1083–87. The Forest Service's monitoring data is of questionable value because the Forest Service did not follow the proper technique to collect it. *See* F-11:1791–96. Nonetheless, the data is more reliable than the general observations the Forest Service cites in its brief, which are not based on *any* scientific data. *See, e.g.*, Doc.67, at 40.

warranting the suspension and an opportunity to achieve compliance. 5 U.S.C. § 558(c); *Anchustegui v. Dep't of Agric.*, 257 F.3d 1124, 1129 (9th Cir. 2001).

The Forest Service's Grazing Permit Administration Handbook sets out the procedure the Forest Service must follow to comply with Section 558.[62] Even if the Handbook does not have "the independent force and effect of law . . . it would be arbitrary and capricious for the Forest Service to ignore it" after it has been incorporated through NEPA analysis. *Ecology Ctr., Inc. v. Austin*, 430 F.3d 1057, 1069 (9th Cir. 2005), *overruled on other grounds by Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc). The 2009 Forest Plan's environmental impact statement incorporates the Grazing Permit Administration Handbook.[63] The Forest Service's failure to comply with the Handbook was, therefore, arbitrary and capricious.

The 2016 and 2017 NONCs did not satisfy Section 558 or comply with the Handbook, so they should be set aside. *See* 5 U.S.C. § 706(2)(A), (D). In issuing the 2016 and 2017 NONCs, the Forest Service failed to (1) attempt informal resolution, (2) specifically describe the alleged violations, (3) explain the action

---

[62] *See* J-06:5869–76.

[63] G-09:3443 (("Section 1 of the Beaverhead–Deerlodge Supplement No. 2209.13-98-1 to the Grazing [P]ermit Administration Handbook Title 2209.13 guides the action that is to be taken when livestock grazing is out of compliance."); G-09:3445 (noting that direction is provided in Forest Service Handbook 2209.13); G-09:3473 (same).

required to demonstrate compliance, or (4) identify the date by which corrective action should have been completed. The Forest has not refuted these deficiencies.

The administrative record demonstrates the Forest Service's failure to comply with procedure required by law. Before an NONC can be issued, the Forest Service must make *documented* attempts at informal resolution.[64] The Forest Service points to no such documentation.[65] To give adequate notice, a NONC must specifically describe the alleged violation, but the Forest Service identifies no specific descriptions in the 2016 and 2017 NONCs.[66] Finally, the Forest Service has not shown that the 2016 and 2017 NONCs provided instructions to cure the alleged violations or a date for completion.[67]

In addition to the notice deficiencies, the 2017 NONC provided no opportunity to comply. The 2017 NONC informed Plaintiffs (1) they had failed to satisfy allowable use standards and (2) their permits would be suspended as a

---

[64] J-06:5869.

[65] The Forest Services cites generally to the 2016 and 2017 Allotment Inspection reports. *See* Doc.67, at 45 (citing E-18 and E-34). Neither report was provided to Plaintiffs before the suspension, nor do the reports document attempts at informal resolution.

[66] *See* Doc.67, at 45 (claiming generally that the NONCs used the required specificity). The 2016 NONC claimed Plaintiffs failed to maintain structural improvements but did not identify a single improvement as out of repair. A-62:165. The three springs listed in the NONC were scheduled for reconstruction in 2017, not 2016. F-04:1711.

[67] *Compare* J-06:5863 (sample NONC stating fence was out of compliance and requiring it to be maintained to specific standards by May 30, 2002) *with* A-62:165 (stating generally that "more maintenance . . . needs to occur").

result.[68] The 2017 NONC was, therefore, identical to the show cause letter that the Ninth Circuit found invalid in *Anchustegui*, 257 F.3d at 1129, and should have been set aside accordingly.[69] Rather than setting aside the 2017 NONC, Deciding Officer Glossa determined that no notice or opportunity to comply were necessary and *reissued* the NONC.[70] With no basis on which to sustain the agency's decision, the Court should strike the procedurally and substantively deficient NONCs from Plaintiffs' grazing records. *See Cal. Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143, 1150 (9th Cir. 2009) (explaining that a court may "uphold an agency decision only on the basis of the reasoning articulated therein").

