# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BUTTE DIVISION

| | |
|---|---|
| 2-BAR RANCH LIMITED PARTNERSHIP, a Montana limited partnership; BROKEN CIRCLE RANCH COMPANY, INC., a Montana profit corporation; R BAR N RANCH, LLC, a Montana limited liability corporation, | No. CV 18-33-BU-SEH |
| Plaintiffs, | |
| vs. | **MEMORANDUM AND ORDER** |
| UNITED STATES FOREST SERVICE, an Agency of the United States Department of Agriculture; SONNY PERDUE, in his official capacity as Secretary of the United States Department of Agriculture; VICTORIA CHRISTIANSEN, in her official capacity as Interim Chief of the Forest Service; LEANNE MARTEN, in her official capacity as Regional Forester for the Northern Region; MELANY GLOSSA, in her official capacity as Forest Supervisor for the Beaverhead-Deerlodge National Forest, State of Montana; CAMERON RASOR, in his official capacity as District Ranger for the Pintler Ranger District in the Beaverhead-Deerlodge National Forest, | |
| Defendants. | |

**Introduction**

This matter is before the Court on the parties'[1] cross-motions for summary judgment.[2] Plaintiffs 2-Bar Ranch Limited Partnership ("Two Bar Ranch"), Broken Circle Ranch Company, Inc. ("Broken Circle Ranch"), and R Bar N Ranch, LLC ("R Bar N Ranch") (collectively "Plaintiffs") seek judicial review under the Administrative Procedures Act ("APA") of a series of United States Forest Service ("Forest Service") decisions concerning Plaintiffs' livestock grazing operations on a grazing allotment in the Beaverhead-Deerlodge National Forest.[3] Both motions are ripe for merit disposition.

**Background**

**I.     Management of Livestock Grazing Within the National Forest System**

The Forest Service administers the National Forest System's ("Forest System") range resources under the Federal Land Policy and Management Act of

---

[1] The Federal Defendants are the United States Forest Service; Sonny Perdue, in his official capacity as Secretary of the United States Department of Agriculture; Victoria Christiansen, in her official capacity as Interim Chief of the Forest Service; Leanne Marten, in her official capacity as Regional Forester for the Northern Region; Melany Glossa, in her official capacity as Forest Supervisor for the Beaverhead-Deerlodge National Forest, State of Montana; and Cameron Rasor, in his official capacity as District Ranger for the Pintler Ranger District in the Beaverhead-Deerlodge National Forest. Doc. 16 at 1.

[2] Docs. 62 and 66.

[3] *See* Doc. 16 at 43–56.

1976 ("FLPMA")[4] and the National Forest Management Act ("NFMA")[5] through the development of land and resource management plans ("forest plans") for each national forest unit.[6] FLPMA authorizes livestock grazing on specified allotments[7] within the Forest System.[8]

Individual livestock grazing operations are managed by site-specific: (1) grazing permits; (2) allotment management plans ("AMPs"); and (3) annual operating instructions ("AOIs").[9] A grazing permit (a) authorizes a permittee to graze cattle within a national forest,[10] (b) identifies the allotment, and (c) specifies the number, kind, and class of livestock permitted and identifies the period of use.[11] An AMP prescribes the manner in which grazing operations may be

---

[4] 43 U.S.C. §§ 1701–87 (2018).

[5] 16 U.S.C. §§ 1600–14 (2018).

[6] *See* 16 U.S.C. § 1604(a) (2018); 36 C.F.R. § 222.1(a) (2019); *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1076 (9th Cir. 2010) (citation omitted).

[7] "An allotment is a designated area of land available for livestock grazing." 36 C.F.R. § 222.1(b)(1) (2019).

[8] *See Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 980 (9th Cir. 2006) ("*ONDA*").

[9] *See ONDA*, 465 F.3d at 979 (citations omitted).

[10] *See* 36 C.F.R. § 222.1(b)(5) (2019).

[11] *ONDA*, 465 F.3d at 980 (citing 36 C.F.R. §§ 222.1–222.4; 43 U.S.C. § 1752).

conducted on a specific allotment through long-term goals and objectives.[12] An

AOI issued at the beginning of each grazing season seeks to implement long-term

grazing directives through annual instructions for the permittee.[13] The grazing

permit incorporates an allotment's AMP and the AOI for each grazing season.[14]

All site-specific actions—grazing permits, AMPs, and AOIs—must be

consistent with the applicable forest plan.[15] If a new forest plan is created or an

existing plan is revised, pre-existing site-specific actions must be revised to

comply with the new or revised plan.[16]

## II.   Livestock Grazing on the Dry Cottonwood Allotment

The Dry Cottonwood Allotment is located in the Beaverhead-Deerlodge

National Forest west of the Continental Divide in Southwest Montana.[17] It was

administered as a part of the Deerlodge National Forest before being included in

the Beaverhead-Deerlodge National Forest in 1996.[18]

---

[12] *See* 43 U.S.C. § 1702(k)(1)–(3) (2018).