## III.    Plaintiffs are entitled to attorney's fees and expenses under EAJA.

The Forest Service wrongly denied Plaintiffs' request for attorney's fees and expenses for their successful administrative appeal. Awards under EAJA are mandatory, "the agency does not have discretion to deny attorney fees . . . unless an exception applies or unless a party fails to qualify." *Grason Elec. Co. v. Nat'l Labor Relations Bd.*, 951 F.2d 1100, 1101 (9th Cir. 1991). Plaintiffs qualify for an

---

[68] *See* A-67, at 181–82 (informing Plaintiffs their grazing permits would be suspended by 20% for one grazing season).

[69] To evade review, the Forest Service ignores the 2017 NONC and cites instead to the 2016 NONC and reissued 2017 NONC. *See* Doc.67, at 42.

[70] F-15:1821–22. Deciding Officer Glossa treated the issue as one involving repeated incidents of noncompliance, F-15:1821, but this case does not involve repeated incidents of noncompliance. *See* Doc.63, at 22, n.56.

award under EAJA and are not subject to any exceptions.[71] Plaintiffs prevailed in an adversary adjudication in which the Forest Service's position was not substantially justified. The Forest Service did not oppose Plaintiffs' application for attorney's fees in the administrative proceedings. Accordingly, Plaintiffs are entitled to attorney's fees and costs as a matter of law. This request pertains to Plaintiffs' successful appeal in the administrative proceedings and does not rely on the outcome in these District Court proceedings.

A.    The Forest Service waived its arguments by failing to make them in the administrative proceedings.

The Forest Service waived all arguments opposing an award of attorney's fees and expenses by failing to raise them in the administrative proceedings. Awards under EAJA are mandatory. *See* 5 U.S.C. § 504(a)(1) ("An agency . . . *shall* award . . . ."). After an application for attorney's fees has been filed, the agency against whom fees are sought must file a petition opposing the application or an award is made automatically. *See* H.R. Rep. No. 96–1418, at 18 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4953, 4997 ("[I]f the government does not oppose an application for fees, the award should be granted."). Plaintiffs applied for attorney's fees and costs in May of 2018.[72] The Forest Service did not oppose

---

[71] F-20:1831.
[72] F-20:1830.

Plaintiffs' application at that time, so its arguments are waived and Plaintiffs should be awarded attorney's fees and expenses as a matter of law.

B.    The Forest Service's arguments opposing an award of attorney's fees and expenses are without merit.

Deciding Officer Glossa denied Plaintiffs' application for attorney's fees based on a flawed interpretation of EAJA. An agency's interpretation of EAJA is reviewed de novo,[73] *Merrell v. Block*, 809 F.2d 639, 640 (9th Cir. 1987), so this Court's review is de novo. The Forest Service argues that EAJA does not apply because (1) Forest Service regulations do not allow fee-shifting; (2) the administrative proceedings did not qualify as adversary adjudications; and (3) the Forest Service's decision was substantially justified. Even if the Forest Service had preserved these arguments, they would still lack merit.

## 1.    Forest Service Regulations do not Supersede EAJA.

EAJA applies to adjudications for which attorney's fees are not already available. The Forest Service's argument that its regulations prohibit attorney's fees is inapposite. Contrary to the Forest Service's contentions, it is *because* Forest Service regulations do not already allow attorney's fees that EAJA applies. *See* H.R. Rep. No. 96–1418, at 18, 1980 U.S.C.C.A.N. at 4997 (explaining that EAJA

---

[73] The Forest Service invokes an abuse of discretion standard of review, *see* Doc.67, at 56, but abuse of discretion applies only if the agency denied attorney fees and expenses based on a factual determination. No factual determination was made in this case.

was "intended to apply only to cases . . . where fee awards against the government are not already authorized").

### 2. Appeals of grazing permit suspensions are adversary adjudications.

An adversary adjudication is an adjudication under 5 U.S.C. § 554 "in which the position of the United States is represented by counsel or otherwise." 5 U.S.C. § 504(b)(1)(C). The Forest Service argues its administrative proceedings were not adversary adjudications because there was no formal hearing (which it equates with "adjudication")[74] and no in-person argument (which it claims is necessary for a proceeding to be adversarial).[75] The Forest Service is mistaken. "Adjudication" is not synonymous with hearing and "adversarial" does not mean in-person argument.