[13] *See ONDA*, 465 F.3d at 980.

[14] *See ONDA*, 465 F.3d at 980; *Buckingham*, 603 F.3d at 1077.

[15] *See* 16 U.S.C. § 1604(i) (2018); *Buckingham*, 603 F.3d at 1077 (citation omitted).

[16] *See* 16 U.S.C. § 1604(i).

[17] *See* Doc. 47-9 at 5.

[18] *See* Doc. 47-9 at 17.

The Forest Service promulgated a new forest plan for the Deerlodge National Forest in 1987 ("1987 Plan") to guide the management of resources and activities within the forest.[19] It established, *inter alia*, new management directives for livestock grazing in riparian areas to protect riparian resources,[20] including limitations on the grazing of riparian vegetation, commonly referred to as "allowable use levels" ("AULs").[21]

The 1987 Plan was amended in 1995 to provide greater protections for native fish populations and habitat, including new objectives and standards for riparian areas.[22] The Interim Riparian Mitigation Measures, Deerlodge National Forest, September 14, 1995 implemented revised AULs for grazing in riparian areas ("1995 AULs") that focused on four measurements of grazing utilization: stream bank disturbance, stubble height, woody utilization, and forage utilization.[23] The 1995 AULs were amended in 1997 to provide permittees flexibility in complying with the AUL limitations ("1997 AULs").[24]

---

[19] *See* Doc. 46-19 at 9.

[20] *See* Doc. 46-19 at 13, 40.

[21] *See* Doc. 46-19 at 40.

[22] *See* Docs. 47-1 at 2, 7 and 47-3 at 6.

[23] *See* Doc. 47-9 at 39, 41.

[24] *See* Doc. 48-1 at 3–4.

An Environmental Assessment ("EA") of livestock grazing on the Dry Cottonwood Allotment was conducted in November 1995.[25] A Decision Notice and Finding of No Significant Impact was issued, which permitted continued livestock grazing on the allotment on the condition that permittees comply with the 1995 AULs.[26]

The Deerlodge and Beaverhead forests were combined in 1996 to create the Beaverhead-Deerlodge National Forest.[27] Management of each forest was continued under its respective forest plan—the 1986 Beaverhead Forest Plan and the 1987 Deerlodge Forest Plan[28]—until 2009 when a new forest plan for the consolidated forest was issued ("2009 Forest Plan").[29]

The 2009 Forest Plan established new "desired conditions, goals, objectives and standards" for the Beaverhead-Deerlodge National Forest.[30] New management directives for livestock grazing, including Interim Livestock Grazing Standards

---

[25] *See* Doc. 47-9 at 4.

[26] *See* Doc. 47-29 at 1.

[27] *See* Doc. 47-3 at 6.

[28] *See* Doc. 47-3 at 6.

[29] *See* Doc. 47-6 at 1, 9.

[30] *See* Doc. 47-6 at 19.

("2009 Interim Standards")[31] that prescribed new AULs for grazing in riparian areas, were implemented.[32] The 2009 Interim Standards were limited to allotments "lacking riparian management objectives and guides designed specifically for that allotment."[33]

## III.  Plaintiffs' Livestock Grazing Operations on the Dry Cottonwood Allotment

The first of Plaintiffs' ten-year term grazing permits for the Dry Cottonwood Allotment was issued to Two Bar Ranch in 1996.[34] That permit incorporated and attached the 1995 AULs.[35] R Bar N Ranch and Broken Circle Ranch first obtained grazing permits for the Dry Cottonwood Allotment in 2004 and 2006, respectively.[36]

Renewed permits were issued to Plaintiffs between 2006 and 2016.[37] All

---

[31] *See* Doc. 47-6 at 33–35.

[32] *See* Doc. 47-6 at 34.

[33] Doc. 47-6 at 33.

[34] *See* Doc. 32-5 at 1.

[35] *See* Doc. 32-5 at 6, 8–10.

[36] *See* Docs. 35-5 at 1 and 38-9 at 1.