### i. *Proceedings on a license suspension are adjudications.*

An adjudication is the "agency process for the formulation of an order." 5 U.S.C. § 551(7). An order is "the whole or a part of a final disposition . . . of an agency in a matter other than a rule making but including licensing." § 551(6). Licensing includes the agency process for suspending a license. § 551(9). An agency permit, including a grazing permit, is a license. § 551(8); *Anchustegui*, 257 F.3d at 1129. Consequently, the procedure provided for a grazing permit

---

[74] If "adjudication" meant "formal hearing," 5 U.S.C. § 554 would state that its terms applied to "every [formal hearing] required by statute to be determined on the record after opportunity for an agency hearing." The interpretation renders the statute nonsensical.

[75] Doc.67, at 49–52.

suspension is an adjudication, regardless of whether a hearing is conducted. *See* H.R. Rep. No. 96–1418, at 15 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4953, 4994 ("A party who prevails in [a proceeding involving a license suspension] is entitled to an award of attorney fees under [EAJA]"); *W. Watersheds Project v. Interior Bd. of Land Appeals*, 624 F.3d 983, 988 (9th Cir. 2010) (explaining that adjudications on the *suspension* of a grazing permit are covered by EAJA whereas proceedings to renew or grant a permit are not).

Adjudications required by due process qualify for fees under EAJA. The Forest Service argues that its appeal procedures are not adjudications because they are not proceedings "required by statute to be determined on the record"[76] before a quasi-judicial body.[77] The Forest Service errs. First, neither EAJA nor its interpreting case law require a "quasi-judicial body" or imply that the Forest Service's appeal process would not satisfy such a requirement. Second, Supreme Court and Ninth Circuit precedent state that neither the language "on the record" nor "required by statute" is necessary for an adjudication to fall under EAJA. *See Wong Yang Sung v. McGrath*, 339 U.S. 33, 48–51 (1950) (concluding that Section 554 applies to all hearings required by law, regardless of whether the requirement is provided by statute); *Collord v. U.S. Dep't of Interior*, 154 F.3d 933, 936 (9th Cir. 1998) (finding that proceedings required by due process come

---

[76] The Forest Service does maintain an appeal record. *See* 36 C.F.R. § 214.17.
[77] Doc.67, at 52.

under EAJA); *Marathon Oil Co. v. Envtl. Prot. Agency*, 564 F.2d 1253, 1264 (9th Cir. 1977) (explaining that what matters is whether the proceedings are adjudicatory and deserving of special protections, not whether the statute used the "particular talismanic language" of "on the record").

Once a permittee has been granted a license to graze, the Forest Service cannot suspend the license without due process. *See* U.S. Const. amend. V (stating that no person shall "be deprived of life, liberty, or property, without due process of law"); *Bell v. Burson*, 402 U.S. 535, 539 (1971) ("Once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses . . . adjudicates important interests of the licensees. In such cases, the licenses are not to be taken without . . . procedural due process . . . ."); *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1082 (9th Cir. 2010) (explaining that a permittee's "livelihood depends, at least in part, upon the right to graze his livestock on national forest lands").

The Forest Service does not deny that Plaintiffs are entitled to due process, nor does it dispute that EAJA applies to due process proceedings. The Forest Service instead argues EAJA should not apply because the Forest Service did not make an in-person argument. In-person argument is not, however, necessary.

*ii. Plaintiffs' administrative appeal was adversarial.*

An adjudication becomes adversarial when the United States takes and represents a position, whether in writing or by oral presentation. The Forest Service cites a case from the District of New Jersey to argue that an adjudication is not adversarial unless a person "physically appear[s] to advocate on [the United States'] behalf." Doc. 67, at 50 (citing *Handron v. Sebelius*, 669 F. Supp. 2d 490, 494 (D.N.J. 2009)). The case is an outlier and its holding was expressly rejected on appeal:

> [W]e disagree with the District Court's conclusion that a human presence at the agency hearing is necessary for the government's position to be represented therein. We believe a writing can represent the government's position and therefore bring a proceeding under the ambit of the EAJA.