[37] *See* Docs. 33-1, 34-8, 36-9, and 39-11.

permits issued after 1996 incorporated[38] and attached[39] the 1997 AULs, and included reference to, but did not attach, an "Allotment Management Plan for the Dry Cottonwood Allotment, approved January 23, 1996."[40]

The Dry Cottonwood Allotment was inspected for compliance with the terms and conditions of the grazing permits during the 2015, 2016, and 2017 grazing seasons.[41] In November 2016, Plaintiffs received a Notice of Noncompliance from the Forest Service detailing violations of several management objectives and standards, including the 1997 AULs.[42] A second Notice of Noncompliance was issued in November 2017, which described continued violations of the 1997 AULs.[43] After the second Notice of Noncompliance was issued, the District Ranger suspended twenty percent of Plaintiffs' permitted grazing privileges for the 2018 and 2019 grazing seasons.[44]

---

[38] *See* Docs. 33-1 at 7, 34-8 at 5, 35-5 at 7, 36-9 at 6, 38-9 at 8, and 39-11 at 5.

[39] *See* Docs. 33-1 at 8–10, 34-8, 35-5 at 8–10, 36-9 at 7–10, 38-9 at 9–11, and 39-11 at 6–9.

[40] Doc. 33-1 at 7; *see* Docs. 34-8 at 5, 35-5 at 7, 36-9 at 6, 38-9 at 8, and 39-11 at 5.

[41] *See* Docs. 42-19 at 1–30, 42-21 at 1–2, 42-22 at 1–33, 42-23 at 1–11, and 43-1 at 1–2.

[42] *See* Doc. 34-12 at 2–3.

[43] *See* Doc. 34-17 at 1–2.

[44] *See* Doc. 34-18 at 1–2.

## IV. Procedural History

Plaintiffs appealed the twenty-percent suspension to the Forest Supervisor on January 29, 2018, arguing in part that the 1997 AULs no longer applied to the Dry Cottonwood Allotment, and had been replaced by the 2009 Interim Standards upon issuance of the 2009 Forest Plan.[45] A "Responsive Statement"[46] in support of the suspension was filed with the Forest Supervisor by the District Ranger.[47]

The Forest Supervisor issued a "final administrative decision" ("Final Administrative Decision") on April 18, 2018, which reversed the twenty-percent suspension and reinstated Plaintiffs' full grazing privileges.[48] The Forest Supervisor disagreed, however, with Plaintiffs' assertion that the 2009 Interim Standards applied to the Dry Cottonwood Allotment, and found instead that the 1995 AULs applied to the allotment. The Forest Supervisor reasoned that the Forest Service had selected the 1995 AULs as "site-specific" AULs for the Dry Cottonwood Allotment in the Decision Notice from 1996 and in an undated AMP (at times referred to in the administrative record as the "1996 AMP"), and

---

[45] See Docs. 45-3 at 29–37, 45-4 at 29–37, and 45-5 at 29–37.

[46] 36 C.F.R. § 214.12(a) (2019).

[47] See Doc. 46-4 at 1–16.

[48] See Doc. 46-10 at 4.

therefore the 2009 Interim Standards did not apply.[49]

Notwithstanding that the Forest Service had incorporated the 1997 AULs into the terms and conditions of Plaintiffs' permits and had used them as a basis for the 2016 and 2017 Notices of Noncompliance, the Forest Supervisor determined that the 1997 AULs were an "unnecessary term" in the grazing permits.[50] Accordingly, the April 18, 2018, Final Administrative Decision directed the Forest Service to: (1) modify Plaintiffs' grazing permits to add the 1995 AULs, remove the 1997 AULs, and add the undated AMP; and (2) replace the 2017 Notice of Noncompliance with a revised Notice of Noncompliance using the 1995 AULs.[51]

On May 14, 2018, the Forest Service issued a revised 2017 Notice of Noncompliance to Plaintiffs.[52] Draft permit modifications that replaced the 1997 AULs with the 1995 AULs and added the undated AMP were proposed on May 24, 2018.[53] An AOI for the 2018 grazing season that instructed Plaintiffs to

---

[49] Doc. 46-10 at 2.

[50] Doc. 46-10 at 2.

[51] *See* Doc. 46-10 at 4.

[52] *See* Docs. 34-24 at 1–7, 37-14 at 1–7, and 40–10 at 1–7.