*Handron v. Sec'y Dep't Health & Human Servs.*, 667 F.3d 144, 152 (3d Cir. 2012). The Forest Service's argument is, therefore, without merit.

The Forest Service took a decisive position in this case by suspending Plaintiffs' grazing permits and defending that suspension in the adjudication. *See* 5 U.S.C. § 504(b)(1)(E) (defining "position of the agency" as the agency action "upon which the adversary adjudication is based" and "the position taken by the agency in the adversary adjudication."). The Responsible Official (District Ranger Rasor) filed a written statement on behalf of the United States.[78] *See* 36 C.F.R.

---

[78] *See* F-09.

§ 214.12. This was not, as the Forest Service claims, a "mere exchange of documents."[79] In his responsive statement, the Responsible Official advocated for the suspension and opposed Plaintiffs' appeal.[80] The Forest Service cannot, in good faith, argue that it did not take a position in the administrative adjudication or that the position was not represented.

C.    Denying Plaintiffs attorney's fees and expenses under EAJA would lead to an inconsistent application of EAJA in grazing permit appeals.

Forest Service permittees are entitled to the same rights and protections as permittees on other federal lands. A permittee who successfully appeals the suspension of a Bureau of Land Management grazing permit is entitled to attorney's fees under EAJA. *See W. Watersheds Project*, 624 F.3d at 988. The Forest Service does not dispute this fact. Nonetheless, the Forest Service argues that a permittee following the parallel procedure appealing suspension of a Forest Service permit should be denied fees under EAJA. The Forest Service cites no law to support its argument.

Congress enacted EAJA to prevent the "high costs of litigation [from] deter[ring] small entities from vindicating their rights when faced with adverse action by a federal agency." *Grason Elec. Co.*, 951 F.2d at 1101; *see also* H.R. Rpt. No. 96-1418, at 5–6, 1980 U.S.C.C.A.N. at 4984. The Act applies to all

---

[79] Doc.67, at 54.
[80] F-09:1758–73.

federal agencies; the Forest Service is not exempt. Plaintiffs are entitled to attorney's fees and expenses under EAJA for their successful administrative appeal.

D. The Forest Service's position in the adversary adjudication was not substantially justified.

The Forest Service provided no justification for its position in the administrative proceedings, rendering its argument on appeal untimely. Even if the Court considers the untimely argument, the Forest Service has not "prove[n] the reasonableness of its action."[81] H.R. Rep. No. 96-1418, at 11, 1980 U.S.C.C.A.N. at 4989.

To avoid an award of attorney's fees and expenses, the Forest Service must show its position (which includes the decision to suspend Plaintiffs' grazing permits and its arguments supporting the suspension during the adversary adjudication[82]) was substantially justified.[83] 5 U.S.C. § 504(a)(1). The Forest Service has not met that burden. Between 2015 and 2017, the Forest Service

---

[81] Plaintiffs are required to make only "a simple allegation that the United States acted without substantial justification." H.R. Rep. No. 96-1418, at 13, 1980 U.S.C.C.A.N. at 4992. Plaintiffs did this in their Brief in Support of Motion for Summary Judgment, Doc.63, at 27–28, and, more importantly, in their Application for Attorney's Fees, F-20:1831–35.

[82] *See* 5 U.S.C. § 504(b)(1)(E).

[83] The Forest Service argues that the Deciding Officer's findings were justified. Even if this were true, her actions are not the "position of the agency" for purposes of EAJA, so they are not at issue. *See* 5 U.S.C. § 504(b)(1)(E).

changed Plaintiffs' allowable use standards three times without warning.[84] None of the standards were created in compliance with NEPA or FLPMA.[85] Plaintiffs met all standards in 2015.[86] In 2016, the Forest Service created new—more restrictive—standards <u>after</u> the grazing season ended and used the <u>new standards</u> to find Plaintiffs out of compliance in 2016.[87] In 2017, the Forest Service made the standards even more unrealistic,[88] found Plaintiffs out of compliance, and suspended part of Plaintiffs' grazing permits.[89]

The suspension letter was full of errors and inaccuracies. The Forest Service's own documentation shows that Plaintiffs met all standards in 2015 and maintained structural improvements to standard in 2017.[90] Nonetheless, District Ranger Rasor accused Plaintiffs of *violating* standards in 2015 and failing to maintain structural improvements in 2017 and used those accusations in support of his decision to suspend their permits.[91] Upon learning of the suspension, Plaintiffs immediately requested the monitoring data that would show whether they had

---

[84] A-60:160; A-62:165–66; A-65:175.