[53] *See* Docs. 34-25 at 3, 37-15 at 3, and 40-11 at 3.

comply with the 1995 AULs was issued in June 2018.[54]

On May 31, 2018, Plaintiffs filed suit in this Court, claiming that the Forest Service's management of grazing operations on the Dry Cottonwood Allotment violated the APA, NFMA, FLPMA, and the National Environmental Policy Act ("NEPA").[55] An Amended Complaint for Declaratory and Injunctive Relief was filed on July 31, 2018, adding a claim that the Forest Service violated the APA and the Equal Access to Justice Act ("EAJA") in denying an award of attorney's fees incurred during the administrative appeal process.[56]

Plaintiffs moved for a preliminary injunction to enjoin the Forest Service from enforcing the 1995 AULs on the Dry Cottonwood Allotment.[57] The motion was denied.[58]

Cross-motions for summary judgment[59] were filed and briefed.[60] A hearing on the motions was held on March 25, 2019.

---

[54] *See* Docs. 34-27 at 2–3, 37-17 at 2–3, and 40-12 at 2–3.

[55] *See* Doc. 1 at 39–49.

[56] *See* Doc. 16 at 52–54.

[57] *See* Doc. 17 at 2–3.

[58] *See* Doc. 50 at 10.

[59] Docs. 62 and 66.

[60] Docs. 63, 67, 68, and 70.

## Standard of Review

Judicial review of agency decisions under NFMA, FLPMA, and NEPA is governed by the APA,[61] which directs the Court, upon review of the administrative record, to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[62] An action is arbitrary and capricious

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[63]

Review under the APA is narrow.[64] The reviewing court is "to engage in a substantial inquiry"[65] to determine whether the agency made a "'clear error of

---

[61] *See Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002); *Ctr. for Biological Diversity v. Veneman*, 394 F.3d 1108, 1111 (9th Cir. 2005) (citation omitted).

[62] 5 U.S.C. § 706(2)(A) (2018).

[63] *Conservation Congress v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (quoting *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010)); *see Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) ("Whether an agency has overlooked 'an important aspect of the problem,' . . . turns on what [the] relevant substantive statute makes 'important.'" (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

[64] *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 495 (9th Cir. 2014) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)).

[65] *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

judgment' that would render its action arbitrary and capricious,"[66] but must "'not substitute [its] judgment for that of the agency.'"[67]

"Agencies are entitled to deference to their interpretation of their own regulations, including Forest Plans,"[68] unless "plainly inconsistent with the regulation at issue."[69] The court must give "controlling weight"[70] to an agency's interpretation "unless an 'alternative reading is compelled by the regulation's plain language.'"[71]

## Discussion

Plaintiffs' Amended Complaint asserts that the Federal Defendants acted arbitrarily and capriciously by: (1) finding that the 1995 AULs, rather than the 2009 Interim Standards, apply to the Dry Cottonwood Allotment in violation of

---

[66] *Lands Council*, 537 F.3d at 993 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)); *see Motor Vehicle Mfrs.*, 463 U.S. at 43 ("In reviewing [an agency's] explanation, [a court] must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" (quoting *Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974))).

[67] *Native Vill. of Point Hope*, 740 F.3d at 495 (quoting *Lands Council*, 537 F.3d at 987).

[68] *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (citations omitted); *see Auer v. Robbins*, 519 U.S. 452, 461 (1997).

[69] *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1069 (9th Cir. 1998) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

[70] *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *see Shalala*, 512 U.S. at 512.

[71] *Shalala*, 512 U.S. at 512 (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

NFMA (Count 1); (2) incorporating the 1996 AMP into Plaintiffs' grazing permits in violation of NFMA, FLPMA, and NEPA (Counts 2, 3, and 4); (3) issuing the 2016 and 2017 Notices of Noncompliance in violation of statutorily mandated procedures and agency guidance (Counts 5 and 6); and (4) denying Plaintiffs' request for attorney's fees incurred during the administrative appeal process in violation of the EAJA (Count 7).[72]

Plaintiffs request, *inter alia*, that the Court: (1) reverse the Final Administrative Decision's conclusion that the 1995 AULs and 1996 AMP apply to the Dry Cottonwood Allotment; (2) instruct the Forest Service to apply the 2009 Interim Standards on remand; (3) set aside the portions of the 2018 AOI that instruct compliance with the 1995 AULs and 1996 AMP; (4) invalidate the 2016 and revised Notices of Noncompliance; and (5) award Plaintiffs attorney's fees incurred during the administrative appeal process.[73]

# I. Jurisdictional Issues

The Federal Defendants raised several of what are characterized as jurisdictional issues—lack of standing, mootness, and an absence of final agency action—as challenges to the claims asserted. Each will be addressed.

---

[72] *See* Doc. 16 at 43–54.

[73] *See* Docs. 16 at 54–56 and 63 at 21, 32.