[85] F-04:1673, 1676.

[86] E-17.

[87] *Compare* A-60:160–61 (2016 AOI) *with* A-62:165–66 (2016 NONC: removing language that allowed 15% exceedance with 85% compliance and heightening standards for Perkins Gulch).

[88] A-65:174.

[89] A-67:181–82.

[90] E-17:974–75; A-67:178.

[91] *Compare* A-68:184 (suspension decision) *with* E-17 (showing Plaintiffs complied with standards in 2015) *and* A-67:178 (showing Plaintiffs adequately maintained structural improvements in 2017).

violated standards. When none was provided, they filed a Freedom of Information Act request,[92] but that was unsuccessful as well. The Forest Service provided <u>no</u> data to support the alleged violations.

Plaintiffs filed an administrative appeal, challenging the suspension letter, deficient NONCs, lack of data, and inconsistent standards.[93] The Forest Service then produced never-before-seen data and altered documents to support its position on appeal.[94] Rather than acknowledging and addressing the errors in the suspension letter, the Deciding Officer tried to quietly brush them under the rug by promising Plaintiffs a full reversal if they would withdraw their demand for a hearing.[95] After Plaintiffs agreed to forgo the expense of—what then appeared to be—an unnecessary hearing, the Deciding Officer promptly changed course, reinstated the NONCs, and modified Plaintiffs' grazing permits to include the 1995 IRMM.[96] Even though the Deciding Officer reversed the suspension, rendering Plaintiffs prevailing parties, she refused Plaintiffs' application for attorneys' fees under EAJA without review.

---

[92] F-01:1377–78.

[93] *See, e.g.*, F-04.

[94] F-11:1788–90.

[95] F-12:1809–10 (informing the parties the Deciding Officer was "prepared to . . . [r]evers[e] the suspension" and asking if Plaintiffs would "prefer to avoid the additional expense and time of the oral presentation" under the circumstances).

[96] F-15: 1821–22.

The Forest Service ignores the errors in the suspension decision, the constantly changing standards, and the complete lack of procedure at the administrative level. Rather than address its improper conduct, the Forest Service tries to distract the Court with accusations that Plaintiffs are bad actors with a history of noncompliance.[97] However, the record—and the Forest Service's own admissions—do not bear this out.[98] Plaintiffs have a *long* history of compliance on Dry Cottonwood Allotment and a long history of cooperating with the Forest Service.[99] It is the Forest Service's conduct, and not the Plaintiffs, that is at issue in this case. The Forest Service's position toward Plaintiffs in the adversary adjudication was not reasonable or justified, and Plaintiffs are entitled to recover attorney's fees and expenses for defending against the unlawful action.

## IV. The Forest Service's arguments lack merit and their requests for summary judgment should be denied.

### A. Plaintiffs have standing regardless of Broken Circle Ranch's status as a permittee.

Plaintiffs have standing for all counts in their Amended Complaint. In cases involving multiple plaintiffs, the "Court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists &*

---

[97] Doc.67, at 6.

[98] Doc.24, ¶ 70 (admitting the Forest Service had never taken adverse action against Plaintiffs before); H-03:4876 (1995 EA: noting Plaintiffs' history of compliance); E-11:893–95 (showing Plaintiffs were in compliance in 2007); E-17:974–75 (showing Plaintiffs were in compliance in 2014 and 2015).

[99] F-04:1672–73, 1681, 1688–89.

*Opticians Lenscrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009). The Forest Service cannot and does not dispute that Two Bar Ranch and R Bar N Ranch have standing. Nor does the Forest Service dispute Broken Circle Ranch's standing to request attorney's fees and costs for its role in the administrative proceedings. Because Plaintiffs collectively have standing for all counts in their Amended Complaint, the Court need not address Broken Circle Ranch's individual standing. *See id.* The Forest Service's motion for summary judgment on Broken Circle Ranch's standing can be denied.