## A.    Article III Standing

The Federal Defendants claim that Broken Circle Ranch lacks Article III standing to bring Counts 1 through 6.[74] Two Bar Ranch's and R Bar N Ranch's standing are not challenged. "As a general rule, in an injunctive case [a] court need not address standing of each plaintiff if it concludes that one plaintiff has standing."[75] Article III standing is established. The issue of standing by Broken Circle Ranch requires no further address or resolution.

## B.    Mootness

The Federal Defendants argue that all claims challenging the 2018 AOIs are moot and should be dismissed because the 2018 AOIs "lost all ongoing force and effect . . . when the 2018 grazing season ended."[76] "Generally, an action is mooted when the issues presented are no longer live and therefore the parties lack a legally cognizable interest for which the courts can grant a remedy."[77] However, "where the violation complained of may have caused continuing harm and where the court can still act to remedy such harm by limiting its future adverse effects, the parties

---

[74] *See* Doc. 67 at 20.

[75] *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) (citing *Preminger v. Peake*, 552 F.3d 757, 764 (9th Cir. 2008)).

[76] Doc. 67 at 20–21.

[77] *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 854 (9th Cir. 1999) (citing *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)).

clearly retain a legally cognizable interest in the outcome."[78]

Although the 2018 grazing season has ended, the 2018 AOIs still have "force and effect" and continue to have the potential to adversely affect Plaintiffs. For example, in 2016 and 2017, the Forest Service issued Notices of Noncompliance and a suspension of grazing privileges based on violations of the 2016 and 2017 AOIs *after* the grazing seasons had ended.[79] Claims grounded in the 2018 AOIs are not moot.

## C.   "Final Agency Action"

The Federal Defendants further assert that all claims based on the 2016 and revised 2017 Notices of Noncompliance should be dismissed because they do not constitute "final agency action" reviewable under the APA. "For agency action to be 'final'," it must: (1) "mark the 'consummation' of the agency's decisionmaking process"; and (2) "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"[80] Agency action is not final if it only affects the plaintiff "adversely on the contingency of future administrative

---

[78] *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988).

[79] *See* Docs. 34-12 at 2–3 and 34-17 at 1–2.

[80] *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

action,"[81] or is merely "interlocutory [in] nature."[82] "A preliminary, procedural, or intermediate agency action or ruling not directly reviewable" may be reviewed under the APA "on the review of the final agency action,"[83] if the plaintiff has exhausted his administrative remedies.[84] A plaintiff must challenge a final agency action "to obtain judicial review under the APA."[85]

The twenty-percent suspension of Plaintiffs' grazing privileges was grounded in the 2016 and 2017 Notices of Noncompliance.[86] Plaintiffs appealed this decision, including the Notices of Noncompliance,[87] to the Forest Supervisor,[88] who then issued the Final Administrative Decision.[89] Plaintiffs now seek judicial review of the Final Administrative Decision and the intermediate actions preceding it. The Court has subject matter jurisdiction to review both

---

[81] *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 496 (6th Cir. 2014) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)).

[82] *Bennett*, 520 U.S. at 178.

[83] 5 U.S.C. § 704 (2018).

[84] *See United States v. Backlund*, 689 F.3d 986, 998–99 (9th Cir. 2012) (citing 5 U.S.C. §§ 702, 704).

[85] *ONDA*, 465 F.3d at 982 (citing 5 U.S.C. § 704).

[86] *See* Docs. 34-18 at 1–2, 37-6 at 1–2, and 40-1 at 1–2.

[87] *See* Docs. 45-3 at 21, 25, 45-4 at 21, 25, and 45-5 at 21, 25.

[88] *See* Docs. 45-3 at 1, 45-4 at 1, and 45-5 at 1.

[89] *See* Doc. 46-10.

Notices of Noncompliance.

## II. Plaintiffs' Claims under the APA, NFMA, FLPMA, and NEPA

Agency actions challenged in this case—the Final Administrative Decision's application of the 1995 AULs and 1996 AMP to the Dry Cottonwood Allotment, the 2016 and 2017 Notices of Noncompliance, and the 2018 AOI—are all grounded in a fundamental finding of the Forest Service: that the 2009 Interim Standards did *not* replace all previously applicable AULs on the Dry Cottonwood Allotment. Whether this finding was arbitrary and capricious will determine whether the challenged actions survive review.

Plaintiffs argue that the 2009 Interim Standards "superseded" the 1995 and 1997 AULs as applicable to the Dry Cottonwood Allotment, and that all Forest Service actions applying the earlier AULs are, in this case, invalid.[90] The Federal Defendants contend, although somewhat inconsistently,[91] that the 2009 Forest Plan subsumed the 1995 AULs as applied to the Dry Cottonwood Allotment, and, as a

---

[90] Doc. 63 at 20–21.