   B.   The 2018 AOIs are not moot because they continue to impact Plaintiffs.

The 2018 AOIs remain ripe for review because the Forest Service has not withdrawn, terminated, or otherwise rendered them invalid. "The burden of demonstrating mootness is a heavy one." *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001). "[W]here the violation complained of may have caused continuing harm and where the court can still act to remedy such harm by limiting its future adverse effects, the parties clearly retain a legally cognizable interest in the outcome." *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988). In addition, "[i]ssues which are 'capable of repetition, yet evading review' present an exception to the mootness doctrine." *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997), as amended Sept. 16, 1997 (quoting *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515 (1911)). Issues

are capable of repetition, yet evading review when "the duration of the challenged action is too short to be fully litigated before it ceases; and . . . there is a reasonable expectation that the plaintiffs will be subjected to the same action again." *Id.* at 1124 (quoting *Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d 933, 939 (9th Cir. 1987)).

The Forest Service has not shown that the 2018 AOIs are moot. The 2018 AOIs imposed standards for the 2018 grazing season. The grazing season is over, but the threat of citation remains. In both 2016 and 2017, the Forest Service issued NONCs <u>after</u> the grazing season ended based on AOIs that—according to the Forest Service—were no longer in effect.[100] Until the 2018 AOIs are withdrawn, terminated, or held invalid, Plaintiffs are under threat of citation.[101] The "threat of continued citation" under unlawful standards is an ongoing injury, *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001), so the 2018 AOIs are not moot.

Even if the 2018 AOIs had become moot, they would fall within the exception for issues capable of repetition, but evading review. *See Or. Natural Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889, 911–12 (D. Or. 2012) (finding that AOIs fit the mootness exception because they were effective for only three to four months and subsequent AOIs were unlikely to be different). The Forest Service has

---

[100] *See* A-62:164 (November 15, 2016); A-67:178 (November 30, 2017).
[101] *See* Doc.23, Exhibit A, ¶ 25; Doc.23, Exhibit B, ¶¶ 16–19.

not indicated that it will revise Plaintiffs' 2019 AOIs to comply with the 2009 Forest Plan. To the contrary, the Forest Service maintains the Forest Plan's standards do not apply. Without a court order, the Forest Service will continue to apply unlawful standards to Dry Cottonwood Allotment through Plaintiffs' subsequent AOIs, so the issue remains ripe.

Finally, none of Plaintiffs' claims are based solely on the 2018 AOIs. All of Plaintiffs claims stem from the erroneous findings and conclusions in the Forest Service's April 18, 2018 final administrative decision. The Forest Service does not argue that the April 18, 2018 final administrative decision is moot or otherwise not susceptible to review by this Court, so Plaintiffs have standing regardless of whether the 2018 AOIs remain ripe.

C.   Plaintiffs have prudential standing for their NEPA claims.

Plaintiffs have environmental interests that satisfy NEPA's prudential standing requirements. Although NEPA does not protect persons with *only* economic injuries, a plaintiff with "an environmental interest or economic injuries that are 'causally related to an act within NEPA's embrace'" has standing under NEPA even if his or her interests are "primarily economic." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005) (quoting *Port of Astoria v. Hodel*, 595 F.2d 467, 476 (9th Cir. 1979)).

Plaintiffs are harmed by decisions—like the Deciding Officer's final administrative decision—that negatively impact resources on Dry Cottonwood Allotment. In its own NEPA analysis, the Forest Service concluded that the 1995 IRMM (which the Deciding Officer applied) were not as protective of resources as the 2009 Forest Plan standards.[102] The Forest Service's decision to apply the 1995 IRMM in lieu of the Forest Plan's stronger standards harms the Allotment and Plaintiffs, who rely on the Allotment for personal and business use.