[91] During the hearing on Plaintiffs' motion for preliminary injunction, counsel for the Federal Defendants made clear that it is their position that the 1997 AULs governed grazing on the Dry Cottonwood Allotment. *See* Doc. 49 at 46:14–48:11. However, in briefing on the cross-motions for summary judgment, the Federal Defendants argued that the 1995 AULs and the 1996 AMP survived the 2009 Forest Plan and continue to govern grazing on the Dry Cottonwood Allotment. *See* Doc. 67 at 37–47.

consequence, application of the 1995 AULs is permissible.[92]

Under NFMA, all grazing permits, AMPs, and AOIs must comply with the applicable forest plan,[93] and when a new forest plan is created, all inconsistent pre-existing site-specific actions must "be revised as soon as practicable."[94] Failure to comply with a forest plan violates NFMA.[95]

The 2009 Forest Plan governs management of the Beaverhead-Deerlodge National Forest.[96] It establishes "desired conditions, goals, objectives and

---

[92] *See* Doc. 67 at 45–47.

[93] *See* 16 U.S.C. § 1604(i) (2018) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."); 36 C.F.R. § 219.15(d) (2019) ("Every project and activity must be consistent with the applicable plan components."); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1377 (9th Cir. 1998) (citations omitted) ("Pursuant to the NFMA, the Forest Service must demonstrate that a site-specific project would be consistent with the land resource management plan of the entire forest."); *Alexander*, 303 F.3d at 1061–62 (internal citations omitted) ("The Forest Service is then required to ensure that the forest is managed in compliance with the forest plan. Specific projects, . . . must be analyzed by the Forest Service and the analysis must show that each project is consistent with the plan."); *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002) ("[A]ll management activities undertaken by the Forest Service must comply with the forest plan."); *Native Ecosystems Council*, 418 F.3d at 961 (citations omitted) ("As NFMA makes plain, '[r]esource plans, permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans.'" (quoting 16 U.S.C. § 1604(i))); *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1109 (9th Cir. 2018) (citations omitted) ("Site-specific projects and activities must be consistent with an approved forest plan."); *Friends of Southeast's Future*, 153 F.3d at 1070–71 (finding "that the Forest Service violated NFMA by failing to make [a] proposed timber sale consistent with the procedural provisions of the" applicable Forest Plan).

[94] 16 U.S.C. § 1604(i).

[95] *See Native Ecosystems Council*, 418 F.3d at 961; *see* cases cited *supra* note 98.

[96] *See* Doc. 47-6 at 1.

-19-

standards that apply forestwide."[97]

The forest-wide standards in the 2009 Forest Plan include the 2009 Interim Standards for livestock grazing,[98] which "apply to livestock grazing operations unless or until specific long-term objectives, prescriptions, or [AULs] have been designed through individual resource management plans or site-specific NEPA decisions; [e.g.], revised [AMPs] or Wilderness management plans."[99] The 2009 Forest Plan further states that the 2009 Interim Standards apply to any allotment with an AMP "lacking riparian management objectives and guides designed specifically for that allotment."[100]

The 2009 Interim Standards apply to all grazing allotments without AULs "designed specifically for" that allotment. The phrase "designed specifically for" focuses upon a pivotal issue in this case: whether previously applicable AULs for the Dry Cottonwood Allotment were replaced by the 2009 Interim Standards.

The plain meaning of the phrase "designed specifically for" is descriptive of that which was conceived or devised with a view towards or a purpose for a

---

[97] Doc. 47-6 at 19.

[98] *See* Doc. 47-6 at 33.

[99] Doc. 47-6 at 33.

[100] Doc. 47-6 at 33.

particular object or cause.[101] In the context of the 2009 Forest Plan, application of

the phrase required that the 2009 Interim Standards apply to an allotment unless

AULs were originally created for the purpose of managing grazing in riparian

areas on that particular allotment. In the Final Administrative Decision, the Forest

Supervisor interpreted the 2009 Forest Plan to require application of the 2009

Interim Standards unless AULs had been "clearly selected" for a particular

allotment by a site-specific action or NEPA decision.[102] She found that the

Decision Notice from 1996 satisfied this requirement.[103]

The Federal Defendants endeavor to support the Forest Supervisor's

interpretation by asserting that under the 2009 Forest Plan, if the Forest Service

evaluated existing AULs "on a site-specific basis" for an allotment, the 2009

Interim Standards do not apply.[104] They argue that "while the 1995 [AULs] are not