The 1995 IRMM impose a short-sighted, reactive management approach that allows a few isolated areas where standards are exceeded to drive management decisions across the entire Allotment. Rather than supporting Plaintiffs' efforts to improve rangeland condition, the Forest Service obstructs proactive management and uses isolated exceedances as the basis for large-scale reductions in livestock numbers.[103] This punitive approach to management negatively impacts the Allotment's long-term trend and health,[104] impedes cooperation between the Forest Service and permittees,[105] and contradicts Forest Service policy. *See* G-08:2842 ("Options for mitigation include changes in the grazing season, pasture rotation,

---

[102] G-09:3009–10 (showing that 2009 Forest Plan's interim livestock  grazing standards provide better protection for riparian areas than the 1995 IRMM).

[103] *See* Doc.23-1, Exhibit A, at ¶¶ 10, 12–16; Exhibit B, at ¶¶ 5, 22.

[104] Doc.23-1, Exhibit A ¶¶ 12–15; Exhibit B ¶¶ 9–11.

[105] 36 C.F.R. § 222.7 (requiring Forest Service to cooperate with "individuals who have [an] interest in improvement of range management").

and fencing; *reduction in numbers is generally seen as a last resort . . . .*" (emphasis added)).

Plaintiffs have a long-standing, intimate relationship with the land where they live and work. Evan Johnston's family has been a permittee on Dry Cottonwood Allotment for more than a century.[106] The Allotment is as much a part of his life as the ranch where he was raised.[107] Plaintiffs have an interest in the health of rangelands on the Allotment for both personal and business reasons.[108] From a business perspective, healthy and productive rangelands mean improved forage quality and quantity for Plaintiffs' livestock.[109] On a personal level, Plaintiffs enjoy the Allotment for its aesthetic value, its natural resources, and its opportunities for hunting and recreation.[110] Plaintiffs value conservation and take a personal interest in seeing those values reflected on the Allotment.[111] In addition, mismanagement on the Allotment bleeds onto Plaintiffs' private lands through the spread of noxious weeds, reduced water quality and quantity, and degraded viewsheds.[112] Plaintiffs are negatively impacted when the Allotment suffers

---

[106] Doc.23-1, Exhibit A, at ¶ 6.
[107] *Id.* ¶ 7.
[108] Doc.23-1, Exhibit A, at ¶¶ 7–11; Doc.23-1, Exhibit B, at ¶ 8.
[109] Doc.23-1, Exhibit B, at ¶¶ 7–9.
[110] Doc.23-1, Exhibit A, at ¶¶ 7–11.
[111] *Id.*; Doc.23-1, Exhibit B at ¶¶ 5–8.
[112] Doc.23-1, Exhibit B, at ¶ 6–9.

environmental damage, so Plaintiffs have prudential standing. The Forest Service's request for summary judgment on all NEPA claims should be denied.

<u>**CONCLUSION**</u>

Plaintiffs are entitled to judgment as a matter of law on all Counts in their Amended Complaint. The 2009 Forest Plan's interim livestock grazing standards apply to Dry Cottonwood Allotment and use of any other standards, particularly the *prior* forest plan's standards, is unlawful. The 2016 and 2017 NONCs were issued with unlawful standards and without the proper procedure. The Forest Service has not shown that Plaintiffs were out of compliance under correct standards, so the NONCs should be set aside. Plaintiffs' application for attorney's fees and costs under EAJA was proper and unopposed, so the award should be made as a matter of law. The Forest Service's arguments and defenses are without merit and cannot affect the outcome in this case. Accordingly, the Court should deny the Forest Service's Cross Motion for Summary Judgment and grant summary judgment to Plaintiffs on all Counts in their Amended Complaint.

RESPECTFULLY submitted this 27th day of February, 2019.

/s/ Calli J. Michaels
John E. Bloomquist
Calli J. Michaels
BLOOMQUIST LAW FIRM, P.C.
*Attorneys for Plaintiffs*
*Two Bar Ranch, Broken Circle*
*Ranch, and R Bar N*

# CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(d)(2)(E), I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 9,681, excluding caption, certificate of compliance, table of contents, and table of authorities.

/s/ Calli J. Michaels
John E. Bloomquist
Calli J. Michaels
BLOOMQUIST LAW FIRM, P.C.
*Attorneys for Plaintiffs*
*Two Bar Ranch, Broken Circle*
*Ranch, and R Bar N*