---

[101] The Oxford English Dictionary defines "design" to mean, *inter alia*, "to conceive, devise, plan (something immaterial, as a scheme, system, programme, etc.)"; "specific" to mean, *inter alia*, "[e]xactly named or indicated" or "particular"; and "for" to mean, *inter alia*, "[w]ith a view to; with the object or purpose of." *Design, Oxford English Dictionary*, http://www.oed.com/view/Entry/50841?rskey=wHDVv5&result=2&isAdvanced=false#eid (last updated March 2012); *Specific, Oxford English Dictionary*, http://www.oed.com/view/Entry/185999?rskey=JyOOUa&result=2&isAdvanced=false#eid (last updated March 2012); *For, Oxford English Dictionary*, http://www.oed.com/view/Entry/72761?rskey=ed7BJC&result=2&isAdvanced=false#eid (last updated March 2012).

[102] Doc. 46-10 at 2.

[103] *See* Doc. 46-10 at 2.

[104] Doc. 67 at 47.

site-specific in themselves, they were analyzed as specifically applied to the Dry Cottonwood [A]llotment in the 1995 EA and 1996 Decision [Notice]."[105]

The Forest Supervisor's interpretation of the 2009 Forest Plan is inconsistent with the plan's plain language and is not deserving of deference.[106] The plan provides that the 2009 Interim Standards apply to an allotment without AULs "designed specifically for" that particular allotment. The Federal Defendants, in effect, inappropriately attempt to replace the phrase "designed specifically for" with the phrase "applied specifically to."

The 1995 AULs were not "designed specifically for" the Dry Cottonwood Allotment. Rather they "were developed as an interim step to assist the [Deerlodge National] Forest in maintaining or moving toward riparian desired conditions"[107] and were referred to in the establishing document as the "Deerlodge National Forest Interim Riparian Mitigation Measures."[108] The establishing document contains no mention or reference to the Dry Cottonwood Allotment or to any other specific grazing allotment. Nothing in the administrative record supports a finding

---

[105] Doc. 67 at 45.

[106] *See Shalala*, 512 U.S. at 512 (quoting *Gardebring*, 485 U.S. at 430); *Friends of Southeast's Future*, 153 F.3d at 1069 (citation omitted).

[107] Doc. 47-9 at 39.

[108] Doc. 47-9 at 41.

that either the 1995 or the 1997 AULs were "designed specifically for" the Dry Cottonwood Allotment.

The agency actions challenged in this case—the Final Administrative Decision's application of the 1995 AULs and 1996 AMP to the Dry Cottonwood Allotment, the 2016 and 2017 Notices of Noncompliance, and the 2018 AOI—applied either the 1995 or the 1997 AULs to the Dry Cottonwood Allotment in contravention to the plain language of the 2009 Forest Plan. Those actions, in so far as they rely on inapplicable AULs, were arbitrary and capricious and in violation of NFMA.

If agency action is arbitrary and capricious and unsupported by the administrative record, generally, the proper course is to vacate the action and remand to the agency for further investigation or explanation.[109] "[R]emand[ing] a case to an agency for decision of a matter" is particularly appropriate if a statute places the matter "primarily in agency hands."[110]

---

[109] *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (citation omitted) ("If [an agency] finding is not sustainable on the administrative record made, then the [agency's] decision must be vacated and the matter remanded to him for further consideration."); *Alsea Valley All. v. Dep't of Commerce*, 358 F.3d 1181, 1185 (9th Cir. 2004) (citations omitted) ("Although not without exception, vacatur of an unlawful agency rule normally accompanies a remand."); *Ca. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011) (citation omitted) ("Similarly, where a regulation is promulgated in violation of the APA and the violation is not harmless, the remedy is to invalidate the regulation.").

[110] *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002).

The Forest Service is, as noted, entrusted with administering livestock grazing within the Forest System under NFMA and FLPMA.[111] "'[J]udicial judgment cannot be made to do service for an administrative judgment,'"[112] and a court ought not "'intrude upon the domain which Congress has exclusively entrusted to an administrative agency.'"[113] On remand, the Forest Service "can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides."[114]

It is both necessary and appropriate for the Court to remand this case to the Forest Service to determine, consistent with this Memorandum, which site-specific actions, documents, and AULs govern livestock grazing operations on the Dry Cottonwood Allotment.

## III.  Plaintiffs' EAJA Claim (Count 7)

Plaintiffs claim that the Forest Service acted arbitrarily and capriciously and

---

[111] *See ONDA*, 465 F.3d at 979; *Buckingham*, 603 F.3d at 1076.

[112] *Orlando Ventura*, 537 U.S. at 16 (quoting *Sec. and Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943)).

[113] *Orlando Ventura*, 537 U.S. at 16 (quoting *Chenery Corp.*, 318 U.S. at 88).

[114] *Orlando Ventura*, 537 U.S. at 17.

in violation of the EAJA in denying them an award of attorney's fees incurred in the administrative appeal process.[115] That act, 5 U.S.C. § 504(a)(1), provides:

> An agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency was substantially justified or that special circumstances make an award unjust.

It is undisputed that Plaintiffs prevailed in challenging the twenty-percent suspension of grazing privileges, which the Final Administrative Decision reversed.[116] Whether the administrative appeal process implicated the EAJA fee-shifting provision depends upon whether the administrative appeal process was an "adversary adjudication" and whether the Forest Service's position was "substantially justified or that special circumstances ma[d]e an award unjust."[117]

The Forest Supervisor's decision to deny Plaintiffs' request for attorney's fees was based on her finding that the administrative proceedings were "not an 'adjudication' under 5 U.S.C. [§] 554 to which EAJA applies," and that Forest Service "regulations require parties to bear their own costs and expenses including

---

[115] *See* Docs. 16 at 52–54 and 63 at 27–32.

[116] *See* Doc. 46-10 at 4.

[117] 5 U.S.C. § 504(a)(1) (2018).

attorney's fees."[118] The Forest Supervisor made no inquiry, however, into whether the agency's position in the administrative proceedings was "substantially justified or that special circumstances ma[d]e an award unjust."

If an "agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[119] Moreover, a court should generally "remand a case to an agency for decision of a matter that statutes place primarily in agency hands."[120]

The EAJA requires an agency to award attorney's fees to a prevailing party in an adversary adjudication, "unless *the adjudicative officer of the agency* finds that the position of the agency was substantially justified or that special circumstances make an award unjust."[121] The question remains in this case as to whether the administrative appeal process constituted an "adversary adjudication" under 5 U.S.C. § 504(b)(1)(C). And since the Forest Supervisor has not fully addressed whether the administrative appeal process in this case met all of the

[118] Doc. 46-16 at 1.

[119] *Fla. Power & Light*, 470 U.S. at 744.

[120] *Orlando Ventura*, 537 U.S. at 16.

[121] 5 U.S.C. § 504(a)(1) (2018) (emphasis added).

requirements necessary to implicate the EAJA, address of the attorney's-fees issue now would be both premature and inappropriate.[122]

As noted, the Forest Supervisor failed to consider whether "the position of the agency was substantially justified or that special circumstances ma[d]e an award unjust"[123] in coming to her decision. The Court will not circumvent the administrative process to answer a question that the statute directly places in the hands of the Forest Supervisor.[124] Remand to the agency for resolution of this question is necessary.

## Conclusion

For the reasons stated above,

ORDERED:

1.     Plaintiffs' Motion for Summary Judgment[125] is GRANTED in part and DENIED in part. The motion is GRANTED as to Plaintiffs' claims under the APA and NFMA that the Forest Service acted arbitrarily and capriciously in applying AULs to the Dry Cottonwood Allotment that did not comply with the 2009 Forest Plan. The motion is DENIED as to the balance of its claims.

---

[122] *See Fla. Power & Light*, 470 U.S. at 744.

[123] 5 U.S.C. § 504(a)(1) (2018).

[124] *See Orlando Ventura*, 537 U.S. at 16.

[125] Doc. 62.

2.     The Federal Defendants' Cross Motion for Summary Judgment[126] is DENIED.

3.     The following actions of the Forest Service are VACATED: (i) the Final Administrative Decision's finding that the 1995 AULs apply to the Dry Cottonwood Allotment; (ii) the portions of the 2016 and revised 2017 Notices of Noncompliance finding Plaintiffs in violation of the 1995 or 1997 AULs; (iii) the 1996 AMP as a term and condition of Plaintiffs' grazing permits; and (iv) the 2018 AOI's incorporation of the 1995 AULs.

4.     The case is REMANDED to the Forest Service to: (i) determine, consistent with this Memorandum, which site-specific actions, documents, and AULs govern livestock grazing operations on the Dry Cottonwood Allotment; and (ii) address the question, for the purpose of fully determining the applicability of the EAJA to the administrative appeal proceedings in this case, whether the Forest Service's position taken in the administrative proceedings was "substantially justified or that special circumstances make an award unjust."

DATED this **26th** day of March, 2019.

SAM E. HADDON
United States District Judge

---

[126] Doc. 66.